# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

OHIO PUBLIC EMPLOYEES
RETIREMENT SYSTEM

          Plaintiff,

v.

PETRÓLEO BRASILEIRO S.A. --
PETROBRAS, PETROBRAS GLOBAL
FINANCE, B.V., CITIGROUP GLOBAL
MARKETS INC., HSBC SECURITIES (USA)
INC., J.P. MORGAN SECURITIES LLC,
MORGAN STANLEY & CO. LLC, ALMIR
GUILHERME BARBASSA, MARIA DAS
GRAÇAS SILVER FOSTER, JOSÉ SERGIO
GABRIELLI DE AZEVEDO, JOSUÉ
CHRISTIANO GOMES DA SILVA, SILVIO
SINEDINO PINHEIRO, DANIEL LIMA DE
OLIVEIRA, JOSÉ RAIMUNDO BRANDÃO
PEREIRA, SÉRVIO TÚLIO DA ROSA
TINOCO, PAULO JOSÉ ALVES, GUSTAVO
TARDIN BARBOSA, ALEXANDRE
QUINTÃO FERNANDES, MARCOS
ANTONIO ZACARIAS, CORNELIS
FRANCISCUS JOZEF LOOMAN,
THEODORE MARSHAL HELMS,
and PRICEWATERHOUSECOOPERS
AUDITORES INDEPENDENTES,

          Defendants

Case No.: 15-cv-3887 (JSR)

**SECOND AMENDED COMPLAINT
FOR VIOLATIONS OF
FEDERAL SECURITIES LAWS**

JURY TRIAL DEMANDED

## TABLE OF CONTENTS

I.     NATURE OF THE ACTION ...................................................................................... 1
       A.     Overview ........................................................................................................1
       B.     Claims Alleged................................................................................................5
II.    JURISDICTION AND VENUE FOR PLAINTIFF'S EXCHANGE ACT CLAIMS........ 7
III.   THE EXCHANGE ACT PARTIES ............................................................................. 7
       A.     Plaintiff ...........................................................................................................7
       B.     Exchange Act Defendants................................................................................8
       C.     Relevant Non-Parties ......................................................................................9
IV.    FACTUAL BACKGROUND ..................................................................................... 11
       A.     History and Operations of Petrobras.............................................................11
              1.     Petrobras' Expansion ...........................................................................12
              2.     Open Bidding and Procurement Process...............................................14
       B.     The Company's Public Statements Regarding Ethics and Compliance .............16
       C.     Organizational Structure of Petrobras............................................................18
V.     FRAUDULENT SCHEME DURING THE RELEVANT TIME PERIOD .................... 18
       A.     Uncovering the Systemic, Institutionalized Corruption at Petrobras....................19
       B.     The "Rules of the Game": the Mechanics of Petrobras' "Institutionalized,"
              "Endemic" Scheme .............................................................................................23
       C.     Petrobras Impeded Prior Investigations into Accounting Irregularities ...............27
              1.     The TCU Investigation of the Abreu e Lima Refinery ..............................27
              2.     The Investigation by the Parliamentary Commission of Inquiry ("CPI") .29
              3.     "Operation Sandcastle"........................................................................30
       D.     Top Executives Ignore and Intimidate Whistleblowers.........................................31
              1.     Venina Velosa da Fonseca ...................................................................31
              2.     Fernando de Castro Sá .........................................................................34
              3.     Mauro Cunha ......................................................................................35
       E.     Major Capital Projects and Other Operations Are Used to Divert Funds to the
              Scheme...............................................................................................................36
              1.     The Pasadena Transaction.....................................................................36
              2.     The Abreu e Lima Refinery ...................................................................37
              3.     The Comperj Refinery ..........................................................................40
              4.     The Repar Project ................................................................................41

|       |       | 5.    | SBM Offshore .................................................................41 |
|       |       | 6.    | Transpetro Subsidiary ..................................................44 |
|       |       | 7.    | The Revap Refinery ......................................................45 |
|       |       | 8.    | The Replan Project........................................................46 |

F. The Impact on Petrobras' Financial Statements During the Relevant Time Period .........................................................................................48

VI. ADDITIONAL ALLEGATIONS RELATED TO THE SCHEME ............................... 50

VII. LOSS CAUSATION................................................................................................. 66

VIII. FALSE AND MISLEADING STATEMENTS DURING THE RELEVANT TIME PERIOD ................................................................................................................ 66

A. The Company's Misrepresentations of Adherence to its Compliance and Ethics Practices .......................................................................................66

B. Materially False and Misleading Statements Concerning Capital Projects and Other Contracts ....................................................................................71

C. Materially False and Misleading Statements Concerning the Bidding Process ....72

D. Materially False and Misleading Statements Concerning the Company's Financial Condition and Operations .........................................................73

E. Materially False and Misleading Statements Concerning the Bribery and Corruption Scandal ..................................................................................84

IX. OVERVIEW OF SCIENTER ALLEGATIONS .......................................................... 85

A. The Executive Board Reviewed and Approved All Contracts Affected by the Bribery and Corruption Scheme ...............................................................86

B. Admissions of Senior Officials Establish the Company's Scienter......................87

|       |       | 1.    | Costa ..........................................................................88 |
|       |       | 2.    | Barusco ......................................................................90 |
|       |       | 3.    | Foster..........................................................................92 |
|       |       | 4.    | Gabrielli ......................................................................96 |
|       |       | 5.    | Duque ..........................................................................97 |
|       |       | 6.    | Cerveró........................................................................98 |

C. Additional Evidence of Scienter ..............................................................99

|       |       | 1.    | The Sheer Size and Reach of the Scheme.................................99 |
|       |       | 2.    | Concerted Retaliatory Efforts against Skeptics and Whistleblowers ......100 |
|       |       | 3.    | Any Investigation of Irregularities Is Impeded.......................101 |
|       |       | 4.    | A Company Plagued by Resignations and Terminations Following the Revelation of the Scheme ....................................................102 |

X.      RELIANCE.................................................................................................. 102

        A.      Fraud-on-the-Market Doctrine...........................................................102

        B.      Actual Reliance...................................................................................103

XI.     THE STATUTORY SAFE HARBOR IS INAPPLICABLE HERE .............................. 104

XII.    OHIO PERS'S DEBT PURCHASES WERE DOMESTIC ................................... 105

XIII.   EXCHANGE ACT CAUSES OF ACTION ................................................... 112

        FIRST CLAIM FOR RELIEF ...................................................................112

        SECOND CLAIM FOR RELIEF .................................................................113

        THIRD CLAIM FOR RELIEF ...................................................................114

XIV.    ALLEGATIONS FOR CLAIMS FOR RELIEF UNDER THE SECURITIES ACT .... 115

        A.      Introduction........................................................................................115

        B.      Relevant Securities Offerings ...........................................................117

                1.      May 15, 2013 Notes Offering .................................................117

                2.      March 11, 2014 Notes Offering ..............................................121

        C.      The Securities Act Parties ..................................................................129

                1.      Plaintiff ..................................................................................129

                2.      Issuer Defendants ...................................................................129

                3.      The Officer and Director Defendants ...................................130

                4.      The Underwriter Defendants..................................................132

                5.      Auditor Defendant .................................................................132

                6.      Relevant Non-Defendant Individuals ...................................133

        D.      Jurisdiction and Venue for Plaintiff's Securities Act Claims .............134

        E.      Material Misstatements and/or Omissions in the Offering Documents...............135

                1.      2011 20-F ................................................................................136

                2.      August 10, 2012 6-K...............................................................139

                3.      2012 20-F ................................................................................140

                4.      April 30, 2013 6-K..................................................................141

                5.      February 26, 2014 6-K............................................................142

                6.      March 7, 2014 6-K..................................................................143

                7.      March 11, 2014 6-K................................................................143

                8.      Petrobras' Financial Statements Failed to Comply with Public Company Accounting Oversight Board Standards and SEC Regulations ...............144

        FOURTH CLAIM FOR RELIEF .................................................................156

FIFTH CLAIM FOR RELIEF ......................................................................................158

SIXTH CLAIM FOR RELIEF.....................................................................................160

PRAYER FOR RELIEF ................................................................................................ 162

JURY DEMAND.......................................................................................................... 162

The Ohio Public Employees Retirement System ("Ohio PERS" or "Plaintiff"), by and through its undersigned counsel, bring this action against Defendants named herein to recover damages suffered by Plaintiff as a result of its purchase and/or acquisition of certain securities issued by Petrobras during the period between May 20, 2010 and March 19, 2015, inclusive (the "Relevant Time Period"). Except as to allegations specifically pertaining to Plaintiff, which are based on personal knowledge, all allegations herein are based upon the investigation of counsel which included, among other things, a review of Petróleo Brasileiro S.A.'s ("Petrobras" or the "Company") public filings with the United States Securities and Exchange Commission ("SEC"); deposition testimony, proffers, criminal complaints and other evidence submitted by Brazilian prosecutors and other governmental authorities in connection with "Operation Car Wash" (detailed below); press releases issued by the Company; information on the Company's websites; domestic and foreign media and news reports about the Company; analyst reports; and other publicly available data, including, but not limited to, publicly available trading data relating to the price and trading volume of Petrobras American Depositary Shares ("ADSs") that trade on the New York Stock Exchange ("NYSE").

I.    **NATURE OF THE ACTION**

    A.    **Overview**

1.    Petrobras is a multinational energy corporation headquartered in Rio de Janeiro, Brazil. The Company describes itself as an integrated oil and gas company that is the largest corporation in Brazil and one of the largest companies in Latin America in terms of revenue. Outside investors own about 21% of Petrobras' common shares and approximately 25% of the Company's preferred stock. Pursuant to Brazilian law, the Brazilian government owns the majority of Petrobras' voting shares. The Brazilian government's majority voting stake gives the

President of Brazil the power to elect a majority of the Company's Board of Directors (the "Board" or "Board of Directors"), which in turn selects a group of the Company's senior executives, including the Chief Executive Officer (the "CEO"), to operate as the "Executive Board" (sometimes referred to as the "Executive Directorate").  The Executive Board is responsible for managing and overseeing Petrobras' day-to-day operations.

2.      This action arises from a massive bribery and corruption scheme at Petrobras that reaches the highest levels at the Company as well as within the Brazilian government.  In league with a cartel of engineering and construction companies, Petrobras participated in a bribery and money laundering conspiracy that lined the pockets of both high ranking senior executives of the Company, including members of the Executive Board, as well as political parties aligned with the Brazilian President.  Unbeknownst to Plaintiff, the Company was engaged in an illegal scheme whereby billions of dollars paid by the Company to third parties, ostensibly for construction and services contracts were being diverted to Petrobras' executives and to political parties associated with the Company's management.

3.      This scheme was in direct contradiction to the Ethics Code of Petrobras System (the "Ethics Code"), publicly available and incorporated by reference into the Company's filings with the SEC, that set forth the Company's commitment to (i) take no action unduly favoring the interests of high ranking executives at the expense of minority shareholders and (ii) be free from corruption and bribery practices.

4.      Pursuant to the Ethics Code, Petrobras specifically assured its investors that it undertook to pursue "a balance of power between the High Management (Board of Directors and Executive Boards) and shareholders['] interests, *including minority*, with a view to aligning the strategic objectives [of Petrobras] with the interests and rights of all interested parties."  Petrobras

also assured investors it would "conduct its business with transparency and integrity, creating credibility" with its shareholders and investors "to achieve growth and profitability with social and environmental responsibility."  In particular, the Company undertook to "refuse any corrupt and bribery practices, keeping formal procedures for control and consequences of any transgressions." The Company further undertook to "refuse support and contributions to political parties or political campaigns of candidates for elective offices."  Despite these assurances, throughout the Relevant Time Period, Petrobras was in direct violation of the Ethics Code it publicly espoused.

5.      Executives at the highest level were funneling billions of dollars from the Company's coffers to pay inflated contract costs and kickbacks to ensure that the scheme would continue to be lucrative to all involved.  In order to hide the nature of these improper payments, Petrobras improperly capitalized these as costs related to the construction, installation, and completion of its oil and gas infrastructure and recorded them as part of the value of the acquired assets on the Company's balance sheet.  Petrobras then recognized expenses for the depreciation of these assets, including the portion related to bribes, over subsequent reporting periods. Additionally, Petrobras calculated and reported the Company's periodic net income based on these incorrect expense figures.  Accordingly, unbeknownst to the investing public, including Plaintiff, Petrobras' publicly released financial statements were false and misleading throughout the Relevant Time Period.

6.      The full details of this scheme came to light as a result of a criminal investigation by the Brazilian Federal Police in an operation titled "Lava Jato Operation" or "Operation Car Wash."  In an attempt to uncover an illegal black market money laundering syndicate, the Brazilian Federal Police, through wiretaps of a suspect, Alberto Youssef ("Youssef"), learned of Petrobras' involvement in a multi-billion dollar money laundering and bribery scheme.  Youssef agreed to

cooperate with Brazilian prosecutors in exchange for a reduced sentence, and his testimony soon implicated Petrobras and certain of its top executives, leading to their arrests.

7.     Through Operation Car Wash and the prosecution of various individuals, it has been revealed that the bribery and corruption scheme at Petrobras was wide-spread and pervasive.  As Pedro Barusco ("Barusco"), a high-ranking official in the Engineering and Services ("E&S") Division of the Company (where he served for a time as engineering manager) testified, by 2003 or 2004 "the payment of bribes in Petrobras was something endemic and institutionalized."

8.     Testimony from another witness implicates the highest-ranking executives at Petrobras, including the former CEOs of Petrobras, José Sergio Gabrielli de Azevedo ("Gabrielli") and Maria das Graças Silva Foster ("Foster"), and other members of the Executive Board. According to Venina Velosa da Fonseca ("Venina"), a former senior Petrobras executive, beginning around early 2008, she uncovered unusual overbilling for small services contracts.  She specifically spoke to Paulo Roberto Costa ("Costa"), a former Chief Downstream Officer who served on the Company's Executive Board until 2012, and who is currently under indictment and cooperating with Brazilian authorities, about the issue.   According to Venina, during her discussions with Costa about the irregularities she had found, Costa pointed to Gabrielli's office, the CEO at the time and the highest ranking officer at the Company, and then to a picture of the then-president of Brazil, essentially the controlling shareholder of the Company, and asked "Do you want to take everyone down?"

9.     In April 2009, Venina uncovered further irregularities at the Abreu e Lima facility, a refinery that is front and center of the bribery and corruption scheme.  She made numerous reports about her concerns regarding these irregularities, including payments for services never rendered, overbilled contracts and violations of the Company's Ethics Code, to Foster, an executive of the

4

Company at the time and the eventual CEO of Petrobras from 2012 to 2015.  By February 2010, in the midst of the Brazilian Presidential elections, she was transferred to Singapore.  She later returned in 2012; however, continuing to uncover irregularities and reporting such irregularities to her supervisors, Venina was fired on November 17, 2014.

10.     Petrobras has not denied its involvement in the bribery and corruption scandal and has confirmed that, as a result of its participation in the massive bribery and corruption scheme, the value of its assets would need to be reduced by $14.1 billion.  At least $2.5 billion of the reduction is due to the improper capitalization of the bribery payments and $11.6 billion is due to the scandal's impact on two of Petrobras' largest refineries, Abreu e Lima and Comperj.

**B.      Claims Alleged**

11.     Plaintiff asserts claims under the U.S. federal securities laws for purchases of Petrobras securities listed on the NYSE and securities purchased in the United States. These claims arise from a series of materially false and misleading statements and omissions made by Defendants in SEC filings and other public statements issued during the Relevant Time Period.

12.     Plaintiff purchased Petrobras ADSs on the NYSE during the Relevant Time Period, and also purchased Petrobras debt securities during the Relevant Time Period, as described further below.

13.     Plaintiff asserts claims under Sections 10(b) and 18 of the Securities Exchange Act of 1934 (the "Exchange Act") in connection with its purchase of Petrobras securities during the Relevant Time Period.

14.     Plaintiff also asserts claims under Sections 11, 12(a)(2) and 15 ("Securities Act Claims") of the Securities Act of 1933 (the "Securities Act").  The Securities Act Claims arise from a series of materially false and misleading statements in offering documents in connection

with two separate offerings of the Company's debt.  Through its wholly-owned subsidiary Petrobras Global Finance B.V. ("PGF"), Petrobras sold debt to Ohio PERS.

15.     Pursuant to a registration statement on Form F-3ASR filed with the SEC on August 29, 2012 (the "2012 Registration Statement"), PGF filed a prospectus supplement on Form 424B2 (the "2013 Prospectus," and together with the 2012 Registration Statement, the "2013 Offering Documents") for the offer and sale of $11 billion in debt securities in six different series of notes (the "2013 Offering").  Ohio PERS purchased debt in the 2013 Offering, which occurred on or around May 13, 2013, from Underwriter Defendants HSBC Securities (USA) Inc. ("HSBC Securities"), J.P. Morgan Securities LLC ("J.P. Morgan"), and Morgan Stanley & Co. LLC ("Morgan Stanley").  *See* ¶¶ 400-404 *infra*.

16.     Pursuant to the 2012 Registration Statement, PGF filed a prospectus supplement of Form 424B2 (the "2014 Prospectus," and together with the 2012 Registration Statement, the "2014 Offering Documents") for the offer and sale of $8.1 billion of debt securities in six different series of notes (the "2014 Offering").  Ohio PERS purchased debt in the 2014 Offering, which occurred on or around March 10, 2014, from Underwriter Defendant Citigroup Global Markets Inc. ("Citigroup").  *See* ¶¶ 405-408 *infra*.

17.     In addition to its purchases directly in the 2013 and 2014 Offerings, Ohio PERS made additional purchases of Petrobras debt that are traceable to the 2013 and 2014 Offerings.  *See* ¶¶ 400-408 *infra*.

18.      As specifically alleged in ¶¶ 361-376 and 400-408 below, Ohio PERS's purchases of Petrobras debt are domestic transactions.[1]

---

[1]      Plaintiff is pursuing both Securities Act and Exchange Act claims with respect to the debt transactions alleged in ¶¶ 400-408; however, Plaintiff does not bring Section 11 claims for any

## II.   JURISDICTION AND VENUE FOR PLAINTIFF'S EXCHANGE ACT CLAIMS

19.     Plaintiff's claims pursuant to the Exchange Act arise under Sections 10(b), 18 and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78r, and 78t), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.  Jurisdiction is also conferred by 28 U.S.C. § 1367.

20.     Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b).  Petrobras maintains an office in this District, sponsors ADSs representing the Company's common and preferred equity that are listed on an exchange located in this District, and certain of the acts that constitute the violations of law complained of herein, including dissemination of materially false and misleading information to the investing public, occurred in and/or were issued from this District, and the Company maintains an office in this District.   In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III.   THE EXCHANGE ACT PARTIES

### A.   Plaintiff

21.     Ohio PERS is a public pension fund organized for the benefit of public employees throughout the State of Ohio who are not covered by another state or local retirement system.  As

---

purchases occurring after Petrobras issued earning statements covering twelve-month periods after the effective dates of the relevant offerings.

of December 31, 2013, Ohio PERS managed approximately $88.6 billion.  Ohio PERS serves over

one million members.  Ohio PERS purchased Petrobras securities, as detailed below.

   B.   **Exchange Act Defendants**

   22.   Defendant Petrobras is a corporation organized under the laws of Brazil, and

maintains its principal executive offices at Avenida Republica do Chile, No. 65, 23rd Floor, 20031-

912, Rio de Janeiro, Brazil.  Petrobras operates in over twenty other countries, including the United

States, where it operates deep-water oil exploration platforms in the Gulf of Mexico.  It also

maintains an office at 570 Lexington Avenue, 43rd Floor, New York New York 10022.

   23.   Petrobras was a fully state-owned enterprise until 1997, when, pursuant to a change

in Brazilian law, it became a semi-public company open to private investment.  Since 2001,

Petrobras has sponsored ADSs representing the Company's common and preferred equity that are

listed on the NYSE, trading under the ticker symbols "PBR" and "PBR/A," respectively.   These

ADSs represent a substantial portion of the average daily trading volume for Petrobras equity,

including a significant majority of the volume for the Company's common equity.  For example,

over the six-month period ending December 22, 2014, the daily average of NYSE-based trade

volume of Petrobras' common stock ADS was 76.9 million shares, or 77.96 percent of all volume

for the Company's common equity, compared to a daily average of Bovespa-based trading volume

of 21.0 million shares, or 21.27 percent of all volume.  The daily average of NYSE-based trade

volume of Petrobras' preferred stock ADSs over the same period was 30.5 million shares,

representing 34.80 percent of all trade volume in the Company's preferred equity.

   24.   Defendant Maria das Graças Silva Foster was the CEO and President of Petrobras

from February 13, 2012 to February 2015.  During her tenure as CEO and President, she was also

a member of the Executive Board and a member of the Board of Directors.  She was appointed by

Brazil's current President, Dilma Rousseff ("Rousseff"). Foster signed the annual reports on Form 20-F filed with the SEC on April 2, 2012 (the "2011 20-F"); April 29, 2013 (the "2012 20-F"); and April 30, 2014 (the "2013 20-F").

25.     Defendant José Sergio Gabrielli de Azevedo served as CEO of Petrobras during the Relevant Time Period and signed Company's annual reports on Form 20-F filed with the SEC on May 20, 2010 (the "2009 20-F") and May 26, 2011 (the "2010 20-F").

26.     Foster and Gabrielli are collectively referred to here as the "Individual Exchange Act Defendants." The Individual Exchange Act Defendants, along with Petrobras, are collectively referred to here as the "Exchange Act Defendants."

C.     **Relevant Non-Parties**

27.     Barusco was a protégé of Renato Duque ("Duque") and a high-ranking official in the E&S Division of the Company, serving as engineering manager for a number of years during the Relevant Time Period. Barusco was arrested and indicted along with Costa and Duque, and like Costa, pled guilty in exchange for cooperating with the government in its ongoing investigation of Petrobras. Much of the bribery, kickbacks and graft was memorialized by Barusco in a series of spreadsheets seized by Brazilian investigators during Barusco's arrest in late 2014.

28.     Nestor Cerveró (here, "Cerveró") was formerly the director of Petrobras' International Division, which along with the Company's "Downstream" and "E&S" divisions and the Transpetro subsidiary, was the hub of extensive criminal misconduct, including bribery and payoffs in connection with Petrobras' hugely expensive acquisition of an oil refinery in Pasadena, Texas. Cerveró was arrested in January 2015 on charges of accepting over $53 million in bribes, many of which came from international companies such as Korea's Samsung Heavy Industries,

9

from which Cerveró sought a $40 million bribe in exchange for an award of lucrative Petrobras contracts for drilling ships.

29.    Costa was the director of the Company's "Downstream Division," the segment of Petrobras primarily responsible for refinery, logistics, oil products and import/export operations. Costa, who was responsible for Petrobras' financial statements and personally signed many of the inflated contracts at the heart of the corruption scheme, was a member of the Company's Executive Board from May 2004 until he left Petrobras in April 2012, with the Company publicly thanking him for his "services to the company, notably [his] leadership, technical expertise, high level of professionalism and commitment during [his] term as Director."  In early 2014, Costa was arrested and indicted on an array of bribery, money-laundering and corruption charges.  After months of publicly denying his and Petrobras' culpability for years of graft and corruption, Costa ultimately pleaded guilty in late 2014 and agreed to become a witness for the prosecution against his former co-conspirators.  Costa's wide-ranging testimony on the duration, scope and mechanics of the corruption at Petrobras began to leak in September 2014, giving investors their first glimpse of the extent of willful mismanagement and institutionalized corruption at the Company.

30.    Duque was the head of the Company's E&S Division and a member of Petrobras' Executive Board from 2003 until April 2012, when he left Petrobras.  The Company thanked Duque in the same press release in which it praised Costa, commending Duque for his "services to the company, notably [his] leadership, technical expertise, high level of professionalism and commitment during [his] term as Director."  Along with Costa, Duque was one the primary players in Petrobras' lengthy, complex corruption scheme; he was arrested and indicted for numerous fraud, money-laundering and corruption charges.

31.     Venina was a longtime Petrobras employee who was fired at the end of 2014 following her public revelations of the numerous efforts she took to highlight the pervasive corruption at the Company's Downstream Division (where she served under Costa from 2008 to 2009) and elsewhere.  Venina, who characterized her relationship with Defendant Foster as "close," was at various times, starting in 2008, threatened, harassed and terrorized for flagging the widespread fraud throughout the Company.  Before being exiled to Petrobras' Singapore office in 2010, Venina documented over 100 instances of overbilling at one Petrobras refinery alone, but her attempts to remedy these problems were ignored by her superiors – all of whom knew of, and many of whom were active participants in, the corruption scheme alleged below.

## IV.     FACTUAL BACKGROUND

### A.      History and Operations of Petrobras

32.     Established in October 1953 by executive decree, Petrobras was incorporated in 1954 in order to carry out crude oil and natural gas production and refining activities on behalf of the Brazilian federal government.   Until 1997, the Company had a government-sanctioned monopoly on the exploration, development, refining, import, export and sale of oil and gas in Brazil.  At the start of the Relevant Time Period, Petrobras was the largest corporation in Brazil by market capitalization, and was among the largest oil and gas conglomerates in the world, competing with companies like ExxonMobil, Sinopec and Statoil.  Petrobras has five principal operating segments: the Exploration-and-Production Division (typically referred to as the "Upstream Division"), responsible for oil and gas exploration, development and production; the Downstream Division (also referred to as the "Supply Division" or "Refinery, Transportation and Marketing Division"), responsible for all of the Company's refining, logistics, transportation, oil products and crude and petrochemical oil export/import functions; the Gas and Energy Division,

11

tasked with managing much of Petrobras' transportation and distribution systems, as well as the Company's hydropower and natural gas distribution; the Distribution Division, responsible for distributing Petrobras' oil and gas to wholesalers throughout Brazil; and the International Division, which included all of the Company's activities outside of Brazil, including exploration-and-production, refining and transportation.  Other segments of the Company relevant to this action include the E&S Division (described below) and Transpetro, Petrobras' wholly-owned transportation subsidiary.

### 1.     Petrobras' Expansion

33.     In late 2005, a series of massive undersea oil fields was discovered in the continental shelf off the coast of Brazil.  Lying under a thick layer of sodium chloride and consequently known as the "pre-salt" fields, these new reserves were the largest oil discovery in the Americas since the 1970s.  The pre-salt fields doubled Brazil's known oil reserves and a number of oil industry commentators have estimated that the size of the pre-salt fields may be as large as those found in certain parts of the Arabian Gulf.

34.     Following the discovery of the pre-salt fields, Brazil's government halted all planned oil exploration and development efforts and re-wrote the country's laws to give Petrobras a larger stake in the pre-salt development, effectively giving Petrobras back the monopoly it lost in the late 1990s.  While Brazil's oil regulator still held auctions for drilling and exploration licenses to private and foreign-owned oil companies, by 2010, the Brazilian government had passed a series of regulations that allowed Petrobras to be the sole operator in the numerous pre-salt oil fields that Brazilian regulators had yet to license via auctioning.  Petrobras was also granted a concession that allowed it to operate joint ventures with other entities looking to bid on the licenses that Petrobras did not already have.

35.     Exploring and developing oil in the pre-salt layer – hundreds of kilometers off the coast, lying in what is known in the oil industry as "ultra-deep" water deeper than 2,000 meters, and buried under yet another 2,000 meters of thick, nearly impenetrable salt – promised to be incredibly expensive.  Wells developed in the pre-salt layer were estimated to cost over $100 million apiece to develop, and scores, and even hundreds, of wells would have to be developed and sunk in order to fully exploit the massive fields.

36.     The exploration and development of the pre-salt layer required Petrobras' Upstream Division to expend capital at an unprecedented rate.  Indeed, according to testimony given by Barusco, the former E&S Division managing engineer, in 2003 the Company's engineering department oversaw $3 billion in contracts per year; when Barusco left Petrobras in 2011 to join Sete Brasil, a company set up in 2010 to lease oil rigs and deep-water drilling platforms to the Company, that figure increased to approximately $36 billion per year – or $3 billion *per month*.

37.     Among other things, the Upstream Division needed to first lease, then ultimately build and outfit, huge floating oil platforms known by their acronym "FPSO" (for "floating production storage and offloading").  Petrobras' spending on contracts for the Upstream Division's operations increased precipitously starting in 2006.

38.     The discovery of the oil and gas fields in the pre-salt layer also required the expansion of Petrobras' existing refineries, which were operated by the Downstream Division headed for most of the Relevant Time Period by Costa.  In order to both reduce Brazil's dependence on foreign oil and exploit what was anticipated to be a massive output from the wells being developed by Petrobras in the pre-salt layer, Petrobras announced that it would be building the country's first new oil refineries since the 1980s.  The focus of the Company's plans were the Comperj oil refinery in Itaborai (here, "Comperj" or the "Comperj Refinery"), originally budgeted

in 2004, and the Abreu e Lima refinery in northeastern Brazil (here, "Abreu e Lima" or the "Abreu e Lima Refinery"), announced in 2005.

39.     Along with the construction of new refineries, Petrobras embarked on the equally capital-intensive expansion and rebuilding of existing refineries – including the Company's largest refinery, the Paulinaia refinery north of Sao Paulo, known as the "Replan" refinery, a refinery in Parana known as the "Repar" refinery, and the Henrique Lage refinery in Sao Jose dos Campos, known as the "Revap" refinery.  The Company also expanded its U.S. operations by signing a joint venture with Transcor Astra Group, SA ("Transcor") to acquire a 50% stake in an oil refinery in Pasadena, Texas, south of Houston (here, the "Pasadena Refinery").

40.     Between 2008 and 2012, the Company announced plans to spend over $411 billion in capital investment programs between 2009 and 2016.

### 2.      Open Bidding and Procurement Process

41.     Shortly after Petrobras' government-sanctioned monopoly ended in the mid-1990s, as part of the government's overall efforts to bring the country's businesses in line with an increasingly competitive globalized economy, Petrobras and other large Brazilian state-owned companies became subject to a series of mandatory procurement regulations that dictated how those companies were to bid on and award contracts.

42.     These rules, which were expanded and supplemented in the late 1990s and early 2000s in anticipation of the massive construction projects needed for the 2014 World Cup and 2016 Summer Olympic Games to be held in Brazil, were aimed at simplifying and streamlining bidding practices and contract awards and sought to bring transparency into the procurement practices of numerous companies, including Petrobras.

43.     Throughout the Relevant Time Period, the procurement and bidding process at Petrobras and its operating subsidiaries was governed by the state-decreed "Simplified Bidding Procedure Regulations" (first imposed on Petrobras in 1998 by presidential decree following a change in the Brazilian constitution) as well as the Company's own procurement manual. Described on the Company's website as being "underpinned by legal, technical, quality and cost criteria," Petrobras' procurement policies "formally oblige[d] suppliers to carry out their activities based on ethics . . ."   The Company also stated that to "reduce our exposure to fraud and corruption risks, we established segregation of functions among employees who demand goods or services, those who conduct the procurement process, and those who are responsible for approving it.  We also established limits of authority, updated and approved periodically by the Executive [Board], for the signing of contracts."

44.     Procurement at Petrobras was carried out in large part by the Company's E&S Division, which was not an operating unit like the "Downstream" or "Upstream" units, but acted to support the Company's operating units following their commission of projects like construction or refurbishing of refineries (in the case of the Downstream Division) or the building and outfitting of the crucial FPSOs (in the case of the Upstream Division).

45.     According to testimony appearing in Costa's plea agreement filings, the E&S Division was "hired" by one or more of Petrobras' operating units to create the underlying design, oversee and conduct the bidding process, select those companies who would execute the project, and oversee the construction of the project.  After the project was completed – the refinery was built, or the FPSO was ready to launch, for example – the relevant operating unit would take over from the E&S Division.  Importantly, as detailed below, the director of the E&S Division during most of the Relevant Time Period was Duque, who ran the E&S Division along with his protégé

15

Barusco, the division's engineering manager.  Duque and Barusco, along with Costa, played central roles in orchestrating, organizing and executing the massive bribery, graft and bid-rigging scheme at Petrobras.

**B.      The Company's Public Statements Regarding Ethics and Compliance**

46.      In May 2002, the Company's Board of Directors approved the "Petrobras Code of Best Practices" (the "Code of Best Practices," often referred to as the "Code of Good Practices" in Petrobras' public filings), which was in effect throughout the entire Relevant Time Period and which was adopted by Petrobras and all of the Company's subsidiaries and affiliates.  The preamble to the "Code of Best Practices" states that "it is necessary that both management and also employees of Petrobras conduct themselves according to the highest ethical standards." Chapter III of the "Code of Best Practices," titled "Policy for Conduct of Management and Employees Who Comprise the Senior Management of Petrobras," states in Article 17 that "[m]anagement and employees comprising the Senior Management of Petrobras have the same duty of loyalty and consequently must conduct themselves in such a way as to avoid any occurrence of situations which may be construed as a conflict of interest and affect the Company's businesses and operations."

47.      Article 18 of Chapter III of the "Code of Best Practices" states that:

The management and employees comprising the Senior Management of Petrobras, principally those employees in positions of authority or, as a result of their functions, having contact with clients, suppliers and competitors, must, in compliance with this Policy, abstain from: receiving from any supplier, client or competitor, a reward or payment for services rendered as an employee or consultant; receiving for himself or any member of his familiy [*sic*] or person residing in his place of abode, gifts or entertainment which, irrespective of value, may give grounds for conflicts of interest; [or] practicing [*sic*] any acts that place him/her in a position of subordination or under the influence of a supplier, client or competitor.

48.     In November 2006, the Petrobras Board of Directors approved the Ethics Code of

Petrobras System, which was in effect throughout the Relevant Time Period.  Items I-III of the

"Complementary Provisions" section of the Ethics Code state:

> The Ethics Code covers the members of the Boards of Directors, Fiscal Councils,
> Executive Boards, the occupants of managerial functions, employees, trainees and
> service providers of Petrobras system, as individual and collective commitment of
> each and all of them to comply with it and promote its compliance in all actions of
> the productive chain of Petrobras System and in its relations with all interested
> parties. . . The employees of Petrobras System will formally acknowledge this
> Code, which will be widely disseminated through printed and electronic means. .
> . The violation of the principles and commitments expressed in this Code may
> result in the adoption of disciplinary measures, in accordance with the standards
> of the companies comprising Petrobras System.

49.     Section 1.1 of the Ethics Code pledges the following:

> Pursuit [*sic*] a balance of power between the High Management (Board of Directors
> and Executive Boards) and shareholders interest, including minority, with a view
> to aligning the System's strategic objectives with the interests and rights of all
> interested parties.

50.     Section 1.2 further pledges that Petrobras would undertake to:

> conduct its business with transparency and integrity, creating credibility with its
> shareholders, investors, employees, suppliers, customers, consumers, government,
> media, communities where it operates and society in general, pursuing to achieve
> growth and profitability with social and environmental responsibility.

51.     Moreover, Section 8.8 of the Ethics Code explicitly requires that the Company's

executives "refuse any corrupt and bribery practices, keeping formal procedures for control and

consequences of any transgressions."

52.     The Ethics Code is explicitly described in Petrobras' annual SEC filings.  The first

20-F filed during the Relevant Time Period, filed with the SEC on May 20, 2010 for the fiscal year

ending December 31, 2009 represented that:

> We have always guided our business and our relations with third parties by strong
> ethical principles. In 1998, our board of executive officers approved the Petrobras
> Code of Ethics, which was extended to all Petrobras companies in 2002. In 2008,

17

our board of executive officers further developed our ethics management through the creation of the Petrobras Ethics Commission. The Code of Ethics is applicable to all employees, the board of executive officers and the board of directors. The document is available on our website at http://www.petrobras.com.br/en/investors/. It is the responsibility of the Ethics Commission to promote compliance with ethical principles and act as a forum for discussion of subjects related to ethics. Currently, the Commission's focus is to develop and strengthen the Petrobras Ethics Management System, which is aimed at assuring the highest ethics standards by defining the roles of managers, employees, the Ethics Commission and their relationships.

### C.  <u>Organizational Structure of Petrobras</u>

53.    The day-to-day operations of Petrobras is managed by members of the Executive Board, which is headed by the CEO of the Company and overseen by the Board of Directors. Because the majority of Petrobras' directors is appointed by the Brazilian government, for the entire Relevant Time Period, the President of Brazil and his or her governing party has had the power to both appoint directors and, indirectly, choose the members of Petrobras' Executive Board.  For over a decade, the Workers' Party (known by its Portuguese acronym "PT") has been Brazil's governing party.  Brazil's current president, Dilma Rousseff (re-elected by a slim margin in November 2014, just as the scope of the Company's corrupt culture started coming to light), chaired Petrobras' board of directors from 2003 until she was first elected president in October 2010.  Prior to her election, she served as chief of staff to then President and member of the PT, Luis Inácio Lula da Silva ("Lula").  Rouseff nominated Foster to replace Gabrielli as Petrobras' CEO.

## V.    <u>FRAUDULENT SCHEME DURING THE RELEVANT TIME PERIOD</u>

54.    Throughout the Relevant Time Period, Petrobras touted itself as one of the best investment targets in the world.  It boasted of its transparency and sound accounting methodologies.  Indeed, when faced with allegations concerning possible accounting irregularities in 2009, Rouseff, Petrobras' then Chairwoman of the Board of Directors, dismissed these

allegations and claimed: "Petrobras has one of the most accurate accounting standards in the world.  If it wasn't the case, investors would not be seeking out the company as one of the great investment targets."

55.     Unfortunately for investors and shareholders, Rousseff's proclamations were far from the truth.  In fact, instead of being a pillar of transparency and corporate responsibility, Petrobras was embroiled in a massive grafting scheme benefiting top executives and members of Rousseff's own political party at the expense of the Company's shareholders and investors.

56.     At least two former Petrobras executives, including a former member of the Executive Board, have admitted in guilty pleas that Petrobras overpaid a cartel of outside contractors and servicers by billions of dollars so that Company executives and politicians alike, including Rousseff's 2010 Presidential campaign manager, could divert some of the excess payments to their pocket books.  As the Company has now admitted, these payments were improperly cast as capital costs dramatically inflating the Company's asset values.

57.     News of the kickback scheme has shocked investors and the Brazilian public. However, the allegations of fraud, money-laundering and unlawful kickbacks into the pockets of senior Company executives and politicians was no surprise to Petrobras.  Indeed, members of the Executive Board including Costa, Cerveró and Duque were directly involved in and profited from the bribery scheme.  CEOs Gabrielli and Foster were also made aware of the irregularities at Petrobras but, certainly in Foster's case, appear to have affirmatively acted to cover them up.  As such, the only victims in this debacle are investors, such as Plaintiff, who have seen the value of their investment in Petrobras decline dramatically.

A.      **Uncovering the Systemic, Institutionalized Corruption at Petrobras**

19

58.     In 2014, Brazilian authorities launched a massive investigation into alleged money-laundering in Brazil.  The investigation – now dubbed "Operation Car Wash" – initially focused on Youssef, by then a convicted money launderer.  However, investigators soon realized that allegations of money-laundering stretched far beyond Youssef.  During a recorded conversation, investigators overheard Youssef mention a bribe paid to former Petrobras executive Costa.  Soon, investigators turned their attention to Petrobras.  Over the next few months, investigators uncovered startling evidence of corruption at Petrobras on a scale not previously seen by Brazilian authorities.  At the center of it all: senior members of Petrobras and members of Brazil's governing parties who had, for years, engaged in widespread corruption and a scheme to enrich themselves by pocketing kickbacks from Petrobras' lucrative contracts.

59.     Recent reports have indicated that, for a period spanning over a decade, senior executives at Petrobras and members of Brazil's governing parties have engaged in an unlawful campaign of collusion, kickbacks and money laundering.  These reports have revealed that Petrobras executives have unlawfully implemented a lucrative "pay to play" scheme in which the Company paid inflated contract values for projects involving its oil refining operations in exchange for a kickback that went directly to Company officials and members of the Brazilian government. The scheme is massive – both in terms of the dollar figure involved and the number of individuals who engaged in the unlawful activity.  August Nardes, president of the Tribunal de Contas da União (the "TCU," roughly the Brazilian equivalent of the U.S. Government Accountability Office and tasked with auditing procurement and contracting practices at companies partially- or wholly-financed by the Brazilian government), has stated that the Petrobras scheme is the "biggest scandal" his agency has ever investigated.

60.     To date, the Brazilian investigation has revealed that more than 60 Petrobras employees and lawmakers were involved in the unlawful scheme.  Authorities have implicated several Petrobras officials in the scheme, including Costa, Cervero and Duque.  According to public reports, the unlawful scheme is reported to "extend all the way up to the president."  The reports stated that "another key suspect," as well as Youssef, have testified that both Brazilian President Rousseff (who worked at Petrobras as the chairwoman of the Company's board of directors from 2003 to 2010) and former President Lula were aware of the scheme.

61.     Lawmakers involved in the scheme belonged to various political parties, including Rousseff's PT and the PT's ally Brazilian Democratic Movement Party (known by its Portuguese acronym "PMDB"), as well as the Progressive Party ("PP").  Some of the individuals identified as having personally received kickbacks are:

- Joao Vaccari Neto ("Vaccari") is a senior official in the PT.  Vaccari was the official treasurer of the Worker's Party and raised millions for the PT which helped finance Rousseff's presidential campaigns.

- Gleisi Hoffmann was Rousseff's chief of staff from 2011 to February 2014.

- Antonio Palocci was Rousseff's chief of staff until 2011.  He was elected member of the Petrobras Board of Directors in April 2011 and resigned in June 2011.

- Mario Negromonte is the former Minister of Municipalities.  He was appointed by Rousseff for that position.  He resigned in 2012 after complaints of irregularities in his Ministry.

- Roseana Sarney is the Maranhao State Governor and member of the PMDB.  Her father was the president of the Senate before Renan Calheiros.  She received kickbacks to fund her campaign.

21

- Edison Lobao was Mines and Energy Minister appointed by Rousseff. According to Costa, he received kickbacks to finance Roseana Sarney's campaign.

- Renan Calheiros is the president of the Senate and member of the PMDB.

- Sergio Cabral is the former Governor of Rio de Janeiro and member of the PMDB and received millions of reais to finance his 2010 campaign.

62.     Others identified include current or former governors of Brazilian states where Petrobras has recently undertaken construction projects, including the governor of the region in which Petrobras' Abreu e Lima Refinery (discussed below) is located.

63.     In March 2014, Brazilian police arrested Costa in connection with Operation Car Wash.  Police also arrested Youssef and approximately two dozen others suspected of being involved in the money-laundering scheme, which totaled approximately 10 billion Brazilian Reais, or US$4.25 billion. Costa, who began working for Petrobras in 1977, served as Petrobras' Director of Refineries and Supply until he resigned in 2012. Costa was nominated for his director position by the PP, which at the time was headed by the late Jose Janene ("Janene").  Costa has since testified that Janene initiated the scheme at Petrobras.

64.     As the Director of Refineries and Supply, Costa was in charge of overseeing billions of dollars of capital expenditures and contracts involving refinery construction and expansion projects.  Around 2004, members of the Brazilian government's ruling party coalition introduced Costa to Youssef.  Within a short time, Costa and Youssef began funneling money as part of the unlawful scheme.

65.     In March 2014, around the same time that police arrested Costa, numerous Brazilian entities, including the House of Representatives and the CVM (roughly the Brazilian equivalent of the U.S. Securities and Exchange Commission) announced their own investigations.

A month later, on April 11, 2014, Petrobras' Foster met with police at the Company's offices and agreed to turn over documents concerning the Company's contracts with third parties. Similarly, on December 26, 2014, the CVM announced an administrative investigation into numerous executives at the Company in connection with the allegations of kickbacks. In late November, Brazil's Federal Prosecutors office sent a task force to Switzerland to investigate a secret bank account suspected to be kept by Petrobras executives. United States authorities have also begun investigating the company for alleged criminal activities and securities law violations. For example, on November 21, 2014 the SEC issued a subpoena to Petrobras seeking documents in connection with their ongoing investigation of the Company. Similarly, the Department of Justice ("DOJ") has also begun its own investigation of the Company.

### B.    The "Rules of the Game": the Mechanics of Petrobras' "Institutionalized," "Endemic" Scheme

66.    In stark contrast to the Company's repeated statements touting Petrobras' transparency, as Costa testified in 2014, "[i]n reality, what was happening within Petrobras, primarily from 2006 onward, was a process of 'cartelization,'" operated pursuant to a series of rules and practices that one conspirator referred to as the "rule[s] of the game." Petrobras' E&S Division, headed by Duque, created the budget for each Company contract or project. According to Costa, Petrobras and a significant number of Petrobras' outside contractors, known as the "Cartel," had an "agreement" to allocate Company contracts to a specific cartel company for a set and non-competitive price. As Costa further explained, this "cartelization result[ed] in an addition to the price" of any given contract. On average, contracts were inflated by anywhere up to 20 percent of the budget price – an amount which Petrobras knowingly and willingly overpaid and recorded on its books. The illegal coordination among the Cartel members caused bids to skyrocket, resulting in Petrobras paying excessive fees for construction and engineering contracts.

As Costa testified, this bid rigging scheme "obviously result[ed] in an excessive delta price" to Petrobras.

67.     In order to ensure that Petrobras remained in the game, the contracting company paid a three percent "political adjustment" (*i.e.*, a bribe) of the total value of the contract, including any amendments to the contract, which were in turn paid (in varying amounts) to Petrobras' executives and to one or more Brazilian political parties.  For instance, according to Costa, for Cartel contracts where Costa was involved, 2% was allocated to the E&S Division.  The remaining 1% was split 60/20/20, 60 to the political party involved, 20 for expenses and the other 20 allocated between Costa and Yousseff or Janene.

68.     Indeed, even with non-Cartel contracts, a bribery fee was mandatory to get Petrobras' business.  As Yousseff testified, the companies that got the work paid the bribe:  "[t]he truth of it is, they would win the work.  [T]hey wouldn't get the work if they didn't pay."

69.     Much of the bribe money paid by the outside contractors was funneled to the coffers of the political parties responsible for appointing Petrobras executives. The political parties and their candidates had much to gain from this grafting scheme.  As Costa testified, the bribery scheme was used to finance Brazilian politicians and the politicians' campaigns.  Indeed, the members of the Board of Directors are picked by Brazil's ruling party, and Rousseff, the former Chairwoman of Petrobras, left the Company to run for office and is currently President of Brazil.  In addition, each member of the Executive Board, including Costa, Duque, Foster and Gabrielli, owed a debt to the direct beneficiaries of the grafting scheme – the politicians – as the members of the Executive Board were indirectly selected by Brazil's ruling political parties to serve on that body.  In other words, the highest ranking officials at Petrobras had a clear motive to keep the bribery and corruption scheme running.

70.     Testimony from numerous senior Petrobras executives – including Costa and Barusco, whose testimony corroborates and expands much of what Costa told authorities – revealed the highly-structured nature of the scheme, which was based on what Brazilian prosecutors described in a December 11, 2014 charging document as the "three nuclei" of "the large criminal organization" in place "from 2006 until at least November 14, 2014."

71.     The "first nucleus" of the organization was made up of senior executives at Petrobras' outside contractors, which consisted of the largest construction companies in Brazil – including Odebrecht, Camargo Correa, Andrade Gutierrez, Iesa, Engevix, Mendes Junior, Toyo Setal, UTC, OAS, and Queiroz Galvão, who collectively made up the bulk of the membership of the Cartel – which was organized to "commit cartel and bid-rigging crimes against Petrobras, to corrupt its officers and launder assets received as a result of these crimes." A number of executives formerly employed by Cartel companies, including Augosto Riberio de Mendonca Neto (here, "Mendonca Neta," a director of engineering, procurement and construction ("EPC") company Toyo-Setal) have pleaded guilty to a range of corruption charges, and testified for the government.

72.     The "second nucleus" consisted of Costa, Duque and "other top level Petrobras employees" who helped the "first nucleus" to "conduct the offences of cartel and bid rigging." A February 2015 article in the Brazilian magazine *Valor International* reported that Petrobras employees and executives actively assisted the members of the Cartel in ensuring that their bids were accepted by the Company, hosting Cartel-member meetings at the Company's offices in Rio to discuss the process of submitting bids to Petrobras. Minutes of those meetings, as reported by *Valor*, reflect that that Petrobras executives "show[ed] representatives of the contractors how they should present claims for contract addenda in order to avoid refusal" by the Company.

25

73.     The "third nucleus" of the criminal scheme was made up of Youssef and other "operators," who coordinated the process of paying bribes to Costa, Duque and other Petrobras employees, in addition to laundering money and other assets stemming from the organization's success.

74.     This organized structure operated under a formal set of procedures, memorialized by a number of Cartel members.  According to testimony from Toyo-Setal's Mendonca Neta, high-level executives of Cartel members with decision-making authority would first secretly meet to discuss and exchange information about upcoming procurement or bid invitations from Petrobras. After the Cartel members finalized a list of which upcoming Petrobras projects were to be targeted by the Cartel, they then agreed who among them would receive which contract, a calculus that, until a number of Cartel members complained about the practice in 2010, took into account the number of Petrobras bids previously awarded to the Cartel members.  Finally, the Cartel made up a final list of which Cartel members would be invited to bid on a given Petrobras project; the list was then forwarded to one or both of Duque and Costa, who had the power to approve which companies would, in fact, receive an invitation to bid.  As a result, as Youssef testified, bidding on Petrobras projects was never competitive, with the Cartel members having agreed beforehand which of them would win the bid before the bidding even started.

75.     Contracts with Cartel members accounted for a vast amount of Petrobras' reported fixed assets during the Relevant Time Period.  Indeed, in January 2015, the Company confirmed that contracts entered into with Cartel members between 2004 and April 2012 alone account for $73 billion in assets, or "1/3 of the [C]ompany's total fixed assets," which in April 2015 was increased to $81.4 billion.

76.     This large-scale, multi-billion dollar bribery and corruption scheme existed for over a decade only because Defendants, as well as other high ranking executives and politicians, took action to cover up any signs of irregularities.

C.     **Petrobras Impeded Prior Investigations into Accounting Irregularities**

1.     **The TCU Investigation of the Abreu e Lima Refinery**

77.     In March 2009, the TCU notified Petrobras that it found evidence of overbilling for work done at the Abreu e Lima Refinery.

78.     For its investigation, the TCU requested that the Company turn over documents in support of their investigation.  Petrobras, however, made it clear that the Company would not cooperate with the investigation.  For example, according to Brazilian magazine *Veja*, in April 2009, the TCU determined that Petrobras had manipulated the numbers on certain spreadsheets in an effort to disguise actual contract figures and to trick the TCU.  After Costa emailed Rousseff warning her that the TCU's investigation would hamper the Company's contracts and the overall scheme, Gabrielli refused to provide key documents to the TCU.

79.     Investigators have now said that they would have uncovered even more abuses had Petrobras provided these documents.  According to Saulo Puttini, one of the auditing officials, the TCU's findings were "a clear warning sign of bigger problems and likely corruption.  What's happening now is not a surprise to us at all."

80.     TCU made findings in a report that was provided to both the Brazilian government and Rousseff, as Petrobras' then Chairwoman of the board.  Rousseff, at this time, was also the chief of staff to the Lula administration and was readying herself to run for the office of President.

81.     In the report, the TCU cited irregular tender practices and systematic overcharging on Abreu e Lima contracts.  It also criticized Petrobras for waiting until the last day of the

investigation to deliver many documents, saying it was tantamount to obstruction. Rousseff immediately alerted Brazil's Comptroller General's Office, and convinced that office to quickly dismiss the allegations and continue to provide Petrobras with money necessary for its projects.

82.     While the TCU investigation and findings became public, Rousseff and Petrobras adamantly denied any irregularities.  In an April 7, 2009 6-K relating to press reports about the TCU's investigation of the Abreu e Lima Refinery, Petrobras stated that "Petrobras contracted the services of a consortium of Camargo Corrêa, Galvão Engenharia, Queiroz Galvão and Norberto Odebrecht to execute earth-moving work at the site of the Abreu e Lima Refinery in Pernambuco. In one of its audits, the Federal Audit Office (TCU) reported indications of overinvoicing in this contract, determining partial suspension of payments. Petrobras is of the opinion that there exists no overpricing or overinvoicing, but has complied with the instructions of the TCU and suspended payments to the consortium. The case for the defense was initiated immediately, contesting the alleged irregularities observed by the TCU auditors. The action remains pending."

83.     The April 7, 2009 6-K concluded by representing that the "Company would also like to point out that, as part of its cost optimization policy, it would not have accepted prices higher than those it considers fair. For this reason, the Company is in permanent contact with its entire universe of suppliers. The Company also clarifies that some of the prices in the bids for construction work and equipment supply for the Abreu e Lima Refinery were considered excessive. As part of its routine operational procedures, the Company cancelled these tender bids and is currently in negotiations with the suppliers."  The Company unequivocally denied all allegations levied by TCU, stating that there were "[n]o problems with Petrobras contracts.  There [was] no overpricing."

84.     Around December 2009, TCU sent a report to Brazilian Congress requesting that funds for the Company's Abreu e Lima and Repar refineries be removed from the 2010 budget because of evidence of overbilling and other irregularities.  Congress agreed and quickly voted to approve the 2010 budget without funding for the refinery project.  Rousseff, who at the time was preparing her run for president and was fully aware that suspending the budget would essentially bring the scheme to a halt, persuaded President Lula (also of the PT) to veto the section of the budget proposal that would have denied funding for the project.  As a result, Lula vetoed Congress's budget and the Abreu e Lima and Repar refineries continued to be funded and the grafting scheme continued to be concealed.

## 2. The Investigation by the Parliamentary Commission of Inquiry ("CPI")

85.     Motivated by TCU's report, members of Brazil's Social Democracy Party (political opponents of the PT party) called for a Parliamentary Commission of Inquiry (known by its Portuguese acronym "CPI") to investigate overpricing concerns at Petrobras.  This was largely viewed as a political attack because it was initiated by the opposition party.

86.     Nonetheless, to counter any perception of wrongdoing, the Company promoted itself as a model corporate citizen, touting its commitment to transparency and ethics.  In a June 20, 2009 posting of "Facts and Data," a website created to allow the Company "to achieve maximum possible transparency in the relationship with its stakeholders," Petrobras quoted an interview with Gabrielli in *Epoca* magazine, in which Gabrielli stated:  "We are very transparent, more than most private and public companies" and "we have a code of ethics, formal procedures and audit and control systems.  If we identify failures and deviations in these processes, we will investigate."

87.     Within five months, the CPI issued a final report and exonerated Petrobras. However, as investors have recently learned, Costa paid off members of the opposition party around late 2009 and a key member of the CPI was paid a $10 million bribe in order to whitewash the investigation.

### 3.     "Operation Sandcastle"

88.     In the same month as the TCU investigation, Brazilian Federal Police arrested ten individuals – four Camargo Correa directors, two secretaries and four black market exchange traders – in what was called "Operation Sandcastle."   Although initially unconnected with Petrobras, during that investigation, police heard one of the four Camargo Correa directors suggest that his company send cash to Recife – the location of one of Petrobras' largest refinery projects, the Abreu e Lima Refinery – and it was suspected that this payment could be related to the overbilling at that facility.

89.     Operation Sandcastle was annulled by the courts in January 2010 on grounds that the investigation was unconstitutional.  This ruling has been appealed to the Supreme Federal Court and is awaiting decision.  However, Brazil's federal prosecutors involved in Operation Sandcastle have made clear that the evidence gathered in that investigation is closely linked to Operation Car Wash, the investigation that exposed Petrobras' involvement in the multi-billion-dollar grafting scheme.

90.     As commentators have noted, the suspension of the investigation was unusual.

> The justification provided by the Minister César Asfor Rocha, then president of STJ, was the initial use of anonymous denunciation in order to request authorization to wiretap phone calls that led to other evidences of the alleged crimes. This decision, according to a research commissioned by that newspaper, contradicted previous and later rulings by that court, including a few issued by Minister Asfor Rocha himself.[2]

---

[2] *Political Corruption, Campaign Slush Funds and the Impact on the Quality of Democracy in Brazil*, by Carlos Joe Carvalho de Formig-Xavier, July 2012.

91.     Operation Sandcastle, like Operation Car Wash, implicated Brazil's major political parties, including the Worker's Party.  It was known that in the summer of 2010, there would be a vacancy in the Supreme Court as one of the justices would reach the mandatory retirement age. Lula, the President of Brazil and the leader of the PT, would be responsible for making that appointment.  Minister César Asfor Rocha became a candidate for the Supreme Federal Court vacancy later that year, but withdrew when allegations of bribery surfaced.

### D.     Top Executives Ignore and Intimidate Whistleblowers

#### 1.     Venina Velosa da Fonseca

92.     Petrobras also silenced a former Company executive who reported the kickback and bribery scheme to Costa and Foster in a series of emails spanning several years.  Beginning in 2008, former Petrobras executive Venina warned numerous Petrobras executives (including Costa, Foster, executive manager Jose Raimundo Brandao Pereira, and the Company's Board of Directors) of evidence concerning irregularities with Petrobras' contracts, including overbilling, payments for services never rendered, and the payment of commissions for contract negotiators.

93.     Venina started at Petrobras in 1990 and held various positions during her tenure, but, in 2008, when she discovered irregularities at Petrobras while serving as an executive manager under Costa, her position at Petrobras became daunting.  Her division was responsible for budgeting and conducting economic evaluations for downstream projects.  Venina also led an internal audit of the Downstream Division's communications sections and discovered fraudulent billing practices.  Venina reported this irregularity to Foster, concluding that these overcharges could only be the result of fraud.

94.     In addition, Venina informed Foster about problems with bidding in connection with the Abreu e Lima Refinery.  Venina testified that she found and reported that "prices for

31

equipment that were four times higher than for the same equipment abroad."  According to one internal Petrobras document, Venina made 107 so-called "quests" to modify project spending and cut Company spending on certain projects by about 947.7 million reais.  All of her proposals were rejected.

95.    Venina testified that she reported these and other concerns to Duque and Costa, but no actions were taken.  Instead, Costa brought her to his office and first pointed to a portrait of Brazil's then-President Lula, then "pointed towards Gabrielli's office" – which was adjacent to Costa's – "asking 'do you want to bring down everybody?'"

96.    Venina also turned to Foster, who at the time was Director of Gas and Energy, for help and support.  In April 2009, Venina prepared a memorandum outlining the details of the irregularities she uncovered.  Before circulating it to management, she asked Foster to review the memorandum.  Indeed, Venina turned over numerous documents concerning contract irregularities obtained from the Company's communications department to Foster.  Venina also sent an email to Foster requesting her input: "I would like to get your opinion on the final text that I need to forward.  Can I leave it for you to read?  You know about the matter.  Feel free if you feel better not reading it.  I await your response to leave or not the material with your secretary."  Foster did not respond.

97.    Hearing nothing from Foster, Venina made a decision to forward her memorandum to the Board of Directors.  In a May 4, 2009 memorandum sent to the Board of Directors, the Legal Department, and Costa, she set forth all her suspicions; in particular, she criticized the methods for contracting with outside vendors.

98.    Senior Petrobras executives, including Costa and Foster, ignored Venina's warnings – knowing very well that the Company was inflating contract prices in order to receive

kickbacks that personally benefited Company executives and politicians. In a 2014 email to Foster, Venina explained how she reported the scheme to "authorities inside the company, including the Legal Department and Auditing" and was then "threatened and harassed."

99.     With the TCU raising concerns to the Company in 2009 and Rousseff's entry into the 2010 presidential race, Venina presented a real threat and liability to the Company, its executives, and members of the Brazilian government.  Accordingly, Petrobras reassigned Venina to Singapore.  However, upon arriving in Singapore, Venina was asked not to work and was instead instructed to take a so-called "specialization course."  While in Singapore, she sent Foster an email on October 7, 2011 stating:

> From the immense pride I once had for my company, now I am ashamed. Directors are calling themselves and acting like gods and treat people like animals. What happened inside [the Downstream Division] in the area of communication and construction was absurd. Technicians fighting for new ways of hiring, new procedures to monitor the construction, *improvement in contracts and what was happening in reality was projects being ripped out and public bids with no efficiency.* Too late for details…
>
> *There are alternatives that I am analyzing even though I fear they will bring risk to me and my daughters. I would like to present you to part of the documents I've got, part of them I know you already know.* I would like to hear from you before I take the next step. I don't want to send you anything without a green light from you.

(emphasis added).

100.     Within three months of receiving Venina's implicit threat of finding "alternatives" for her concerns and the documents supporting those concerns, in January 2012, it was announced that Gabrielli would leave the Company to be replaced by Foster.  Just a short three months later, in April 2012, Costa and Duque's resignations from the Executive Board were announced.  Today, Petrobras maintains that the grafting scheme ended in 2012.

101.     Venina communicated with Foster one last time on November 19, 2014, describing the treatment she received for trying to expose the problems at Petrobras:

Since 2008, my life has become a nightmare, I came across an initial scheme of embezzlement, in the department of Communications and Supply. When I tried to fight this, I was threatened and harassed. Even had a gun pointed to my head and my daughters.  I have with me all the documents for the case that I never offered to the press in respect to PETROBRAS, despite all the attempts of contact from reporters. *I have taken the subject to the responsible authorities inside the company, including the Legal Department and Auditing, which was in vain.*

After that, I was against the scheme that seemed to exist in the [Abreu e Lima Refinery] project. Once again, I was exposed to all kinds of harassment. When I left my position, I was expatriated, and the director who is in jail nowadays cheered, even though he said it was a shame he could not keep me exiled for life. I have all documentation for the actions I have taken during this period, I have informed everything in my deposition, and I have witness of my actions against the illegal acts that were practiced. Again here there was omission of the authorities, including those in the compliance area already mentioned before.

102.    On December 12, 2014, an interview with Venina was published in *Valor Economico*, citing to "hundreds of internal documents" Venina provided to the newspaper.  In the interview, Venina described her discovery of significant "irregularities" at Petrobras and how she reported these red flags to Foster, Gabrielli, Costa, Duque and others in 2008 and 2009.

### 2.    Fernando de Castro Sá

103.    Another whistleblower who was silenced was Fernando de Castro Sá (here, "Fernando").  Fernando was a lawyer in Petrobras' Supply Division and had regular interactions with Duque and Gabrielli.  On January 7, 2015, he was deposed by Brazilian Federal Prosecutors.

104.    Fernando testified that he issued a legal opinion concluding that Geovane de Morais should be terminated based on Venina's internal inquiry, which found that Morais was responsible for improper payments in the Downstream Division.  According to his testimony, this opinion angered his superiors, including Gabrielli, and Petrobras' senior management, who made a decision forcing the legal department to give an opinion revising his findings.

105.    Fernando also led an effort to adopt a procurement model that would target some of the deficiencies that Venina had found during her inquiry.  Although the Board of Directors approved the adoption of the model, the division responsible for overseeing procurement contracts refused to use it.  Fernando complained about the division's refusal to comply with the new model and, in particular, questioned contract terms for Abreu e Lima.  He drafted a report to document his concerns and met with his superior, Nilton Maia.  Maia dismissed his concerns, telling him that "[t]his is the deal…. You are already out of here.  And it won't help to talk to anyone because I already talk to [Gabrielli] … I have spoken with [Costa] and Duque.  He testified:  "I was told that Gabrielli wanted me fired, so did Duque."

106.    Fernando was then transferred to a small office in the International legal department, without any work, and a reduced salary.

### 3.    Mauro Cunha

107.    Petrobras not only targeted employees, it also silenced independent members of the Company's Board of Directors.  Mauro Cunha ("Cunha") is one of three independent members of the Board, and at one point was also a member of the Board's audit committee, and has represented minority investors in Petrobras since 2013.  In early 2014, he was on the audit committee investigating the Pasadena transaction and the Abreu e Lima and Comperj refineries.  According to a *Dow Jones* article published on March 18, 2014, Cunha rejected the Company's 2013 earnings report because "he didn't have enough time to analyze the firm's finances… there was insufficient information and apparently inadequate accounting of the firm's investment in refineries."  Cunha, in a letter to the CVM dated February 25, 2014, stated that he was "not comfortable with the absence of impairment." Two months later, the Board of Directors removed Cunha from the audit committee.

E.     **Major Capital Projects and Other Operations Are Used to Divert Funds to the Scheme**

108.    While knowingly using Petrobras' major projects as the source for funding the bribery and corruption scheme, Petrobras, throughout the Relevant Time Period, repeatedly assured investors that the cost overruns on these projects were just a part of normal operating procedures and that no irregularity was involved.  Below are examples of key projects and their role in the grafting scheme.

1.     **The Pasadena Transaction**

109.    As part of their investigation, Brazilian authorities (including the Federal Police, federal prosecutors, and lawmakers) have focused on the Company's February 2006 acquisition of an oil refinery in Pasadena, Texas (the "Pasadena Transaction") from the Belgian company Transcor.  Petrobras initially paid approximately $360 million for a 50% stake in the refinery, an objectively exorbitant amount considering Transcor's purchase price for the entire refinery just one year before of $42.5 million.

110.    As part of the contractual terms, Transcor had a put option which would force Petrobras to purchase the remaining 50% stake, an option that they exercised a year later.  Petrobras refused to purchase the stake and went to arbitration.   After years of arbitrating the matter, Petrobras was required to purchase the remaining stake.  When all was said and done, Petrobras spent approximately $1.2 billion for the Pasadena Refinery – again, a facility that had been initially purchased for $42.5 million in 2005.

111.    As news of this debacle came to light, the Company denied any claims that the investment in Pasadena was a result of fraud or corruption.  For example, in August 2013, Gabrielli appeared before a Brazilian Senate committee to defend Petrobras' Pasadena purchase and

36

reiterated Rousseff's assertion that the Pasadena Refinery was a "normal operation, based on market conditions."

112.    Moreover, on May 23, 2014, the Company issued a statement on "Facts and Data" regarding the Pasadena Transaction.  The header of the "Facts and Data" page stated:  "We have strict legal procedures for payments, including for the purchase of Pasadena."  The statement continued in noting that:

> Any payments we make and in any country follow strict and clear internal proceeding and the applicable legislation.  Moreover, we have a structured Internal Audit department that has unrestricted access to any unit in the Petrobras system to verify the abidance of proceedings and operations.

113.    However, as Costa admitted and contrary to the above representations, *see* paragraph 316, *infra*, Petrobras' unfavorable contract with Transcor for the Pasadena Refinery was a direct product of the bribery scheme.

## 2.    The Abreu e Lima Refinery

114.    The construction of the Abreu e Lima Refinery was announced in 2005, and initiated in 2006.  It was originally a joint project between Petrobras and PDVSA from Venezuela.  However, PDVSA never formally approved the joint venture with Petrobras, and for this reason Petrobras could never force them to pay for their part of the deal.

115.    A number of ongoing investigations have revealed evidence of overbilling and kickbacks at the Abreu e Lima Refinery.  When first proposed approximately ten years ago, the Abreu e Lima Refinery was expected to cost approximately $2.5 billion.  The price tag has ballooned to $18.5 billion.  From the start, numerous projects connected to the construction of the Abreu e Lima Refinery were plagued by the corruption and kickback scheme.

116.    On August 5, 2009, Costa asserted in Brazilian press reports that "the amount foreseen initially for the Abreu e Lima refinery 'will certainly increase, since the forecast was for

37

three years and a lot has changed. . .'"   In a December 2, 2009 press release, Petrobras announced that it had "executed today five contracts, in the amount of R$ 8.9 billion [roughly U.S. $3 billion] for the construction of the Abreu e Lima refinery."

117.    Increases in cost put a spotlight on the Abreu e Lima Refinery and questions arose from media outlets regarding cost overruns.  In response, in a January 28, 2010 "Facts and Data" post, Petrobras stated: "*there are no irregularities in contracts for the construction of the Abreu e Lima Refinery.*"  The next day, on January 29, 2010, Petrobras reaffirmed that "there was no 'overbilling' or 'overpricing' in the construction works of the Abreu e Lima refinery."

118.    Petrobras also launched a media campaign to quell any market concerns about cost overruns.  As part of this campaign, Costa met with research analysts to alleviate market concerns.  In particular, in a meeting with analysts in November 2010, Costa explained that the increased costs of the Abreu e Lima Refinery was due to unique infrastructure needs.  After this meeting, Morgan Stanley issued a report dated November 21, 2010, stating:

> We walked out of the presentation hosted by Downstream Director [Costa] convinced that the concerns surrounding the construction of the refineries are overstated.  [Costa] made a thorough presentation touching on every single controversy raised by the market over the past 18 months and justifying every decision made by the [C]ompany based on economics.

119.    Since then, investors have learned that the Abreu e Lima Refinery, as Costa and other witnesses have described it, was ground zero for the massive bribery and corruption that the Brazilian police have uncovered.  Prosecutors have found evidence of fraud, overpricing and kickbacks in approximately seven contracts relating to the Abreu e Lima Refinery. The TCU had found evidence of overpayments of as much as $540 million (1.3 billion reais) in numerous contracts relating to the Abreu e Lima Refinery.  Police have arrested executives from numerous construction companies involved, including the companies who won many of the contracts: Cartel

members Odebrecht SA, OAS SA and Camargo Correa SA, which are three of the largest EPC companies in Brazil.  Queiroz Galvão, another Brazilian Cartel company involved in the Abreu e Lima Refinery's construction, is also under investigation.  Brazilian authorities have learned that Costa and Duque both approved at least $2.7 billion (6.6 billion reais) in contracts for the Abreu e Lima Refinery.  Those contracts were subsequently approved by the Company's Executive Board, which includes Petrobras' senior executives and the CEO.

120.    Barusco has also testified that he observed the Cartel's involvement in the Abreu e Lima Refinery while serving in the E&S Division.  Specifically, Barusco testified that in April or May 2008, Odebrecht SA's director Rogerio Araujo approached him with a list of companies that should be invited to bid for contracts related to the refinery.  Araujo notified Barusco that everything had already been arranged with Costa.  When Petrobras compiled a list of the companies formally invited to "bid" on the contracts, Barusco quickly realized that the list included the same companies on the list Araujo had given him. A spreadsheet seized by Brazilian authorities during Barusco's arrest – later appended to Barusco's plea agreement, recently unsealed by Brazilian prosecutors – identified a number of companies who (either on their own or as part of a consortium) inflated contracts for the engineering or construction of the Abreu e Lima Refinery.

121.    As part of the investigation, Brazilian police also arrested Erton Medeiros Fonseca – a director of engineering and infrastructure at Galvão Engenharia SA.  Erton Medeiros Fonseca has since admitted to paying roughly $1.5 million (4.5 million reais) in kickbacks to Petrobras after Costa and Youssef informed him that Galvão Engenharia SA would "have to pay" in order to win Petrobras' business, which according to Erton Medeiros Fonseca also included kickbacks paid to Petrobras on numerous projects, including several projects as large as 2 to 3 million reais in connection with the Abreu e Lima Refinery.

39

### 3. The Comperj Refinery

122.    Petrobras officials also received kickbacks in connection with the construction of the Comperj Refinery.  The Comperj Refinery was originally budgeted in 2004 to cost the Company approximately $6.1 billion and be completed by 2011.  Since then, the actual cost of the project has increased to approximately $50 billion.

123.    Again, in order to address cost overrun concerns, in a "Facts and Data" post on October 8, 2010, Petrobras issued denials that any overpricing was occurring.  It also insisted that it had strictly observed competitive bidding requirements.

124.    Responding to reports from both *Globo TV* and *Jornal Nacional* on January 6 and 7, 2013, respectively, Petrobras restated that there were "no irregularities" at the Comperj Refinery.  Petrobras explained that the increase in costs was due to the modifications in the project plan since the plan's inception.

125.    However, like the Abreu e Lima Refinery, the Comperj Refinery was enmeshed in corruption.  A spreadsheet seized by Brazilian authorities during Barusco's arrest – later appended to Barusco's plea agreement, recently unsealed by Brazilian prosecutors – identified a number of companies (either on their own or as part of a consortium) who inflated the contracts for the engineering or construction of the Comperj Refinery .

126.    The TCU has determined that the Company overpaid by tens of millions of dollars in connection with the project and that contracts worth approximately $3.1 billion (7.6 billion reais) were awarded without a competitive bidding process.  In one instance, Julio Camargo of Cartel member Toyo-Setal proposed a "project of utilities for Comperj" for bidding which, as it was set up, incorporated the unlawful payments that would "naturally" kickback to Costa.

### 4.      The Repar Project

127.      Petrobras hired five construction companies for $7.5 billion reais to expand production capacity of its Repar refinery in Parana, and construction occurred between 2006 and 2012.  Yet again, the TCU found "irregularities" in 20 of the 52 contracts awarded in connection with the expansion of Repar.  The overpricing at Repar is estimated to be higher than the overpricing in the construction of Abreu e Lima Refinery, recently evaluated at $1.1 billion reais by the TCU.

128.      According to the federal police and the federal prosecutors, shell companies controlled by Youssef had at least three contracts with the construction companies involved in the Repar project, amounting to payments of millions of reais.  The federal police recently released a spreadsheet they found at Youssef's house during one of his arrests that details payments of kickbacks totaling $35.8 million involving Repar.

### 5.      SBM Offshore

129.      In September 2008, the Company announced its approval of contracts for ten "new FPSO-type (Floating Production Storage and Offloading)" oil-production platforms for the pre-salt areas in the Santos Basin.  A year later, the Company announced the Executive Board's approval of a "strategy to hire up to 28 new drilling rigs to be built in Brazil" which would "afford Petrobras greater economic and operating benefits."

130.      The Company's 2011 20-F summarized this exponential increase in capital expenditures as follows: "[t]he exploration and development of this large reserve . . . has demanded, and will continue to demand, significant investments and the rapid growth of our operations. To support this growth, we have ordered the construction of 22 new FPSOs and 33 drilling rigs and are also making necessary investments in infrastructure. We have planned capital

expenditures and investments of U.S. $50.6 billion for 2012 and of U.S. $224.7 billion for the period from 2011 through 2015."

131.    A significant number of these rigs and FPSOs involved contracts with Dutch engineering firm SBM Offshore, N.V. ("SBM" or "SBM Offshore"), which Brazilian investigators determined paid approximately $139 million in bribery payments to unnamed Petrobras executives and government officials.  According to a former employee of SBM Offshore, these payments were made via an intermediary between 2005 and 2011 in exchange for Petrobras granting SBM Offshore certain lucrative contracts for floating oil platforms. However, Barusco has testified that he received payments from SBM dating back to 1997 or 1998 while he was the Installation Technology Manager in the Exploration and Production Department. The unlawful payments continued after the Company entered into a second contract with SBM in 2000.  According to that contract, SBM made monthly kickback payments to Barusco and other unnamed persons associated with Petrobras.  In relation to that contract, Barusco testified that he received between $25,000 and $50,000 per month.  Barusco also testified that by 2010 he had received approximately $22 million from SBM.

132.    Among the contracts involving kickbacks from SBM was the February 2008 EPC contract relating to Petrobras' P-57 platform, which was disclosed in an October 6, 2010 6-K announcing the christening of the P-57 platform.  The October 6, 2010 6-K represented that the strategy used to build the P-57 platform "ensured greater efficiency both in project management and in the progress of the procurement, construction, assembly and testing stages. The result was the strict compliance with contractual terms, the maintenance of the initial planned cost, and the assurance of the quality demanded under the contract. Additionally, the new strategy resulted in a

lighter, easier-to-maintain platform, a significant gain, therefore, from the economic, managerial, and technical standpoints."

133.     Petrobras' dealings with SBM Offshore have been under close scrutiny since March 11, 2014, when Brazil's House of Representatives voted to create an external commission to investigate allegations of kickbacks. Just two days later, on March 13, Brazil's Senate Foreign Relations Committee voted to create a joint commission with the House of Representatives to bolster the investigation.  Brazilian Federal Police and public prosecutors also announced their own investigation, and the Comptroller's General Office has similarly announced that it was investigating 20 current and former Petrobras employees in connection with the SBM kickback scheme.  Petrobras also announced its own internal investigation into the allegations. As part of that investigation, Petrobras' Foster met with members of the oil commission of Netherlands.

134.     To no surprise, Petrobras concluded its investigation within 45 days and publicly announced that it had found no evidence of unlawful payments made by SBM Offshore. In a public statement on March 31, 2014, the Company announced that "[t]here were no facts or documents that provide proof of any payment to employees," and that there were no "irregularities" in its relationship with SBM Offshore.

135.     Just a few days later, on April 3, SBM Offshore announced the results of its own investigation, which began in 2012 and focused on former SBM employee Julio Faerman. According to the testimony of Philippe Jacques Levy, SBM's representative in Brazil, Levy informed members of Petrobras' Board of Directors about SBM's internal investigation as early as the summer of 2012.  According to Sietze Hepkema, who was hired by SBM to investigate the bribery allegations and who was recently named head of compliance at SBM, he notified Foster of SBM's investigation during a meeting that took place in early 2013.

136.   SBM Offshore's investigation found evidence of improper payments of approximately $139 million in Brazil between 2007 and 2011.  Petrobras could no longer contain the fallout from the various investigations of its dealings with SBM Offshore, and on May 27, 2014, more than a year after she was briefed on the matter, Foster announced before a Brazilian congressional hearing that Petrobras would not entertain bids from SBM Offshore on future projects while the investigations into the bribery and kickbacks continued. According to a statement made by the Company, Petrobras' profit could be reduced by $15 billion between 2014 and 2018 if it is required to suspend all contracts with SBM Offshore. Currently, SBM Offshore has 8 contracts with Petrobras which total approximately $25 billion.

137.   Finally, on November 17, 2014, Foster publicly confirmed that Petrobras had received kickbacks from SBM Offshore, and that she had become aware of the SBM kickbacks in mid-2014, contrary to statements made by SBM's head of compliance, Sietze Hepkema, who has asserted that he notified Foster of SBM's internal investigation during an early-2013 meeting. Foster further announced that SBM Offshore would not be permitted to bid on any contracts with the Company. A week later, on November 26, 2014, SBM Offshore publicly announced that the Dutch Public Prosecutor's office had "established that payments were made from the accounts of the Company's agent to government officials in Brazil."

### 6.    Transpetro Subsidiary

138.   Transpetro, Petrobras' wholly owned subsidiary, operated a transportation network to transport oil and gas products.  According to the Company, Transpetro was critical to the Company's integrated business plan, including its plan to revitalize Brazil's shipping industry through its "Fleet Modernization and Expansion Program," known by its Portuguese acronym

"PROMEF." The Company claimed that, as with its other projects, Transpetro strictly adhered to its mandatory competitive bidding process.

139.    However, like the cost overruns for the Company's capital projects, the market raised questions about Transpetro's expenditures in connection with PROMEF. Again, the Company resorted to its usual denials. For example, in response to *O Globo* articles detailing specific contractual terms in a February 27, 2011 report, Petrobras stated that allegations of "overbilling against the administration of Transpetro . . . are unfounded." According to Petrobras, Transpetro's "management is transparent, always focused on the public interest and continuously monitored by supervisory bodies and other competent authorities."

140.    As the investors have now learned, these denials were untrue. Transpetro's CEO, Sergio Machado ("Machado"), was a participant in the bribery scheme, and was directly implicated by Costa, who claimed that Machado paid him a 500,000 reais bribe in exchange for his approval of a shipping contract.

### 7.    The Revap Refinery

141.    The construction of the Revap Refinery in Sao Jose dos Campos is also the subject of investigation. Authorities have obtained testimony from Cartel-member Toyo-Setal's Julio Camargo admitting to paying at least $10.5 million in kickbacks to Petrobras, with at least some of the funds going directly to Duque and Costa. Duque deposited some of the funds in an overseas account, which was identified by Barusco. Costa deposited some of the funds in an overseas account with the help of Youssef. These payments related to Petrobras' contract with Ecovap – a consortium formed by Toyo, Setal Oil and Gas, and OAS – for the construction of the Revap Refinery.

142.     On January 9, 2015, pursuant to his collaboration agreement with the Brazilian government, Youssef presented a spreadsheet in which he detailed who paid kickbacks, the amounts, and which project was related to each payment. The project with the highest payment – $90 million reais in kickbacks – is Revap. The contracts between 2005 and 2012 for Revap, the third biggest refinery in the country, were for expansion and modernization. Youssef said the kickback payments were made by the joint venture BCV (formed by MPE, Camargo Correa, and Promon) and by OAS.  According to Youssef's spreadsheet, the cost for the Revap project was expected to be $3.5 billion reais, and later on it was raised to $6.7 billion reais, but the actual cost was $9 billion reais.  From that amount, 1% would go to PP (the party that had essentially appointed Costa to the Supply Director position) as kickbacks.  Much of the information appearing in Youssef's spreadsheet on the Revap refinery is corroborated by the spreadsheet seized by Brazilian authorities during Barusco's arrest, which identified a number of companies who (either on their own or as part of a consortium) inflated the contracts involved in the engineering or construction of the Revao refinery.

### 8.     The Replan Project

143.     Construction and rebuilding projects at still another Petrobras refinery – indeed, the Company's largest oil refinery, the Paulinaia refinery north of Sao Paulo, which is known as the "Replan" refinery – was marked by overbilling and fraud.  On January 14, 2015, Petrobras electrical engineer Luiz Antonio Kalil Horta ("Horta"), during his deposition with the federal police, reported that he had been pressured by Barusco's subordinates to negotiate bids well above the stipulated price for Replan projects. Horta affirmed he was removed from Replan's bidding committee, after he canceled winning bids that were higher than the budget.

144.    According to Horta, the lowest bid in a 2007 project to expand Replan's power house was $919 million reais. The amount is much higher than the $506 million reais estimated by Petrobras, which would cause the cancelation of the bidding process. However, when Horta mentioned that he would take that measure, his superior Jairo Luiz Bonet and Fernando Almeida Biato (who worked at Segen – Engineering Services of Petrobras, responsible for calculating the estimates for biddings at Petrobras) came after him. They told him not to cancel the bid and negotiate with the companies. Horta rejected their "suggestion," and in the second round of bidding, the winning bid was actually under the established budget.

145.    In a similar situation, Horta conducted bidding procedures to expand Replan's water treatment station. In that episode, he also canceled the first bidding because the proposals were above the budget calculated by Segen. In the second bidding round, one of Segen's employees raised the budget for the project.   Horta declared to the police that there was no reason for the increase, since the winning bid was placed by a reliable company that was able to execute the project.   Horta called the employee who did it, who mentioned he had been pressured to take that step, and on the same day, Horta received an email from the Segen employee informing Horta that the budget had been returned to the original – *i.e.*, higher – numbers.  Horta, however, did not conclude this bidding round, because he was transferred to another refinery, losing a bonus related to his position at Replan of about 15% to 20% of his salary. When investigators questioned whether he had any contact with Costa or Barusco, Horta denied that he had direct contact with either man, but mentioned that Fernando Almeida Biato, his superior, referred to Costa and Barsusco as the "people from above" that "are ordering we negotiate with the construction companies that were offering extremely high bids."

47

146.    Other Petrobras employees were shunted elsewhere when they raised questions about the costs incurred at the Replan Refinery.  In addition to Horta, Seishiro Morimoto, an engineer who worked on bidding for certain projects at the Replan Refinery, was also removed from the site after he had cancelled the bidding for the construction of gasoline treatment units because the bids were well above the budget.  Morimoto confirmed to Brazilian investigators that he was "intrigued" by the fact that 18 companies were invited to the bidding, but only 3 proposals were presented, which, according to him, was very unusual.

### F.    The Impact on Petrobras' Financial Statements During the Relevant Time Period

147.    The massive bribery and corruption scheme detailed herein had a material impact on the Company's reported financial results.  As witnesses have testified, the scheme had the effect of inflating contract amounts by 20%, on top of this inflation, 3% of which was used to pay bribes to Petrobras' top ranking executives and ruling political parties.  Despite this inflation, Petrobras capitalized these costs and included them as part of the value of its assets on its balance sheet.  As a result, the amount of Property, Plant, and Equipment ("PP&E") that Petrobras reported to the SEC throughout the Relevant Time Period included billions of dollars in unlawful bribes and overpayments.

148.    Under Generally Accepted Accounting Principles (defined above as "GAAP") and International Financial Reporting Standards ("IFRS"), bribes and inflated costs cannot be capitalized and recorded as assets in the Company's financial statements.  IFRS provision International Accounting Standard ("IAS") 16 states that "[a]n item of property, plant and equipment that qualifies for recognition as an asset shall be measured at its cost," where "cost" is defined as "the amount of cash or cash equivalents paid or the fair value of the other consideration given to acquire an asset at the time of its acquisition or construction."  GAAP requires the same.

Under GAAP, Accounting Standards Codification ("ASC") 360, companies can record the "historical cost" of PP&E, which includes only "the costs necessarily incurred to bring it to the condition and location necessary for its intended use." The bribes and the inflated costs incurred due to the Cartel conspiracy were not cash "given to acquire an asset at the time of its acquisition or construction" under IAS 16, nor were these costs "necessarily incurred to bring [the asset] to the condition and location necessary for its intended use" under ASC 360. Accordingly, these payments could not be recorded as assets in the PP&E reported within Petrobras' financial statements

149.    Throughout the Relevant Time Period, Petrobras claimed that it was valuing its PP&E assets in accordance with the appropriate accounting guidelines. However, Petrobras' accounting for these payments was in direct violation of GAAP and IFRS.

150.    Instead of capitalizing the bribes and inflated costs, Petrobras, under the relevant accounting principles, was required to recognize the inflated costs and payments as expenses pursuant to IFRS CF 4.52, IAS 1 and ASC 360.

151.    In a press release dated January 27, 2015, Petrobras admitted that the bribes and inflated costs were improperly capitalized as part of the historical cost of its property, plant and equipment and were still part of their carrying amount. The Company further admitted that it would need to correct these amounts and, accordingly, Petrobras admitted that its financial statements contained "errors in the carrying amount of [PP&E]."

152.    Since then, Petrobras filed Form 6-K with the SEC on April 23, 2015 and has admitted that the Company improperly recorded the bribery payments as assets during the Relevant Time Period, having an impact of approximately $2.5 billion. Moreover, it has attributed $11.6 billion to the impact of the bribery scheme on the Abreu e Lima and Comperj refineries.

Accordingly, throughout the Relevant Time Period, the reported assets in Petrobras' financial statements were overstated by at least $14.1 billion.

## VI.    ADDITIONAL ALLEGATIONS RELATED TO THE SCHEME

153.    On November 12, 2012, *Bloomberg*, citing the Brazilian news magazine *Veja*, reported that a Brazilian Federal prosecutor had requested information from Petrobras regarding its $1.1 billion purchase price for the Pasadena refinery and that an investigation could be opened depending on Petrobras' response.  Petrobras' common ADSs declined 1.97% on November 12, 2012 and Petrobras' preferred ADSs declined 2.03% on November 12, 2012.

154.    On February 14, 2014, *Bloomberg* reported that Petrobras started in internal investigation related to allegations of bribery payments made by SBM.  Over the next two days that markets were opened for trading, further details came to light. On February 14, 2014, Petrobras' common ADSs declined by $0.05 or 0.43%, and Petrobras' preferred ADSs declined by $0.05 or 0.41%.

155.    On February 17, 2014, according to *Bloomberg*, the Brazilian Comptroller asked Petrobras for information related to the contracts signed with SBM.  In addition, it was reported that Foster publicly acknowledged the Company's internal investigation into the SBM bribery allegations.  On February 18, 2014, Petrobras' common ADSs declined by $0.31 or 2.69%, and Petrobras' preferred ADSs also declined by $0.43 or 3.5%.

156.    On March 13, 2014, the Brazilian newspaper *O Globo* reported that members of Brazilian parliament were arguing for expansion of the special commission to investigate bribery allegations.  On that same day, *Folha* published an article stating that Brazilian federal authorities had started a criminal investigation into allegations that Petrobras officials received bribes from

SBM.  On March 13, 2014, Petrobras' common ADSs declined by $0.15 or 1.40%, and Petrobras' preferred ADSs declined $0.20 or 1.78%.

157.    On March 14, 2014, *O Globo* further reported that the TCU had opened an investigation into the bribery allegations related to SBM.  On the same day, *Bloomberg* reported that Antonio Imbassaby, an opposition lawmaker, proposed a guide for the investigation of Petrobras.  The guide was presented to the Brazilian legislature, with a main provision mandating that Congress supervise the investigation.  On March 14, 2014, Petrobras' common ADSs declined by $0.17 or 1.61%, and Petrobras' preferred ADSs declined by $0.19 or 1.72%.

158.    On April 8, 2014, *Bloomberg* reported that leaders of the opposition parties filed an injunction with Brazil's Supreme Court to guarantee creation of a parliamentary commission to exclusively investigate Petrobras' purchase of the Pasadena Refinery.  On April 8, 2014, Petrobras' common ADSs declined $0.30 or 2.11%, to close at $13.92, and Petrobras' preferred ADSs declined $0.35 or 2.36%, to close at $14.48.

159.    On April 9, 2014, the Brazilian senate approved a broader probe involving Petrobras.  On April 9, 2014, Petrobras' common ADSs declined $0.09 or 0.65%, to close at $13.83, and Petrobras' preferred ADSs declined $0.08 or 0.55%, to close at $14.40.

160.    On April 15, 2014, the Brazilian Congress instituted an inquiry in response to apparent overspending by Petrobras on the Pasadena refinery as well and allegations that Petrobras managers received bribes in connection with contract Petrobras granted to SBM Offshore, a Dutch oil-production ship leasing company.  On that day, CEO Foster spoke about the project before a Brazilian Senate hearing, and conceded that the company was likely to lose money on the deal. On April 15, 2014, the price of Petrobras common ADSs and preferred ADSs fell $0.55 and $0.61 per share, respectively, or 3.96% and 4.24%, to close at $13.33 and $13.77.

161.    On April 22, 2014, *Folhade S.Paulo* published an article providing more details about the Pasadena transaction.  According to the article, in 2007, Transcor which originally owned the Pasadena refinery and sold half of it to Petrobras, offered to buy back Petrobras' share in the refinery.  Petrobras refused, and in the end, after an extensive legal battle, Petrobras was, instead, forced to purchase the remaining half still owned by Transcor for $885 million, bringing its total purchase price for the Pasadena refinery to $1.25 billion.  The refinery was originally purchased by Transcor for only $42.5 million in 2005.  On April 22, 2014, Petrobras' common ADSs fell $0.37 or 2.65%, to close at $13.60 and Petrobras' preferred ADSs fell $0.31 or 2.12%, to close at $14.29 on April 22, 2014.

162.    On April 25, 2014, the Brazilian newspaper *O Estado de Sao Paulo* reported that an ex-Petrobras official was accused of money laundering from 2009 to 2014, related to the payment of overpriced contracts to companies who directly or indirectly rendered services to Petrobras, an activity assisted by Costa.  On April 25, 2014, Petrobras' common ADSs fell by $0.23 or 1.68% to close at $13.50 per share and Petrobras' preferred ADSs fell by $0.21 or 1.45% to close at $14.27.

163.    On May 8, 2014, *Valor* reported that Petrobras would postpone the conclusion of its internal investigation into the Pasadena transaction for another thirty days.  The findings were to be submitted to the Comptroller, TCU, and other Brazilian regulatory bodies.  Petrobras' common ADSs declined $0.48 or 3.07%, to close at $15.18, and Petrobras' preferred ADSs declined $0.58 or 3.46%, to close at $16.19 on May 8, 2014.

164.    On May 14, 2014, after the close of trading, the *Wall Street Journal* reported that the Brazilian Senate had opened a probe into Petrobras' purchase of the Pasadena Refinery, and that "Petrobras' current chief executive officer, Maria das Graças Silva Foster, and the CEO before

Ms. Foster, José Sergio Gabrielli, are expected to testify next week."   Petrobras' common ADSs declined $0.32 or 2.05%, to close at $15.27 and Petrobras' preferred ADSs declined $0.24 or 1.45%, to close at $16.27 on May 15, 2014.

165.    On June 17, 2014, *Estado* reported that another refinery owned by Petrobras was under investigation by Brazilian authorities.   According to the article, the Federal Public Ministry suspected that like the Abreu e Lima Refinery, the Repar refinery in Paraná was also part of the money laundering scheme.   Petrobras' common ADSs declined $0.28 or 1.77%, to close at $15.52 and Petrobras' preferred ADSs declined $0.35 or 2.08%, to close at $16.44 on June 17, 2014.

166.    On August 12, 2014, after the market closed, *Bloomberg News* reported that a Petrobras-linked money laundering probe had spread to banks, including Citigroup, HSBC, and Bradesco.   In the article, it stated that prosecutors were investigating whether financial institutions met compliance requirements.   Petrobras' common ADSs declined $0.72 or 4.45%, to close at $15.46 and Petrobras' preferred ADSs declined $0.84 or 4.88%, to close at $16.37 on August 13, 2014.

167.    On Sunday, September 7, 2014, *Bloomberg News* reported that information was being leaked "to local media from a police investigation into alleged kickbacks involving [Petrobras] in an attempt to alter the results of the October national election.   On September 8, 2014, Petrobras' common ADSs and preferred ADSs both declined $1.03 per share or more than 5%, to close at $18.35 and $19.24, respectively.

168.    On September 8, 2014, after the market closed, Petrobras issued a statement acknowledging Costa's arrest and the federal criminal investigation. The Company stated, in part:

> It is in the best interests of the company's management to see the completion of all ongoing investigations. Any irregular acts that may have been committed by a person or group of people, whether or not they are company

employees, do not represent the conduct of the Petrobras institution and its workforce.

On September 9, 2014, Petrobras' common ADSs declined $0.52 per ADS or 2.83%, to close at $17.83 per ADS, and Petrobras' preferred ADSs declined $0.53 or 2.75%, to close at $18.71.

169.    On September 30, 2014, after the market closed, *Bloomberg News* published an article regarding allegations that top executives at Petrobras were involved in the grafting scandal. The article stated that Duque "stamped and signed at least 6.6 billion Brazilian reais ($2.7 billion) in contracts for the Abreu e Lima refinery," and Costa had revealed to prosecutors that "misappropriation of funds also existed in other divisions including the one Duque headed." On October 1, 2014, Petrobras' common ADSs declined $0.89 per ADS or 6.27%, and Petrobras' preferred ADSs declined $1.05 or 7.05%.

170.    On October 9, 2014, after the market closed, *The Wall Street Journal* reported that Costa "alleged a certain percentage of the contracts at the refining unit at Petrobras were to go to members of the Workers' Party." Additionally, recordings of Costa's testimony given in Brazilian court were reported to have been released. On October 10, 2014, Petrobras' common ADSs declined by $1.15 per ADS or 6.86% to close at $15.62 per ADS, and Petrobras' preferred ADSs declined $1.22 or 6.87%, to close at $16.55 per ADS.

171.    On October 15, 2014, the Administrative Council for Economic Defense, an agency of the Brazilian government responsible, among other things, for combatting corruption, announced that it would formally investigate the existence of a cartel involving enterprises that have contracts with Petrobras. On October 15, 2014, Petrobras' common ADSs declined $1.55 or 9.06% and Petrobras' preferred ADSs declined $1.58 or 8.73%.

172.    On October 16, 2014, before the market opened, news reports circulated of TCU's findings concerning the Comperj facility. The TCU report described the project's management as

"reckless" and stated that Petrobras will spend 60 percent more than originally budgeted at one of its refineries.  Specifically, the TCU concluded that Petrobras' management had been "reckless with irregularities in the omission of technical analyses, overpaying for contracts and a lack of effective controls."  On October 16, 2014, Petrobras' common ADSs declined $1.05 per ADS or 6.75%, and Petrobras' preferred ADSs declined $1.30 or 7.87%.

173.    On Saturday October 18, 2014, during a news conference, Rousseff admitted that there was embezzlement and that the Brazilian government would seek reimbursement of any money illegally diverted from the Company.  Petrobras' common ADSs declined $0.93 per ADS or 6.23%, to close at $14.00 per ADS on October 20, 2014, and Petrobras' preferred ADSs declined $1.08 or 6.9% to close at $14.57 on October 20, 2014.

174.    On October 20, 2014, after the market closed, *Bloomberg News* published a detailed article about the money laundering and bribery scheme. The article noted that Costa had admitted that for almost a decade he and other Petrobras officials accepted bribes "from companies to whom Petrobras awarded inflated construction contracts" and "then used the money to bribe politicians through intermediaries to guarantee they would vote in line with the ruling party while enriching themselves."  On October 21, 2014, Petrobras' common ADSs declined $0.80 per ADS or 5.71%, to close at $13.20 per ADS, and Petrobras' preferred ADSs declined $0.98 or 6.73% to close at $13.59.

175.    On October 22, 2014, *Bloomberg* reported securities regulators would also begin an inquiry into whether Petrobras violated securities laws.  On October 22, 2014, Petrobras' common ADSs declined $0.37 or 2.80%, and Petrobras' preferred ADSs declined $0.35 or 2.58%.

176.    After months of repeatedly and vehemently denying the existence of the bribery and corruption scheme, on October 27, 2014, Petrobras issued a formal statement filed in a Form

6-K with the SEC regarding Operation Car Wash.  In this statement, Petrobras acknowledged for the first time that the facts revealed by the police investigation could have a significant negative impact on its business. The Company also outlined the steps the Company was taking in response to the testimony and the investigation.  On October 27, 2014, the Company's ADSs fell nearly 14% in a single day on extraordinarily high volume. Specifically, the common ADSs dropped $1.77 or 13.69%, and the preferred ADSs dropped $1.97 or 14.64%.

177.    On Saturday, November 1, 2014, the Brazilian outlet of *Bloomberg News* reported that PricewaterhouseCoopers Auditores Independentes ("PwC"), Petrobras' auditor, had declined to sign off on the Company's third quarter financial results in light of the money-laundering and bribery investigations.  Specifically, PwC refused to sign off on the financial results for one of Petrobras' subsidiaries, Transpetro, as they were signed by its CEO, Sergio Machado.   On November 3, 2014, Machado agreed to take a 31-day unpaid leave of absence.  Also on November 3, 2014, Petrobras issued a press release announcing that Machado had "presented a letter to the Board of Directors of this subsidiary requesting a non-paid leave for the next 31 days."   On November 3, 2014, Petrobras' common ADSs declined $0.44 or 3.76% to close at $11.26, and Petrobras' preferred ADSs declined $0.56 or 4.58% to close at $11.67.

178.    On Sunday November 9, 2014, the *Financial Times* reported that the DOJ had opened a criminal investigation into whether Petrobras or its employees were paid bribes and that the SEC had opened a civil investigation into the matter. On November 10, 2014, Petrobras' common ADSs declined $0.28 per ADS, or 2.57%, to close at $10.62, and Petrobras' preferred ADSs declined $0.23, or 2.04%, to close at $11.04.

179.    On November 13, 2014, after the market closed, Petrobras issued a press release, which it filed with the SEC on Form 6-K. The press release revealed for the first time that the

allegations of bribery and corruption at Petrobras could potentially impact the Company's financial statements, but it did not specify how.

180.   On November 14, 2014, the Brazilian Federal Police arrested Duque. Duque's arrest revealed to the market that Costa's bribery and graft admissions were not the actions of a rogue employee, but instead spread throughout the Company. That same day, the Brazilian Federal Police arrested 26 other likely Cartel members in connection with the investigation of Petrobras, including senior executives and contractors who had contracts with Petrobras worth approximately $59 billion.  In addition, Brazil's Comptroller General's office announced that it was investigating allegations that Petrobras officials accepted bribes to award contracts to SBM Offshore.  Petrobras' common ADSs dropped 2.45%, falling from a close of $10.20 per share on Thursday, November 13, 2014 to close at $9.95 per share on Friday, November 14, 2014, and Petrobras' preferred ADSs dropped 2.76%, falling from a close of $10.52 per share on November 13, 2014 to a close of $10.23 per share on November 14, 2014.

181.   On Monday, November 17, 2014, before the market opened, the Company held its earnings conference call with investors. During the call, Foster admitted that while the Company had not yet determined the extent of the corruption scheme, "the accusations and investigations of the [O]peration Car Wash ... if found to be true, could potentially affect the Company's financial statements."  Almir Guilherme Barbassa ("Barbassa"), Petrobras's CFO during the Relevant Time Period, identified the specific line items on Petrobras' balance sheet and income statement that were impacted by the fraud, stating that "if the accusations are proven to be true ... payment above what would be a fair value for a good [or] service ... should be removed from the PP&E line item ... and should be taken to the result." Barbassa went on to state that Petrobras' PP&E "should not include values which are not a fair value for that good or service" – *i.e.*, bribes – and that the

Company "would deduct from it any amount that could be linked to bribery of any sort; any excessive price that would have been charged." Likewise, in response to an analyst's inquiry into why the alleged corruption would necessitate an asset write-down if proven true, Foster stated: "You have an obligation to write off from the asset a cost related to corruption . . . if there is a cost relating to corruption in the value of [a] net asset, even if the asset can pay off that cost, you have an obligation to write off that cost."

182.    Additionally, on November 17, 2014, a *Washington Post* article titled "'Operation Carwash' in Brazil Causes Normally Staid Business Meeting to Go Off Script," noted that the conference call contained "[w]ords nobody wants to hear at a quarterly results event for a world-renowned oil company with a $220.6 billion business plan to complete: 'corruption,' 'bribe,' 'federal police,' 'internal investigation,' 'over-invoicing,' 'governance,' 'difficult moment' and 'painful.'"  As the *Washington Post* also noted, Defendant Foster's representations that no one within the Company "[h]ad any idea of the scale of the corruption problem" in March raised more questions than it answered: "So nobody knew anything.  If not, why not?  There are billions of dollars involved in Operation Carwash.  Two top executives were jailed."

183.    On November 17, 2014, the prices of Petrobras common ADSs dropped 6.23%, falling from a close of $9.95 per share on November 14, 2014 to a close of $9.33 per share on November 17, 2014 and preferred ADSs dropped nearly 5.77%, falling from a close of $10.23 per share on November 14, 2014 to a close of $9.64 per share on November 17, 2014.

184.    However, because the Company did not provide a range or scope of the potential write-downs, the market was uncertain of the impact.  Some analysts expressed skepticism that the impact would be significant.  In an analyst report titled "PBR Conference Call What Happens Next?" an analyst from Itau BBA noted that:

The impact [of the scandal] might … not be too significant for the time being, at least not as considerable as the USD 16 billion estimated capex overrun for [Abreu e Lima]. Additional adjustments might be required as the investigations evolve.

185.    The Itau BBA analysts concluded that "[t]he impact of a possible write-off, assuming a reduction in the asset value, is therefore minimal."

186.    On Sunday, December 7, 2014, the *New York Times* reported that Mendonca Neta, an executive at Toyo-Setal, an EPC and shipbuilding company heavily implicated in the Cartel's activities, testified the previous week that he paid more than $23 million in bribes directly to the Workers' Party and Petrobras executives in exchange for contracts to build oil tankers.   On December 8, 2014,  Petrobras common ADSs and preferred ADSs declined by $0.59 and $0.65 per share, respectively, or 6.69% and 6.91%, to close at $8.23 and $8.75 per share.

187.    On December 10, 2014, Reuters reported that "Brazil's state controlled oil firm Petrobras may have to hike fuel prices, cut spending or seek a capital injection from the government next year as a widening corruption probe threatens to temporarily leave it out of capital markets."   The article noted that Petrobras might trigger early payment provisions for approximately $11 billion in bonds and a $5.8 billion loan if it did not publish audited financial statements.   On December 10, 2014, Petrobras common ADSs and preferred ADSs declined by $0.40 and $0.45 respectively per share, or 4.91% and 5.14%, to close at $7.75 and $8.31 per share.

188.    On December 12, 2014, at 2 a.m. New York time, before the market opened, *Valor Economico* reported, as part of an article that included an interview with Venina, that it had obtained documents showing that in 2009, Venina had warned Foster about inflated contracts on refinery projects. In response to *Valor Economico*, Petrobras issued a statement saying it began investigations into the information in 2008.   On December 12, 2014, Petrobras' common ADSs

and preferred ADSs declined by $0.31 and $0.41 per share, respectively, or 4.18% and 5.14%, to close at $7.11 and $7.57 per share.

189.     Following the December 12 publication of *Valor Economico*'s article, Petrobras took immediate steps to discredit Venina.  Late on December 12, 2014, Petrobras posted a response on "Facts and Data," stating that the Company "took all measures to elucidate the facts in [Venina's] reports" and questioned why Venina waited five years to bring this information to light, insinuating that it was nothing more than an act of retaliation.

190.     On December 12, 2014, after the market closed, Petrobras announced that because of the impact of the bribery investigation, it was not releasing its consolidated interim financial statements for the third quarter of 2014 because those statements had not been approved by its independent auditors.  Petrobras also disclosed that it was reducing its planned levels of capital expenditures and reducing operating costs in order to "eliminat[e] the need for additional financing in the capital markets next year."

191.     On December 15, 2014, just weeks after Cervero appeared before the CPI and denied having received any bribes or knowing about the alleged corruption, Brazilian criminal authorities announced Cervero's formal indictment for acts of corruption and money laundering. Cervero was implicated in, among other things, receiving tens of millions of dollars of bribes in connection with his implementation of the suspicious Pasadena acquisition, as well as an additional $53 million in bribes in connection with a deal to supply offshore drilling vessels by Samsung Heavy Industries.

192.     With Cervero's arrest, investors learned that the corruption at Petrobras was more rampant and broader in scope than had previously been disclosed. Due to his former position as

International Director, Cervero's arrest indicated that the criminal scheme was not confined to bribery and money laundering in Brazil, but was in fact international in scope.

193.     On December 15, 2014, the Company's common ADSs fell 11.96%, from a close of $7.11 per share on December 12, 2014 to a close of $6.26 per share on December 15, 2014, and the preferred ADSs fell 12.02%, from a close of $7.57 per share on December 12, 2014 to a close of $6.66 per share on December 15, 2014.

194.     On Sunday, January 4, 2015, several news sources disclosed significant new information concerning the scope of the fraud and its impact on the Company's financial results. First, *O Globo* published a report disclosing new evidence of irregularities found by the TCU, including overbilling and improper bidding process, concerning the construction of the Gasene pipeline—a project that Foster oversaw during her tenure as the head of Petrobras' Gas and Energy Division.  Second, a report published in *Folha S. Paulo* on January 4, 2015 revealed that an internal Company audit completed in November 2014 concluded that Petrobras would have to record R$1 billion in losses on equipment purchased in connection with projects associated with Comperj that were acquired before the plans for the project had been finalized, and which could no longer be used. Further, *Folha* reported, the internal audit identified other "irregularities" in connection with a R$3.8 billion contract for Comperj that was awarded without competitive bidding to Cartel members Odebrecht, UTC and Toyo. In both cases, the internal audit concluded, the Comperj contracts had been influenced by "pressures" from Duque and Costa.

195.     On January 5, 2014, Petrobras common and preferred ADSs fell approximately 10%, with Petrobras common ADS falling from $6.76 per share on January 2, 2015 to $6.07 per ADS on January 5, 2015, and Petrobras preferred ADSs dropping from $6.95 to $6.26.

196.    On January 6, 2015, Petrobras disclosed that the unpaid leave of Transpetro CEO Machado would be extended until January 21, 2015, following a confidential meeting of the Board of Directors. Further, according to a report in *Estadao*, Petrobras shares continued to decline on January 6, 2015 because they were "affected by the news that the National Agency of Petroleum, Natural Gas and Biofuels (ANP) applied R $18.7 million fine to Petrobras for irregularities in two platforms."  On January 6, 2015, the Company's common ADS fell to $6.02 per share, while Petrobras preferred ADS declined to close at $6.14 per share on January 6, 2015.

197.    Finally, after the markets closed on January 27, 2015, Petrobras released its unaudited third-quarter financial statements. The Company's external auditor, PwC, did not sign off on Petrobras' third quarter financial statements, and its reported results did not contain any write-downs of Petrobras' PP&E.

198.    In its January 27, 2015 earnings release, which it filed with the SEC on Form 6-K on January 28, 2015, the Company acknowledged that "[t]he information currently available to the Company indicates that contracts entered into between January 1, 2004 and April 30, 2012 . . . with suppliers and contractors named in the depositions may have included amounts related to the misconduct by suppliers and contractors, political agents, Petrobras personnel and other people." Petrobras further disclosed that R$188.4 billion (US$73 billion) of the Company's assets, "or approximately 1/3 of the company's total fixed assets," relate to "contracts assigned between Petrobras and the [Cartel] companies...from 2004 to April 2012," and were thus impacted by the corruption charges.

199.    The Company also admitted that it improperly capitalized as assets the inflated contract amounts confessed to by Costa, resulting in the material overstatement of its PP&E.

200.    In the January 27, 2015 earnings release, Petrobras admitted that it needed to "correct" the carrying value of its PP&E. The Company likewise acknowledged in Note 2 that the failure to correct the carrying value of PP&E meant that its financial statements contained material errors and did not comply with IFRS.

201.    Although Petrobras acknowledged that the corruption scandal would result in significant financial adjustments to the Company's balance sheet and income statement, it did not record an asset write-down. However, as the Company disclosed, its internal review of certain assets impacted by the fraud indicated a range of potential write-downs between $1.5 billion and $34 billion.

202.    Petrobras' admissions concerning the material errors in its financial results and the vast scope of the fraud, coupled with its internal control weaknesses and its continued lack of transparency regarding the quantification of the write-down, unsettled the market.  On January 28, 2015, Petrobras' common ADSs fell $0.89 or 11.95%, from a close of $7.45 per share on January 27, 2015 to a close of $6.56 per share on January 28, 2015 and the Company's preferred ADSs fell $0.92 or 11.7%, from a close of $7.86 per share on January 27, 2015 to a close of $6.94 per share on January 28, 2015.

203.    On February 6, 2015, Petrobras announced that it had appointed a new chief executive, Aldemir Bendine, the head of the nation's Banco do Brasil.  Cunha, the independent board member representing minority shareholders who was unceremoniously dismissed from the Board's audit committee following his public revelation of his discomfort with the Company's 2013 financials, said he learned about Bendine's appointment from news reports before the Board of Directors even had a chance to vote on the appointment: "We have seen today an episode of disrespect for the board of directors of Petrobras," Cuhna stated. "Once again the controlling

shareholder (the government) has imposed its will over the interests of Petrobras, ignoring the appeals of long-term investors." Anger at state interference led all three independent Board members to vote against Bendine's appointment.   In a similar vein, Silvio Sinedino, a representative of the Company's unionized employees, said he voted against Bendine and five other senior appointments in protest over the political nature of the appointments and the failure to consult the Board and Company workers.

204.    On February 6, 2015, Petrobras' common ADSs declined $0.57 or 8.02% to close at $6.54 on February 6, 2015, and Petrobras' preferred ADSs declined $0.63 or 8.73% to close at $6.59 on February 6, 2015.

205.    On February 24, 2015, after the close of trading, Petrobras announced in a Form 6-K filing that Moody's Investor Service had downgraded its global foreign currency debt ratings from Baa3 to Ba2, such that Petrobras was no longer an investment grade company for Moody's. Petrobras stated that the revision reflected Moody's concerns "with the ongoing investigation of corruption and possible liquidity pressures that may arise if the Company is not able to timely deliver its audited financial statements."

206.    Also on February 24, 2015, after the close of trading, Moody's Investors Service cut Petrobras' bonds to junk, stripping them of their investment grade rating, as the Company faced a widening corruption probe.   The downgrade "reflects increasing concern about corruption investigations and liquidity pressures," Nymia de Almeida, an analyst at the rating company, said in a statement.   On February 25, 2015, Petrobras' common ADSs declined $0.37 or 5.39% to close at $6.49 on February 25, 2015, and Petrobras' preferred ADSs declined $0.47 or 6.72% to close at $6.52.

207.    On March 3, 2015, after the close of trading, *Bloomberg* reported in an article entitled "Petrobras Scandal Takes Brazilian Politicians To Supreme Court" that a Brazilian court official had announced that Brazil's top prosecutor had asked the Supreme Federal Court to open investigations into politicians who benefited from Petrobras kickbacks. The next trading day, March 4, 2015, Petrobras' common ADSs and preferred ADSs declined by $0.23 and $0.28 per share, respectively, or 3.59% and 4.31%, to close at $6.18 and $6.21.

208.    On March 10, 2015, the *New York Times* reported in an article entitled "Former Petrobras Executive Tells Brazil Congress of Bribes" that Barusco told a congressional panel that he began accepting bribes from some of the country's top construction firms 18 years earlier, and that by 2003 "that practice had become more widespread and institutionalized." He also estimated that the FP had received between $150 million and $200 million.  Following this news, on March l0, 2015, Petrobras' common ADSs and preferred ADSs declined $0.29 and $0.21 per share, respectively or 5.19% and 3.70% from their opening price, to close at $5.30 and $5.47 per share.

209.    On March 13, 2015, the Brazilian newspaper *Folha de S. Paulo* reported that Petrobras had spoken with creditors about the possibility of delaying its audited financial reports by another six months, citing unnamed "senior officials at the company and state bankers." On March 13, 2015, Petrobras' common ADSs and preferred ADSs declined $0.20 and $0.23 per share, respectively 3.84% and 4.32% from their opening price, to close at $5.01 and $5.10 per share.

210.    On March 19, 2015 it was reported by a number of news sources that Swiss regulators seized $400 million of bank assets as part of the probe into Petrobras. In addition *Thestreet.com* reported a number of problems tied to the Brazilian state-owned energy company's ongoing corruption scandal. First, the TCU announced that it had chosen to investigate whether

Petrobras board members mismanaged the company. Also, Brazil's Comptroller-General Office added six more construction and engineering firms to its investigation into contractors that allegedly participated in corrupt dealings at the energy company. According to the article, this brought the total number of firms under investigation to twenty four.   The claims allege that the firms overpriced their contracts in a multi-billion-dollar scheme that pushed bribes to Petrobras executives and Brazilian politicians.   Petrobras' common ADSs declined $0.40 or 7.07%, to close at $5.26 and Petrobras' preferred ADSs declined $0.36 or 6.26%, to close at $5.39 on March 19, 2015.

## VII.   LOSS CAUSATION

211.    During the Relevant Time Period, as detailed herein, the Exchange Act Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Petrobras' securities by misrepresenting the Company's operating conditions, commitment to ethics and corporate responsibility, and financial condition.

212.    As a result, the market for the Company's securities promptly digested current information with respect to Petrobras from all publicly available sources and reflected such information in the price of the Company's securities.  Accordingly, Plaintiff purchased Petrobras' securities at artificially inflated prices.  Once the truth began to emerge, the artificial inflation was removed, causing Plaintiff economic loss.

## VIII.   FALSE AND MISLEADING STATEMENTS DURING THE RELEVANT TIME PERIOD

### A.     The Company's Misrepresentations of Adherence to its Compliance and Ethics Practices

213.    Petrobras' "Code of Best Practices" is explicitly described in its annual SEC filings. The annual report, on the 2009 20-F, represented that pursuant to rules promulgated by the New

York Stock Exchange mandating that "listed companies must adopt and disclose a code of business conduct and ethics for directors, officers and employees, and promptly disclose any waivers of the code for directors or executive officers," Petrobras "has adopted a Code of Ethics (*Código de Ética*) applicable to its employees and a Code of Good Practices (*Código de Boas Práticas*) applicable to directors and executive officers.  No waivers of the provisions of the Code of Ethics or Code of Good Practices are permitted.  Both documents are available on Petrobras' website."

214.    The Ethics Code is also explicitly described in the 2009 20-F:

> We have always guided our business and our relations with third parties by strong ethical principles. In 1998, our board of executive officers approved the Petrobras Code of Ethics, which was extended to all Petrobras companies in 2002. In 2008, our board of executive officers further developed our ethics management through the creation of the Petrobras Ethics Commission. The Code of Ethics is applicable to all employees, the board of executive officers and the board of directors. The document is available on our website at http://www.petrobras.com.br/en/investors/. It is the responsibility of the Ethics Commission to promote compliance with ethical principles and act as a forum for discussion of subjects related to ethics. Currently, the Commission's focus is to develop and strengthen the Petrobras Ethics Management System, which is aimed at assuring the highest ethics standards by defining the roles of managers, employees, the Ethics Commission and their relationships.

215.    The preamble to the Code of Best Practices, in effect during the Relevant Time Period, states that "it is necessary that both management and also employees of Petrobras conduct themselves according to the highest ethical standards."  Chapter III of the Code of Best Practices, titled "Policy for Conduct of Management and Employees Who Comprise the Senior Management of Petrobras," states in Article 17 that "[m]anagement and employees comprising the Senior Management of Petrobras have the same duty of loyalty and consequently must conduct themselves in such a way as to avoid any occurrence of situations which may be construed as a conflict of interest and affect the Company's businesses and operations."

216.    Article 18 of Chapter III of the Code of Best Practices states that:

The management and employees comprising the Senior Management of Petrobras, principally those employees in positions of authority or, as a result of their functions, having contact with clients, suppliers and competitors, must, in compliance with this Policy, abstain from: receiving from any supplier, client or competitor, a reward or payment for services rendered as an employee or consultant; receiving for himself or any member of his familiy [*sic*] or person residing in his place of abode, gifts or entertainment which, irrespective of value, may give grounds for conflicts of interest; [or] practicing [*sic*] any acts that place him/her in a position of subordination or under the influence of a supplier, client or competitor.

217.    Items I-III of the "Complementary Provisions" section of the Ethics Code, in effect during the Relevant Time Period, states:

The Ethics Code covers the members of the Boards of Directors, Fiscal Councils, Executive Boards, the occupants of managerial functions, employees, trainees and service providers of Petrobras system, as individual and collective commitment of each and all of them to comply with it and promote its compliance in all actions of the productive chain of Petrobras System and in its relations with all interested parties. . . The employees of Petrobras System will formally acknowledge this Code, which will be widely disseminated through printed and electronic means. . . The violation of the principles and commitments expressed in this Code may result in the adoption of disciplinary measures, in accordance with the standards of the companies comprising Petrobras System.

218.    Section 1.1 of the Ethics Code pledges the following:

Pursuit [*sic*] a balance of power between the High Management (Board of Directors and Executive Boards) and shareholders interest, including minority, with a view to aligning the System's strategic objectives with the interests and rights of all interested parties.

219.    Section 1.2 further pledges that Petrobras would undertake to:

conduct its business with transparency and integrity, creating credibility with its shareholders, investors, employees, suppliers, customers, consumers, government, media, communities where it operates and society in general, pursuing to achieve growth and profitability with social and environmental responsibility.

220.    Section 8.8 of the Ethics Code explicitly states that the Company would undertake to "refuse any corrupt and bribery practices, keeping formal procedures for control and consequences of any transgressions."  Section 8.10 further states the Company would undertake

to "refuse support and contributions to political parties or political campaigns of candidates for elective offices."

221.    Substantively similar statements regarding Petrobras' adoption and implementation of the Code of Good Practices and Ethics Code were repeated in the 2010 20-F, 2011 20-F, 2012 20-F and the 2013 20-F.

222.    On July 4, 2013, the Company announced the adoption of the "Petrobras Corruption Prevention Program (PCPP)," which the Company stated was "aimed at reinforcing the prevention, detection and correction of acts of fraud and corruption, through integrated management and improvement of actions and controls in our governance structure."  As part of the PCPP, the Company published and made available on its website the "PCPP Manual" in December 2014, which defendant Foster stated "set[] out the main concepts and measures adopted by the [PCPP] and reaffirms our commitment to ethics, transparency and zero tolerance to fraud and corruption in our activities and businesses."  In the PCPP Manual, Petrobras acknowledged that it is "subject to . . . [the] United States Foreign Corrupt Practices Act 1977 (FCPA), a federal anti-corruption law to which were are subject since we have American Depositary Receipts (ADSs) traded on the New York Stock Exchange."

223.    On November 19, 2014, the Executive Board approved the Petrobras "Conduct Guide," published (and currently available) on the Company's website, whose preamble stated that "[m]embers of senior management and people in managerial positions are responsible for complying with and striving to enforce the guidance established in this guide, spreading its application among the teams they manage."  The Conduct Guide also stated that it "applies to members of the Board of Directors, Audit Council and Executive Board, the occupants of management functions, employees and interns."

224.    Under the heading of "General Guidelines," Section 4.1.4 of the Conduct Guide states that its employees cannot "imply, request, demand or accept, nor offer, promise or give any kind of favor, advantage, benefit, donation, gratuity or bribe, for the benefit of yourself or another person, in exchange for actions by yourself or third parties."

225.    Under the heading "Fraud and Corruption," Sections 4.6 through 4.63 state that:

For the purposes of applying this guide, fraud means any intentional action or omission aimed at injuring or deceiving another person, capable of resulting in a loss for the victim and/or an improper advantage, material or otherwise, for the author or third parties. . . For the purposes of applying this guide, corruption means any direct or indirect action consisting of authorizing, offering, promising, requesting, accepting, delivering or receiving an improper advantage, of economic nature or otherwise, involving individuals or legal entities, public agents or otherwise, with the aim of making someone do or not do a given act.  Petrobras repudiates any and all forms of fraud and corruption at all hierarchical levels, in the public and private sectors.  Petrobras requires the following: . . .Reject and report situations of fraud and corruption, of any kind, direct or indirect, active or passive, whether or not involving monetary values; Do not imply, request, accept or receive kickbacks, bribes or any other improper advantages.

226.    Under the heading "Relations with Customers and Suppliers," Sections 4.10.4 and 4.10.4.4 through 4.10.4.8, the Conduct Guide states that Petrobras requires its employees to

Conduct procurement or negotiation meetings formally, always in the presence of at least one other Petrobras employee.  Direct procurement that does not require a competitive tender offer due to its low value may be conducted by a formally designated employee, in accordance with the company's internal rules; Inform your immediate manager of inappropriate conduct or behavior by customers and suppliers; [and] Guide customers and suppliers with regard to the Petrobras System's Code of Ethics, this guide and other internal rules.

227.    The statements set forth above in paragraphs 213 - 226 were materially false and misleading because throughout the Relevant Time Period and in direct contradiction to the publicly-available policies set forth in the Ethics Code and Code of Good Practices, Petrobras and its top executives were engaged in a massive bribery and corruption scheme causing harm to investors and minority shareholders alike.

228.     Despite all the representations regarding Petrobras' compliance with applicable laws and implementation and adherence to its own internal anti-corruption policies, the Company has a history of <u>not</u> following its own internal procedures and policies.

**B.     Materially False and Misleading Statements Concerning Capital Projects and Other Contracts**

229.     During the Relevant Time Period, Defendants issued a series of false and misleading statements to help quell any concerns about rising costs for the Company's capital projects.  In particular, they denied any irregularities for the inflated purchase price of the Pasadena facility, the rising costs of the Abreu e Lima, Comperj and Repar refineries, contracts with SBM and contracts concerning Transpetro.

230.     With respect to the Pasadena Transaction, on August 7, 2013, Petrobras' former CEO Gabrielli maintained, in public testimony before the Brazilian Senate, that the transaction price was based on market conditions.   This assertion was reiterated on May 23, 2014 in a post on the Company's "Facts and Data" website.

231.     With respect to the Abreu e Lima and Repar refineries, on November 9, 2010, after the TCU alleged that contracts for work at those refineries were overpriced, Petrobras, in a "Facts and Data" statement on its website, denied that there were any irregularities in the construction of either facility.  Petrobras again defended pricing for the Repar Refinery in two "Facts and Data" posts on November 9 and 10, 2011.  Petrobras continued to defend pricing at Abreu e Lima throughout 2014, in particular, through "Facts and Data" posts on May 19, May 20, June 17, June 21, June 22, June 23 and July 14, 2014.

232.     Similarly, for contracts regarding the Comperj Refinery, the Company issued a statement on October 8, 2010, affirming that there were no irregularities on contracts for that refinery.  The Company reaffirmed that sentiment on January 8, 2013 in a "Facts and Data" post.

71

233.    Petrobras also denied any wrongdoing regarding SBM.  It issued statements denying that there were any bribery payments in connection with construction contracts with SBM. For example, on March 31, 2014, the Company announced the completion of its hasty internal investigation, asserting that the probe uncovered "no facts or documents" that "prove the payment of bribes to employees of Petrobras."

234.    This was repeated on April 1, 2014 and reconfirmed on April 30, 2014 in Petrobras' 2013 20-F.  Furthermore, on April 4, 2014, Petrobras posted a letter on "Facts and Data" that it wrote to Brazilian regulators concerning SBM and Pasadena – once more denying any wrongdoing.

235.    Finally, with respect to Transpetro, on February 27, 2011, the Company asserted that complaints of overbilling against Transpetro were unfounded.

236.    The statements described in paragraphs 229 - 235 were false and misleading because, as the market later learned, there were indeed irregularities with respect to the costs of the contracts that Petrobras had entered into.  The increased costs paid by Petrobras were due directly to the massive bribery and corruption scandal, and not simply the result of market conditions, facts that Petrobras never disclosed.

C.    **Materially False and Misleading Statements Concerning the Bidding Process**

237.    Throughout the Relevant Time Period, Petrobras falsely maintained that it awarded contracts through a competitive bidding system.  For instance, on July 11, 2011, Petrobras, in response to an article published by *O Estado de S. Paulo* asserting that Petrobras had received complaints about its bidding process, rejected any accusations of fraud with respect to its bidding process.

238.    Further, on August 15, 2011, in a "Facts and Data" post, Petrobras clarified that "the companies participating in the bidding process at Petrobras have to prove legal, technical, economic and financial qualification and tax compliance."

239.    In addition, on January 22, 2012, Petrobras claimed that its practice was to "seek competition" for its formal bids.

240.    Then, on November 13, 2013, in a "Facts and Data" post, the Company stated: "the bidding, contracting and performance of services processes of Petrobras are constantly being assessed by its Internal Audit and its recommendations are diligently reviewed, aiming at protecting the interests of the Company."

241.    The statements described in paragraphs 237 - 240 were false and misleading because Petrobras failed to disclose that a substantial amount of contracts it awarded was a product of bid-rigging conspiracy that inflated the cost of the contract by as much as 20 percent.  As set forth herein, the contracts were awarded based on bribery and collusion – not competition.

   D.    **Materially False and Misleading Statements Concerning the Company's Financial Condition and Operations**

242.     On May 20, 2010, the Company filed its 2009 20-F and reported financial results for the year ended December 31, 2009.  In particular, Petrobras reported assets for PP&E of $136 billion, total assets of $200 billion, net income of $15.5 billion (year to date) and costs and expenses of $70 billion.

243.    In the 2009 20-F, Petrobras stated that the "Company's management assessed the effectiveness of [its] internal control over financial reporting as of December 31, 2009" and "has concluded that...[the] Company's internal control over financial reporting is effective."

244.     On May 27, 2010, the Company issued a press release and reported financial results for the quarter ended March 31, 2010.  The Company reported PP&E assets of $140.6 billion, total assets of $204 billion, net income of $4.4 billion and cost and expenses of $21.4 billion.

245.     In the release, Defendant Gabrielli stated:

> We are going through a period of crucial importance regarding our shareholders. ... We are fully committed to implementing a fair and transparent operation, respecting our minority shareholders' rights and following the best practices of corporate governance.

246.     The financial information in the May 27, 2010 press release was repeated in an SEC filing on Form 6-K on May 28, 2010.

247.     On August 24, 2010, Petrobras issued a press release announcing its financial results for the quarter ended June 30, 2010.  The Company reported assets for PP&E of $147 billion, total assets of $210.6 billion, net income of $8.6 billion and costs and expenses of $23.4 billion.  This information was repeated in an SEC filing on Form 6-K on August 25, 2010.

248.     On November 23, 2010, Petrobras issued a press release and reported financial results for the quarter ended September 30, 2010.  The Company reported assets for PP&E of $206.3 billion, total assets of $298.1 billion, net income of $13.3 billion and costs and expenses of $25.1 billion.  In connection with these results, Defendant Gabrielli stated:

> The success of our Global Offering was due to the confidence of our shareholders and investors, the Company's excellent reputation in the capital markets and our commitment to transparency and investor returns.

249.     The financial information in the November 23, 2010 press release was repeated in an SEC filing on Form 6-K on November 24, 2010.

250.     On March 15, 2011, Petrobras issued a press release and reported financial results for the year ended December 31, 2010.  The Company reported assets for PP&E of $219 billion, total assets of $309 billion, net income of $19.2 billion and costs and expenses of $96 billion.

251.   In the release, Defendant Gabrielli stated:

Our results for the fourth quarter and full year of 2010 further underscore our capacity for overcoming challenges, as well as emphasize [*sic*] the quality of our assets and investment projects.

At Petrobras, we are fully aware that our achievements would not have been possible without the adoption of good corporate governance practices....

252.   On May 24, 2011, Petrobras issued a press release and reported financial results for the quarter ended March 31, 2011.  The Company reported PP&E assets of $230 billion, total assets of $331 billion, net income of $6.5 billion and costs and expenses of $25.2 billion.  The financial information in the May 24, 2011, press release was repeated in an SEC filing on Form 6-K on May 26, 2011.

253.   On May 26, 2011, Petrobras also filed the 2010 20-F which included the same financial information set forth in the May 24, 2011 press release.  The 2010 20-F contained Sarbanes-Oxley ("SOX") certifications by one or more of defendants which stated, in part, the following:

1.   I have reviewed this annual report on Form 20-F of Petróleo Brasileiro S.A. – PETROBRAS (the "Company")

2.   Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.   Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the Company as of, and for, the periods presented in this report;

4.   The Company's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the Company and have:

(a)     Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the Company, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)     Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c)     Evaluated the effectiveness of the Company's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d)     Disclosed in this report any change in the Company's internal control over financial reporting that occurred during the period covered by the annual report that has materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting; and

5.     The Company's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the Company's auditors and the audit committee of the Company's board of directors (or persons performing the equivalent functions):

(a)     All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information; and

(b)     Any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting.

254.     Petrobras further stated that the "Company's management assessed the effectiveness of each Company's internal control over financial reported as of December 31,

2010" and "has concluded that...each Company's internal control over financial reporting is effective."

255.    On August 24, 2011, Petrobras issued a press release and reported financial results for the quarter ended June 30, 2011.  The Company reported PP&E assets of $247 billion, total assets of $351 billion, net income of $6.6 billion and costs and expenses of $31.2 billion.  The same information was included in a filing with the SEC on Form 6-K on August 25, 2011.

256.    On November 22, 2011, Petrobras issued a press release and reported financial results for the quarter ended September 30, 2011.  The Company reported PP&E assets of $220 billion, total assets of $309 billion, net income of $3.9 billion and costs and expenses of $31.5 billion.  The same information was included in a filing with the SEC on Form 6-K on the same day.

257.    On January 23, 2012, Petrobras announced a possible change among the Company's executives.  The next day, the Company announced that Defendant Foster would replace CEO Gabrielli.

258.    On February 28, 2012, Petrobras issued a press release and reported financial results for the year ended December 31, 2011.  The Company reported PP&E assets of $182 billion, total assets of $319 billion, net income of $20.1 billion and costs and expenses of $118.6 billion.  The same information was included in a filing with the SEC on Form 6-K on February 29, 2012.

259.    On April 2, 2012, Petrobras filed the 2011 20-F setting forth the financial information in the February 28, 2012 press release.  In addition, the 2011 20-F contained SOX certifications substantially similar to the certification described in paragraph 253 above.  The 2011 20-F also included the following:  the "Company's management has assessed the effectiveness of

each Company's internal control over financial reporting as of December 31, 2011" and "has concluded that each Company's internal control over financial reporting was effective...."

260.    On April 27, 2012, Petrobras issued a press release announcing that Costa and Duque had resigned from the Company; the press release praised both Costa and Duque for their long service to Petrobras.

261.    On May 15, 2012, Petrobras issued a press release and reported its financial results for the quarter ended March 31, 2012.  The Company reported PP&E assets of $194 billion, total assets of $338 billion, net income of $5.3 billion and costs and expenses of $31 billion.  The same information was included in a filing with the SEC on Form 6-K on May 17, 2012.

262.    On August 3, 2012, Petrobras issued a press release and reported its financial results for the quarter ended June 30, 2012.  The Company reported PP&E assets of $185 billion, total assets of $311 billion, net loss of $953 million and costs and expenses of $32 billion.  The same information was included in a filing with the SEC on Form 6-K on August 10, 2012.

263.    On August 29, 2012, Petrobras, Petrobras International Finance Company ("PifCo") (at that time a wholly owned subsidiary of Petrobras, described in more detail below in paragraph 395) and PGF filed the 2012 Registration Statement.  The 2012 Registration Statement included a prospectus that incorporated by reference certain documents filed by Petrobras with the SEC, including the 2011 20-F.

264.    The 2012 Registration Statement also incorporated any future filings of Petrobras on Form 20-F made with the SEC after the date of the prospectus and prior to the termination of the offering of securities offered by the prospectus.

265.    On October 26, 2012, Petrobras issued a press release and reported its financial results for the quarter ended September 30, 2012.  The Company reported PP&E assets of $191

billion, total assets of $318 billion, net income of $9.3 billion and costs and expenses of $32 billion.  The same information was included in a filing with the SEC on Form 6-K on October 30, 2012.

266.    On February 4, 2013, Petrobras issued a press release and reported its financial results for the year ended December 31, 2012.  The Company reported PP&E assets of $205 billion, total assets of $332 billion, net income of $10.9 billion and costs and expenses of $127.2 billion.

267.    On February 6, 2013, Petrobras filed a Form 6-K with the SEC with the same financial information in the February 4, 2013 press release.

268.    On April 26, 2013, Petrobras issued a press release and reported its financial results for the quarter ended March 31, 2013.  The Company reported PP&E assets of $214 billion, total assets of $345 billion, net income of $3.9 billion and costs and expenses of $31.4 billion.

269.    On April 29, 2013, Petrobras filed the 2012 20-F which included the financial information set forth in the Company's press release dated February 4, 2013.  The 2012 20-F included the SOX certifications in substantially the same form described herein in paragraph 253 above.

270.    On April 30, 2013, Petrobras filed a Form 6-K with the SEC which contained the financial information released on April 26, 2013.

271.    On May 15, 2013, PGF filed the 2013 Prospectus for the offer and sale of the 2013 Notes.  The 2013 Offering Documents incorporated by reference the 2012 20-F.

272.    On August 9, 2013, the Company issued a press release and reported financial results for the quarter ended June 30, 2013.  The Company reported PP&E assets of $204 billion, total assets of $338 billion, net income of $2.7 billion and costs and expenses of $30.2 billion.

273.    On August 13, 2013, Petrobras filed a Form 6-K setting forth the financial results released on August 9, 2013.

274.    On October 25, 2013, the Company issued a press release and announced its financial results for the quarter ended September 30, 2013.  The Company reported PP&E assets of $208 billion, total assets of $340 billion, net income of $1.5 billion and costs and expenses of $31.4 billion.

275.    On October 28, 2013, Petrobras filed a Form 6-K setting forth the financial results released on October 25, 2013.

276.    On February 25, 2014, the Company issued a press release and announced its financial results for the year ended December 31, 2013.  The Company reported PP&E assets of $228 billion, total assets of $321 billion, net income of $2.6 billion and costs and expenses of $125 billion.

277.    In the release, Defendant Foster stated:

I would like to notice that in the second half of 2013 we implemented the Corruption Prevention Program, reaffirming the commitment of the Petrobras Executive Board and of its employees with ethics and transparency at our organization. The program complies with both national and international initiatives against fraud and corruption, as well as with the laws of the countries where Petrobras operates, with positive impacts in the relations with all its stakeholders.

278.    On February 26, 2014, Petrobras filed a Form 6-K with the SEC setting forth the Company's financial statements released on February 25, 2014.

279.    On March 7, 2014, Petrobras issued a press release regarding its internal control over financial reporting, stating in part:

Our management has assessed the effectiveness of our internal control over financial reporting as of December 31, 2013, based on the criteria established in Internal Control—Integrated Framework (1992) issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). Based on such assessment and criteria, the Company's management has concluded that

Company's internal control over financial reporting was effective as of December 31, 2013.

280.    On March 10, 2014, Petrobras filed a Form 6-K/A with the SEC which included the statements in the March 7, 2014 press release regarding the Company's internal controls.

281.    On March 11, 2014, PGF filed the 2014 Prospectus for the offer and sale of the 2014 Notes pursuant to the 2012 Registration Statement.  The 2014 Offering Documents incorporated by reference the Company's report on Form 6-K filed with the SEC on March 7, 2014.

282.    On April 30, 2014, the Company filed the 2013 20-F, signed by Foster, which included the financial statements that were previously released on February 25, 2014.  In addition, the 2013 20-F contained SOX certifications signed by Foster, affirming that the financial information contained in the 2013 20-F was accurate.

283.    Moreover, the 2013 20-F included a statement that "Company's management has assessed the effectiveness of our internal control over financial reporting as of December 31, 2013" and "has concluded that the Company's internal control over financial reporting was effective as of December 31, 2013."

284.    The 2013 20-F also represented that on "March 31, 2014, our internal commission established to evaluate bribery allegations involving SBM Offshore confirmed that it found no internal evidence to support such allegations."

285.    On May 9, 2014, the Company issued a press release and announced its financial results for the quarter ended March 31, 2014.  The Company reported PP&E assets of $241 billion, total assets of $354 billion, net income of $2.4 billion and cost and expenses of $31.4 billion.

286.    In the release, Foster stated:

I would like to register, once again, the commitment of Petrobras Executive Board and of its employees with ethics and transparency at our organization, as expressed when we launched in the 2nd half of 2013, the Corruption Prevention Program.  All the allegations presented are and will continue to be investigated through the mechanisms created for this specific purpose.

287.   On May 12, 2014, the Company filed a Form 6-K which included the financial results it had previously released on May 9, 2014.

288.   On June 11, 2014, Foster represented to the CPI and to the investing public that no irregularities were discovered regarding contracts with SBM Offshore even though she knew about several instances of irregularities.

289.   On August 8, 2014, the Company issued a press release and announced its financial results for the quarter ended June 30, 2014.  The Company reported PP&E assets of $254 billion, total assets of $363 billion, net income of $2.3 billion and costs and expenses of $32.9 billion.

290.   On August 11, 2014, the Company filed a Form 6-K which included the financial results it had previously released on August 8, 2014.

291.   The statements set forth in paragraphs 242-290 were false and misleading for the following reasons:

  a.   Throughout the Relevant Time Period, Petrobras and its top executives were engaged in a massive bribery and corruption scheme whereby Petrobras paid inflated contract prices to certain Cartel members, a portion of that payment being directed to certain of the Company's top executives or political parties connected to these executives;

  b.   Petrobras improperly capitalized these contract costs which inflated the asset value reported in the Company's financial results;

  c.   The inflated payments should have been recorded as an expense which would have decreased the Company's reported net income; and

  d.   The Company did not have or maintain proper internal controls and, in fact, suffered from material weaknesses in its disclosure controls and procedures, and in its internal controls over financial reporting which allowed the Company to engage

in a wide-reaching bribery scheme, involving dozens of Petrobras executives, causing its financial statements to be materially misstated.

292.     In addition, in the following Forms 6-K filed on May 28, 2010; March 26, 2010; August 25, 2010; November 24, 2010; March 17, 2011; May 26, 2011; August 25, 2011; and November 22, 2011, Petrobras represented that the financial statements set forth therein had been "prepared in accordance with U.S. generally accepted accounting principles (U.S. GAAP) and the rules and regulations of the Securities and Exchange Commission (SEC) for interim financial statements."  Petrobras made similar representations in the 2010 Form 20-F when it stated that the Company's "audited consolidated financial statements . . . and the accompanying notes, contained in this report have been presented in U.S. dollars and prepared in accordance with U.S. generally accepted accounting principles, or U.S. GAAP."

293.     The statements described in paragraph 292 above were false and misleading when made, because the Company's financial statements were not prepared in accordance with U.S. GAAP.  In particular, as discussed above at paragraphs 148 – 150, the Company's financial statements violated, among other GAAP provisions, ASC 360, ASC 205, ASC 210 and ASC 225.

294.     In its Forms 6-K filed on May 17, 2012, August 10, 2012; October 30, 2012; April 30, 2013; August 13, 2013; October 28, 2013; May 12, 2014; and August 11, 2014, the Company represented that its financial statements were presented or prepared "in accordance with IAS 34 Interim Financial Reporting issued by the International Accounting Standards Board (IASB)".  In its 2011 Form 20-F, 2012 Form 20-F, 2013 Form 20-F and Forms 6-K filed on February 29, 2012; February 6, 2013; and February 26, 2014, the Company represented that its financial statements were presented or prepared "in accordance with the international financial reporting standards (IFRS) issued by the International Accounting Standards Board (IASB)."

295.    The representations in paragraph 294 above were false and misleading when made, because the Company's financial statements were not prepared in accordance with IFRS. Specifically, as discussed above at paragraphs 148 – 150, the Company's financial statements violated, among other IFRS provisions, IFRS CF 4.52, IAS 16, IAS 1 and IAS 34.

296.    The 2010 Form 20-F contained certifications executed by Gabrielli and Barbassa which represented that the annual report "fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934" and "fairly presents, in all material respects, the financial condition and results of operations of the Company."  The 2011 Form 20-F, 2012 Form 20-F and 2013 Form 20-F contained the same certifications executed by Foster and Barbassa. These certifications were materially false and misleading when made for the reasons set forth in paragraph 291 above. The 2012 Form 20-F and 2013 Form 20-F also contained the following representation regarding the Company's accounting policy for valuing PP&E: "Property, plant and equipment are measured at the cost to acquire or construct, including all costs necessary to bring the asset to working condition for its intended use, adjusted during hyperinflationary periods, as well as by the present value of the estimated cost of dismantling and removing the asset and restoring the site and reduced by accumulated depreciation and impairment losses."  This statement was materially false and misleading for the reasons set forth in paragraph 291 above.

E.    **Materially False and Misleading Statements Concerning the Bribery and Corruption Scandal**

297.    As news of the investigative findings of Operation Car Wash began to be released, Petrobras and Foster strenuously denied any knowledge or participation in the bribery scheme.

298.    For instance, in the 2013 20-F, with respect to its internal investigations of Pasadena, contracts with several service providers and contracts with specific service providers involving the Abreu e Lima and Comperj refineries, Petrobras asserted that it did not believe that

"the findings of any of these internal commissions would have a material effect on [the Company's] financial statements."

299.    Further, on May 12, 2014, Foster, during a conference call (with respect to SBM) stated, "there are no facts or documents that would document the payment of bribery to any employees of Petrobras."  Indeed, Foster claimed that "we have been working hard to investigate many of these episodes, such as the SBM Offshore situation."

300.    Then on July 12, 2014, Petrobras again asserted that it had "not found any facts or documents evidencing the payment of bribes to employees of Petrobras."

301.    The statements set forth in paragraphs 297 - 300 were false and misleading because Petrobras was central to the bribery and corruption scheme.  Top executives at Petrobras, as well as political parties associated with the controlling shareholder of Petrobras received millions of dollars in bribery payments.

## IX.    OVERVIEW OF SCIENTER ALLEGATIONS

302.    Petrobras' knowledge or reckless disregard of the falsity of the Company's statements set forth in Section VIII is demonstrated, among other things, by: (a) the admissions of a number of Petrobras' top executives, including Costa and Barusco (who collectively personally received tens of millions of dollars in kickbacks from Petrobras' vendors), confirming that the Company was involved in an illegal scheme concerning the artificial inflation or overpricing of numerous contracts through bid-rigging and rampant bribe-paying; (b) the plea agreements of both Costa and Barusco, which, along with prison terms, require the two men to repay nearly $130 million in kickbacks they received both before and during the Relevant Time Period; (c) the mountain of evidence adduced in the wide-ranging criminal probes against Costa, Duque and Cervero showing their knowing participation and active involvement in the kickback and bid-

rigging scheme that pervaded most of Petrobras' operating units; (d) the sworn testimony of senior Petrobras officials describing the "endemic," "institutionalized" criminal corruption, bid-rigging and kickback scheme involving Petrobras executives and their political patrons, as well as significant number of the Company's primary outside vendors;  (e) the testimony and statements of Venina, who on numerous occasions – both in writing and well as during face-to-face meetings – detailed to Foster the artificial inflation of Petrobras contracts, before being exiled to Singapore and eventually fired by Petrobras in November 2014; and (f) Fernando's corroboration of many of Venina's allegations.

### A.    The Executive Board Reviewed and Approved All Contracts Affected by the Bribery and Corruption Scheme

303.    The Company's powerful Executive Board was made up of the CEO and top Petrobras officers, including the chiefs of the Downstream, E&S, Finance, Gas-and-Energy, International and Upstream divisions.  Before and during most of the Relevant Time Period, a number of individuals who either masterminded, or actively participated in, the widespread bid-rigging and bribery scheme, populated the Executive Board, including Costa, Duque and Cerveró. The two highest ranking officials during the Relevant Time Period – former CEOs Gabrielli and Foster – had knowledge of, or recklessly disregarded, the bribery, corruption and bid-rigging scheme.

304.    Meeting, as Foster noted in the Company's February 6, 2013 6-K, "twice a week to focus on the physical and financial monitoring of the principal projects in [Petrobras'] investment plan," the members of the Executive Board reviewed and approved all the contracts that were successfully targeted by the Cartel for inflation by bid-rigging, bribes and kickbacks; indeed, as Barusco eventually testified, the contracts were in fact approved by the Executive Board of Petrobras during the Relevant Time Period.  And, importantly for purposes of showing scienter,

because the Company's by-laws dictate that "interim balance-sheet and further financial statements periodically be prepared by the Board of Executive Officers," many Executive Board members were directly involved in preparing the false statements at the heart of Plaintiff's damages claims.

305.    Evidence uncovered by Brazilian prosecutors shows that almost every single contract that Petrobras (or, in certain instances, its subsidiary Transpetro) had with members of the Cartel was "close to the maximum" contract amount that Petrobras had estimated for those contracts.  Moreover, the bids offered by the Cartel members consistently (and to some Petrobras insiders, like Venina, suspiciously) exceeded the contracts' price caps – in many instances, up to the 20% maximum contract overage allowed by Petrobras' procurement and budgeting policies.

306.    Yet the Company continued to enter into such contracts.  The Cartel's years-long practice of continually exacting over-budget contracts from Petrobras was an obvious red flag that the book value of any assets acquired, maintained or refurbished pursuant to those contracts would necessarily be inflated.

### B.    Admissions of Senior Officials Establish the Company's Scienter

307.    Costa was the head of the Downstream Division and served on Petrobras' Executive Board until leaving the Company in April 2012 to take a job at Sete Brasil, a company partially-owned by Petrobras that was at the center of the bid-rigging scheme in the latter parts of the Relevant Time Period.  In his position at the Downstream Division, Costa was responsible for Petrobras' financial statements, routinely gave investor presentations about the Company's downstream operations, and personally signed many of Petrobras' inflated contracts during the Relevant Time Period.  In lengthy depositions and detailed statements proffered to Brazilian police and prosecutors, Costa – who recently agreed to repay Petrobras about $27 million in kickbacks

received during his tenure – admitted to the "criminal enterprise" at the heart of the fraud alleged here.  Those admissions gave Brazilian prosecutors much of the basis to file a criminal complaint against Costa and numerous other individuals on December 11, 2014 (here, the "12/11/14 Complaint," which is akin to an indictment in the United States).

308.    The 12/11/14 Complaint details how "top-level civil servants" at Petrobras – including core participants Costa, Duque and Barusco – rigged "competitive bidding processes" involving the "major works contracted by Petrobras between 2004 and 2014, largely increasing the profits of those companies" to the tune of millions of dollars.  Those amounts, in turn, were falsely reported as assets – as opposed to expenses – on the Company's financial statements.

### 1.    Costa

309.    It is clear from Costa's admissions that the Cartel's contract-inflation and bribery scheme had, in Costa's words, "the support" of Petrobras' Executive Board, including himself and Duque, who ensured that "the intent of the criminal group was realized."

310.    Costa has admitted that, following his appointment as head of Petrobras' Downstream Division in 2004, he was well aware that Petrobras had incorporated a figure of as much as three percent into all of its contracts with Cartel members to be paid as bribes to Petrobras executives who, in turn, passed a portion of that money on to Brazilian politicians and political parties.  Costa personally signed many of the inflated contracts, and (after months of public denials) ultimately confessed his direct involvement in the overpricing of contracts, receipt of kickbacks, and payment of bribes throughout the Relevant Time Period.

311.    Specifically, Costa testified to Brazilian investigators that he worked directly with Yousseff and the late Jose Janene, as well people at the "senior management and presidency level" of the Cartel companies, in order to operate their scheme.  As Costa admitted, first, he would  "sign

the contract, some time would pass, then after the contract was signed, the first billing event Petrobras generates for services is 30 days . . . .the service is executed, Petrobras does the calculation and pays 30 days later. So normally there is a gap of 60 days between the execution deadline and final payment deadline.  Normally after these 60 days it was possible to make those payments" to the right people.

312.   It is also clear from Costa's testimony that every division of Petrobras was, in some measure, involved in the receipt and doling out of bribe money.  In the E&S Division overseen by Duque, Costa testified that "everyone knew that they had a percentage of those contracts, of the three percent, two percent was for the [PT] . . ."  In another example, Foster's gas and energy division also funneled bribes to the PT, as Costa testified that "[o]ther departments, such as gas and energy and [exploration and production], were also PT, so there was PT in the exploration department, PT in the gas and energy department and PT in the [E&S Division]."

313.   Costa also admitted that he personally received millions of dollars in kickbacks as part of the fraud that impacted almost every construction contract at Petrobras (both within Costa's own Downstream Division as well as in other parts of the Company), getting the lion's share of a given percentage of the bribes paid to Brazilian politicians – delivered in (untraceable) cash to Costa's home or office and occasionally at clandestine meetings in shopping malls. The kickbacks continued following Costa's departure from Petrobras in April, 2012.

314.   Besides the three percent "political adjustment" incorporated into contracts to cover the bribes to politicians, Costa has also confessed that he knew that the Cartel was rigging bids for Petrobras jobs.  He testified that it was "clear to me that there was . . . a prior agreement" among the contractors prior to bidding.  This "excessive delta price," as Costa characterized it, had the effect of artificially inflating the Company's contract costs.

315.    Costa further testified that bribes paid to Brazilian politicians were memorialized in a "daybook" that catalogued, in specific detail, the bribes parceled out to politicians.  At a meeting at Yousseff's office, Costa copied (apparently from Yousseff) a table that showed the amounts given to politicians "from various political parties . . ." related to the 2010 elections.

316.    Costa's testimony also includes admissions that the wide-ranging fraud touched the United States as well.  Specifically, Costa admitted that Petrobras' ill-fated 2005 purchase of the Pasadena Refinery was smoothed along by a $1.5 million bribe from Fernando Soares ("Soares," a so-called lobbyist with long-standing ties to the PMDB).  That particular bribe ensured that, despite internal skepticism at Petrobras about the necessity of the Pasadena, Texas refinery, the Company's Board of Directors would approve the deal.  The bribes from Soares – which Brazilian press outlets reported came from Transcor, the Belgian entity who was selling part of its stake in the Pasadena Refinery – were meant to quell internal dissent within Petrobras about the transaction, and to otherwise "keep [dissenting Petrobras executives] from interfering" with the Pasadena deal, which went on to cost Petrobras an estimated $820 million.

317.    Costa also implicated Soares as a participant in the bribery at Petrobras' International Division; there, Soares played the role of middleman, ensuring that the necessary portions of the bribes were properly "channeled" to the right Petrobras executives, in particular Cerveró, and their political patrons.

## 2.    Barusco

318.    Barusco, who on May 6, 2015, agreed to refund Petrobras $51.2 million in kickbacks and embezzled funds he received over the lifetime of the scheme, has, like Costa admitted to taking nearly $100 million in bribes and kickbacks.  Barusco, a managing engineer

and Duque's aide-de-camp, has confessed to "crimes against the financial system" and a host of other charges including money laundering, which provides further inference of Petrobras' scienter.

319.     Barusco's November 20, 2014 plea agreement confirmed that the payment of bribes within Petrobras was "endemic" and "institutionalized," and that when Barusco became the executive manager of the E&S Division, the Cartel's rampant bribery payments "already existed." Barusco's understanding, he told Brazilian prosecutors, was that the bribery scheme was simply "part of the relationship" between Petrobras and its many contractors.

320.     Barusco has similarly confirmed his awareness of this pervasive bid-rigging by the Cartel, telling Brazilian regulators that bids received by Petrobras from members of the Cartel were always "near the maximum amount" of Petrobras' internal budgets for the contracts put out to bid.  Barusco, who as part of the E&S Division was among those tasked with devising budgets for operations throughout Petrobras, also testified that there was "organized pressure" to keep contracts associated with the Abreu e Lima Refinery "at the top tier of the Petrobras budget."

321.     The bribery exploded along with the growth of Petrobras following the discovery of oil fields in the pre-salt layer in late 2005.  The "amount of the bribes," Barusco told a federal judge, "intensified due to the increased billing at Petrobras," which also saw a corresponding spike in the prices charged by Cartel members.

322.     Increased project spending meant increased bribery, and in turn increased contract costs for the Company, as Petrobras boosted its capital expenditures in order to try to exploit the discoveries in the pre-salt layers.  All told, Barusco admitted to investigators, he received nearly $100 million in bribe payments, covering 60 contracts between Petrobras and one or more companies (most, but not all of which, were part of the Cartel).

### 3.     Foster

323.    Petrobras' scienter is further evidenced by the scienter of Foster, who previously served as the Company's chief gas and energy officer before becoming CEO in 2012 (she resigned in February 2015).

324.    As a member of the Executive Board, Foster was responsible for approving numerous contracts that were artificially inflated by the bribery and kickback scheme.  Indeed, Barusco's testimony confirms that bribes were paid for contracts in the oil and gas division during Foster's tenure as division chief, with Barusco noting that "whenever the contracts involved the board of gas and energy, whose chairman was . . . Foster, the percentage of the bribe usually ranged 1% to 2%."  But Foster's knowledge of the scheme went beyond her knowing approval of inflated contracts.

325.    Before becoming CEO in 2012, Foster was directly informed – on numerous occasions, both in writing and in person – of the "irregularities" in the inflated contracts at the heart of the bribery and kickback scheme.  Venina, who reported directly to Costa during much of the Relevant Time Period, has told the Brazilian press that, as early as 2008, she realized that "there was something wrong" in Petrobras' downstream division; she began reporting those problems to her superiors, which included both Costa and Foster (with whom, according to Venina, she was "close").

326.    Venina told a Brazilian television newsmagazine that in 2008, she began to notice "irregularities regarding the payment of services that were never rendered, contracts that were apparently overbilled, negotiations that were made where a commission was sought for the people in charge of the negotiation and a series of problems" that ran afoul of Petrobras' ethical and

procedural guidelines.  She immediately brought her suspicions to Foster to discuss her findings. Foster, Venina said, had "access to these irregularities in . . . executive board meetings."

327.    Venina began documenting her suspicions in April 2009, when she began preparing a detailed memorandum identifying and describing the numerous "irregularities" and problems she and her team had uncovered during a series of audits of various projects in the communications unit of the Downstream Division.   Intending to send the memorandum to Petrobras' top management, Venina wrote to Foster – at the time the chief of the Company's oil and gas unit – on April 3, 2009, asking for Foster's help to finish the document before its transmission to senior management, writing "I would like to have your opinion on the final text that I need to forward. Can I leave it for you to read?  You know about the matter.  Feel free if you feel better not reading it. I await your response to leave or not the material with your secretary."  Foster failed to reply.

328.    Despite Foster's lack of response, Venina went ahead and sent the document to Petrobras' board of directors later that day.  The report, titled "Internal Document of the Petrobras System," stated that what Venina and her team called "administrative irregularities" existed in the Downstream Division's communications unit.  Among the "irregularities" specified in Venina's document was a graft scheme whereby millions of reais were diverted from Petrobras' coffers to Bahia-based members of the Workers' Party – the political party to which then-CEO Gabrielli belonged.

329.    The April 2009 report was but the first of many warnings that Venina sent, or otherwise relayed, to Foster.  She continued to apprise Foster of the various improper payments at Petrobras well into the Relevant Time Period.  In October 2011 – a few months prior to Foster's elevation to CEO – Venina emailed Foster describing the misdeeds at the Downstream Division's communications unit as "absolute nonsense."

330.    Venina also informed Foster that bidding was undertaken at Petrobras "with no efficiency."  Unlike so many others at Petrobras, to whom the Company's Ethics Code was nothing but window-dressing, Venina told Foster that she was bringing Foster's attention to the wrongdoing to "comply with the rules and ethical code of Petrobras."  Venina told Foster that her assertions of malfeasance were supported by documents, telling Foster that she would like to furnish Foster with "part of the documentation that I already have," also stating, importantly for purposes of showing Foster's scienter, that "[p]art of it, I know you are already aware of."

331.    Often seeking, in essence, Foster's approval of her continued inquiry and revelation of wrongdoing at a company for which she once felt "immense pride," Venina ended an October 2011 email to Foster by writing that "I would like to hear from you before taking the next step.  I don't want to send you anything without a positive sign from you."  Venina expected a "positive" response from Foster, who as a division chief had the power and authority to directly address, indeed probably remedy, the numerous problems flagged by Venina. Venina thought that Foster would be "comfortable" enough with Venina to candidly discuss what Venina had uncovered, and because she "had a lot of access to" Foster, Foster would be in a position to meet with Venina and explain the irregularities or otherwise follow up on them. Instead, she was transferred to the other side of the globe, assigned to Petrobras' Singapore office – about as far as Foster could possibly send Venina.

332.    By virtue of Venina's repeated, and obviously unheeded, warnings about malfeasance at Petrobras, Foster possessed, or at least had ready access to, information showing that Petrobras' financial statements (as well as her own representations about the sufficiency of the Company's internal controls) were false or misleading.  As CEO, Foster had a duty to monitor the Company for exactly the kind of fraud that Venina was bringing to her attention – but in making

or approving the false statements Plaintiff alleges in this Complaint, Foster knowingly or recklessly disregarded the red flags being waived by Venina.

333. The evidence of Petrobras' scienter is also demonstrated by its treatment of Venina after she brought her findings to Foster's attention starting in 2009. Following her revelations, Venina told a Brazilian television journalist in a recent interview, she was continually "harassed" and "pressured" by numerous executives within the Company. This orchestrated campaign to silence, or at least sideline, Venina began when her superiors first became aware that she was memorializing her findings in what became the April 2009 memorandum. "There was great pressure," Venina told an interviewer, "to prevent that from happening," but she told her bosses that "I'm going to do this. Now, who should I send this to? Should I send it to the auditing department? Do I notify legal? Shall I notify the director[s]?" The whole time she was trying to bring attention to the scheme infecting nearly all parts of Petrobras, she was "pressured into doing things outside the company's ethical code."

334. The threats to Venina were not limited to workplace harassment, and the extent and severity of the threats against Venina provide more evidence of Petrobras' scienter. Venina has told the press that, following her initial report on wrongdoing in the communications section of the Downstream Division, she received threatening phone calls at home, which she shared with her then-five- and seven-year-old daughters. She even had a gun pointed at her head.

335. Foster's scienter is further shown in her strenuous public statements that – as she put it on May 12, 2014 – "there are no facts or documents that would document the payment of [bribes] to any employees of Petrobras." The truth, as alleged above, is that on numerous occasions prior to and into the Relevant Time Period, Venina provided Foster with a host of "facts or documents" showing the massive fraud at Petrobras. Foster has since backtracked, offering to

resign as CEO and finally acknowledging that "I need to be investigated, we all need to be investigated."

336.    In addition, Foster's refusal to acknowledge that she had been aware of the SBM's investigation of bribery regarding Petrobras' contracts demonstrates her scienter.  According to the testimony of Philippe Jacques Levy, SBM's representative in Brazil, he informed members of Petrobras' Board of Directors about SBM's internal bribery investigation as early as the summer of 2012 and, according to Sietze Hepkema, who was hired by SBM to investigate the bribery allegations, he notified Foster of SBM's internal investigation during a meeting that took place in early 2013.   Accordingly, by early 2013 at the latest, Foster knew about the SBM bribery allegations.  However, not until November 17, 2014, did Foster publicly confirm that Petrobras had received kickbacks from SBM Offshore.  She also represented, contrary to the testimony of two witnesses, and that she had only become aware of the SBM kickbacks allegations in mid-2014.

### 4.    Gabrielli

337.    Gabrielli served as CEO of Petrobras from July, 2005 until February, 2012, during which time he signed SOX certifications attesting to the accuracy of the Company's financial statements and the sufficiency of its internal controls. He also served on Petrobras' Executive Board while CEO.  While Gabrielli is not currently facing any criminal charges, Brazilian press reports have indicated that he is being targeted by regulators for potential indictments.  He is, however, the target of an active civil investigation that has seen Gabrielli's assets and property seized around the world.

338.    According to Ricardo Pessoa, the jailed president of Cartel member UTC, following the 2003 election of President Lula, contractors began receiving visits from government functionaries who were privy to the "new rules" whereby "everyone would come out a winner."

Passoa asserted that Gabrielli knew about the schemes and contract inflation because "the scheme of corruption always relied on the knowledge of the ex-president of Petrobras Jose Sergio Gabrielli."

339.    Moreover, as exiled would-be whistleblower Fernando testified, Gabrielli halted his efforts to remove an employee who was involved in contract irregularities.  Further, when Fernando sought to fix the broken procurement system at Petrobras, he was told Gabrielli wanted him removed.

340.    In addition, as Venina asserted, Costa implicated Gabrielli when she spoke with him about the irregularities that she had uncovered.  According to Venina, when she spoke to Costa, Costa pointed to a picture of Lula and to Gabrielli's office when he asked, "do you want to take everyone down?"

341.    Finally, Gabrielli was instrumental in stonewalling the TCU's investigation of Abreu e Lima Refinery by refusing to produce key documents for its investigation.

### 5.    Duque

342.    The charges lodged against Duque, Petrobras former E&S Division director and a member of the Executive Board who was responsible for the Company's financial statements during his tenure, also show Petrobras' scienter.  Duque – whose apparent fondness for Frank Sinatra resulted in him being code-named "My Way," shortened to "MW," in Barusco's detailed records about the scheme's main players – was arrested on November 14, 2014 for his role in the criminal enterprise at Petrobras; he remains jailed as of the date of this Complaint.

343.    Barusco's plea agreement – which relies heavily on a number of detailed documents created by Barusco contemporaneously with his involvement in the bribery scheme – confirms that between 2005 and 2010, Duque was directly involved in the corruption at Petrobras, receiving

tens of millions of dollars in bribes and kickbacks in connection with at least <u>60</u> contracts between Petrobras and companies both inside and outside of the Cartel.  Duque would split the bribe between himself and Barusco, keeping the lion's share of the bribes – estimated to be around $40 million – as a kickback to himself.

344.    Barusco also confirmed that, between 2004 and at least 2010 or 2011, along with Joca Vaccari of the Brazilian Workers' Party, he attended meetings with Duque where they talked about "the contracts, the progress of [outstanding] projects and bidding," and the "payment of bribes."  Barusco's testimony about Duque's central role in the corruption scheme has been corroborated by two former executives from Cartel member Toyo Setal, both of whom confirmed that they paid bribes directly to Duque, including a multimillion-real bribe in connection with the construction of a coking unit at the Repar refinery.

### 6.    Cerveró

345.    Cerveró was the former director of Petrobras' International Division and a member of the Executive Board.  In January 2015, he was arrested and charged with accepting $53 million in bribes, many of which were paid by non-Brazilian companies outside of the Cartel (including Korea-based Samsung Heavy Industries, Co., from whom Cerveró solicited a $40 million bribe related to the awarding of drilling ship contracts).

346.    Cerveró's complicity and active involvement in the kickback scheme has been confirmed by Costa, who told a Brazilian federal judge that Cerveró – who had "strong ties" with Brazilian political party PMDB – personally received bribes in connection with certain construction contracts.  Responding to the judge's inquiry, Costa said that "this was talked about within the company and it was clear that yes, they did get bribes."  Costa implicated Cerveró in

wrongdoing connect to the Pasadena Transaction, stating that Cerveró received millions to ensure that Petrobras entered into the deal.

C.     **Additional Evidence of Scienter**

1.     **The Sheer Size and Reach of the Scheme**

347.     The following graphic, created by the Brazilian prosecutors to attempt to show the reach of the scheme, further shows Petrobras' scienter, as it is indicative of the massive and byzantine scope of the criminal enterprise at Petrobras: it shows that the fraud touched literally every part of the Company.



348.     Indeed, Petrobras has conceded that the bribe and corruption scheme affected at least $81 billion – or roughly 36 percent – of the assets on its PP&E balance sheets.

349.     In addition, the Company's scienter is established by the sheer number of senior, decision-making executives that have been implicated (and in at least two cases – Costa and

Barusco – admitted to their roles) as direct participants in this wide-ranging criminal enterprise. Corruption was, as Barusco recently told an investigative committee of the Brazilian House of Representatives, "widespread and institutionalized by 2003 or 2004," and continued to grow in the following years and into the Relevant Time Period.

350.    Other documents and testimony show the scope of the fraudulent scheme and provide further evidence of Petrobras' scienter.  Much of the evidence detailing the pervasiveness of the corruption within Petrobras comes from co-conspirators outside the Company.  Convicted money-launderer Yousseff testified that it was well-known within Petrobras and its Cartel counterparts that construction firms "wouldn't get the work if they didn't pay" the bribes.  A former Toyo-Setal executive (recently indicted himself) described the payment of bribes to Petrobras as "very much mandatory."  The CEO of Galvão Engenharia (a johnny-come-lately to the scheme) told investigators that despite continually submitting the lowest bids for Petrobras jobs, his company never saw a dime of business from Petrobras until he was forcefully informed by Costa that Galvão Engenharia "would have to pay" bribes to get the business.

351.    The Cartel members could not have succeeded without the active assistance of numerous Petrobras employees.  The Brazilian press has reported that Petrobras met periodically with Cartel companies at Petrobras' Rio offices to discuss upcoming contracts, with the senior Petrobras executives giving tutorials to Cartel members on how they should structure their contracts and addenda to ensure acceptance by Petrobras.

## 2.    Concerted Retaliatory Efforts against Skeptics and Whistleblowers

352.    Petrobras' scienter is also shown in the efforts the Company's management took to silence or sideline would-be whistleblowers who threatened to expose the criminal enterprise plaguing the Company.  Besides exiling Venina to Singapore, and transferring Fernando to a

backwater office to shuffle papers, Petrobras endeavored to sideline independent directors sitting on the Company's Board of Directors, who by February 25, 2014, were refusing to approve Petrobras' 2013 financial statements. Outspoken independent board member Mauro Cunha refused to approve the 2013 financials, stating that "the accounting for refineries was inadequate" and that Cunha believed some kind of impairment charge was necessary. Two months after filing a formal complaint with the CVM saying that he was "not comfortable with the absence of impairment" on the refineries, Cunha was removed from a board committee investigating wrongdoing at the Pasadena and Abreu e Lima refineries, and feared retaliation for blowing the whistle on the wrongdoing in the downstream division. Discussing the appointment of Foster's successor for part of a *Bloomberg* piece, Cunha said "I would like to say publicly the truth I put in the minutes of the meeting [addressing the appointment of a new CEO], but would risk retaliation as I have suffered in the past."

### 3.        Any Investigation of Irregularities Is Impeded

353.    In early 2009, the TCU made findings concerning irregularities at Abreu e Lima. Instead of investigating the matter or providing the necessary cooperation to the TCU, Petrobras stonewalled the TCU's investigation and used the political power of its Chairwoman to ensure that its funding would not be interrupted.

354.    Other investigations were either thwarted by what appears to be the product of bribery, or were halted for some mysterious reasons. The finding of no irregularities by the CPI is now suspect, as those involved are alleged to have been given bribes. The injunction granted for the prosecution of certain individuals snared in Operation Sandcastle, an investigation that (i) implicated one of the contractors embroiled in the massive bribery scheme, and (ii) uncovered

illicit payments connected to the Abreu e Lima Refinery, was puzzling as some commentators have noted:

> The justification provided by the Minister César Asfor Rocha, then president of STJ, was the initial use of anonymous denunciation in order to request authorization to wiretap phone calls that led to other evidences of the alleged crimes. This decision, according to a research commissioned by that newspaper, contradicted previous and later rulings by that court, including a few issued by Minister Asfor Rocha himself.[3]

### 4.   A Company Plagued by Resignations and Terminations Following the Revelation of the Scheme

355.   Additional inference of Petrobras' scienter can be drawn from the legions of Petrobras senior executives who have resigned or been fired – including, it bears noting, the entire Executive Board – because of the fraud, corruption and wrongdoing alleged in Plaintiff's Complaint.  By the end of 2014, Duque and Gabrielli had been arrested or targeted for additional investigation by numerous Brazilian regulators.  During the first week of February, 2015, Foster (the Company's CEO) and Barbassa (Petrobras' CFO) were forced to leave the Company, and by the end of that week, the heads of Petrobras subsidiary Transpetro, and the chiefs of the gas-and-energy, downstream and exploration-and-production operations had all resigned as well.

## X.   RELIANCE

### A.   Fraud-on-the-Market Doctrine

356.   Throughout the Relevant Time Period, Petrobras' securities traded in an efficient market for the following reasons, among others:

a.   The Company's common stock ADSs and preferred stock ADSs met the requirements for public listing and were listed and actively traded on the NYSE, a highly efficient market.

---

[3] *Political Corruption, Campaign Slush Funds and the Impact on the Quality of Democracy in Brazil*, by Carlos Joe Carvalho de Formig-Xavier, July 2012.

b.      As a registered and regulated issuer of securities, Petrobras filed periodic public reports with the SEC, in addition to the Company's frequent voluntary dissemination of information;

c.      Petrobras regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services, the Company's websites and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

d.      The Company was followed by securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports were publicly available and the information in these reports entered the marketplace;

e.      The material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of Petrobras' securities; and

f.      Without knowledge of the misrepresented and omitted facts, Plaintiff purchased or otherwise acquired Petrobras securities during the Relevant Time Period when the prices for Petrobras' securities were artificially inflated by these misrepresentations and omissions.

**B.      Actual Reliance**

357.   During the Relevant Time Period, Plaintiff reviewed and relied on the accuracy of Petrobras' publicly reported financial statements in making its investment decision to purchase Petrobras securities.

358.     In particular, Plaintiff reviewed and relied upon the accuracy of Petrobras financial statements in the 2009 20-F, 2010 20-F, 2011 20-F, 2012 20-F and 2013 20-F.  Plaintiff relied upon the Company's representations regarding Petrobras' asset values and expenses.  Plaintiff also relied upon the Company's representation that its financial statements complied with the IFRS and/or GAAP, as well as certifications that the Company had appropriate internal controls.

359.     Plaintiff did not know, and in the exercise of reasonable diligence could not have known, that the Company's financial statements were materially false and misleading because Petrobras had improperly accounted for the bribery and overpayments in key capital projects and other transactions by capitalizing its costs and failing to take a proper expense charge as set forth herein.  Had Plaintiff been aware of the improper accounting at Petrobras, Plaintiff would not have purchased the securities at the market price.

## XI.     THE STATUTORY SAFE HARBOR IS INAPPLICABLE HERE

360.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint.  Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Petrobras who knew that those statements were false when made.

**XII.   OHIO PERS'S DEBT PURCHASES WERE DOMESTIC**

361.    The following purchases of Petrobras debt securities were domestic transactions.

362.    On December 19, 2014, Investment Partners, L.P. ("Stone Harbor") a Delaware limited-liability partnership located at 31 West 52nd Street in New York City, in its capacity as investment manager for Ohio PERS, purchased for Ohio PERS' account $195,000 of the Petrobras 7.25% notes due in 2044 (CUSIP: 71647NAK5) (the "NAK5 Notes") in the secondary market at a trade price of $96.6160.  These securities were purchased from Merrill Lynch, Pierce, Fenner & Smith, Inc., d/b/a Bank of America/Merrill Lynch ("Merrill Lynch Brokerage"), a broker-dealer located at 200 North College Street, Charlotte, North Carolina 28255, which acted as both selling counterparty and executing broker for the transaction.  Stone Harbor's purchase order for this transaction was placed from its offices in New York.  The securities for this transaction were sourced from the Depository Trust Company ("DTC") participant account of Merrill Lynch, Pierce, Fenner & Smith, Inc./Fixed Income.  This transaction settled at the DTC in New York, New York on December 24, 2014 and delivery was made in New York, New York to DTC account number 8187, the DTC participant account of J.P. Morgan Chase Bank, National Association/Public Employee Retirement System of Ohio (OPERS), a custodian bank for Ohio PERS.

363.    On February 4, 2015, in their capacities as investment managers for Ohio PERS, Aberdeen Asset Management LLC ("Aberdeen LLC," located in the United Kingdom), in conjunction with Aberdeen Asset Management, Inc. ("Aberdeen Inc.," located in Philadelphia, Pennsylvania) purchased, on behalf of Ohio PERS,  $145,000 of NAK5 Notes in the secondary market at a trade price of $88.8470.  The purchase order for this transaction was placed by Aberdeen LLC traders in the United Kingdom, using the Omgeo Central Trade Manager ("Omgeo

CTM") electronic trading platform, which is also used by Aberdeen Inc. in the United States.  The selling counterparty for this transaction was Citibank, N.A., located at 399 Park Avenue, New York, New York 10043.  Upon information and belief, this transaction settled on the DTC in New York, New York on February 9, 2015, and was delivered to the DTC participant account of Ohio PERS's custodian bank, J.P. Morgan Chase Bank.

364.    On February 4, 2015, in their capacities as investment managers for Ohio PERS, Aberdeen LLC, in conjunction with Aberdeen Inc., purchased, on behalf of Ohio PERS, $145,000.00 of NAK5 Notes in the secondary market at a trade price of $89.9310.  The purchase order for this transaction was placed by Aberdeen LLC traders in the United Kingdom, using the Omgeo CTM electronic trading platform, which is also used by Aberdeen Inc. in the United States. The selling counterparty for this transaction was Citibank, N.A., located at 399 Park Avenue, New York, New York 10043.  Upon information and belief, this transaction settled on the DTC in New York, New York on February 9, 2015, and was delivered to the DTC participant account of Ohio PERS's custodian bank, J.P. Morgan Chase Bank.

365.    On March 3, 2015, MacKay Shields, LLC ("MacKay Shields"), a United States entity with its headquarters in New York, NY, in its capacity as investment manager for Ohio PERS, purchased for Ohio PERS's account $320,000 of NAK5 Notes in the secondary market at a trade price of $95.503.  MacKay Shields placed the order for the purchase by phone from its own New York, NY office to the New York, NY office of Barclays Capital, Inc.  The transaction settled at the DTC in New York, NY on March 6, 2015

366.    On March 3, 2015, MacKay Shields purchased $160,000 of NAK5 Notes in the secondary market for Ohio PERS's account at a trade price of $94.969.  MacKay Shields placed the order for the purchase by phone from its own New York, NY office to the New York, NY

office of Deutsche Bank Trust Company Americas.  The transaction settled at the DTC in New York, NY on March 6, 2015.

367.     On March 5, 2015, MacKay Shields, in its capacity as investment manager for Ohio PERS, purchased $100,000 of NAK5 Notes in the secondary market for Ohio PERS's account at a trade price of $94.57.  MacKay Shields placed the order for purchase by phone from its own New York, NY office to the New York, NY office of Merrill Lynch Brokerage, which acted as both execution broker and clearing broker for the transaction.  The selling counterparty for this transaction was Bank of America Securities LLC, which is a United States entity.  The transaction settled at the DTC in New York, NY on March 10, 2015.

368.     On March 6, 2015, MacKay Shields, in its capacity as investment manager for Ohio PERS, purchased $370,000 of NAK5 Notes in the secondary market for Ohio PERS's account at a trade price of $95.55.  MacKay Shields placed the order for the purchase by phone from its own New York, NY office to the New York, NY office of Barclays Capital, Inc.  The transaction settled at the DTC in New York, NY on March 11, 2015.

369.     On March 6, 2015, MacKay Shields, in its capacity as investment manager for Ohio PERS, purchased $100,000 of NAK5 Notes in the secondary market for Ohio PERS's account at a trade price of $94.961.  MacKay Shields placed the order for the purchase by phone from its own New York, NY office to the New York, NY office of Deutsche Bank Trust Company Americas. The transaction settled at the DTC in New York, NY on March 11, 2015.

370.     On March 9, 2015, MacKay Shields, in its capacity as investment manager for Ohio PERS, purchased $580,000 of NAK5 Notes in the secondary market for Ohio PERS's account at a trade price of $94.895.  MacKay Shields placed the order for the purchase by phone from its own

New York, NY office to the New York, NY office of Barclays Capital, Inc.  The transaction settled at the DTC in New York, NY on March 12, 2015.

371.    On March 9, 2015, MacKay Shields, in its capacity as investment manager for Ohio PERS, purchased $3,750,000 of NAK5 Notes in the secondary market for Ohio PERS's account at a trade price of $94.104.  MacKay Shields placed the order for the purchase by phone from its own New York, NY office to a New York, NY office of JP Morgan Securities, LLC, and J.P. Morgan International, Inc., which acted as execution broker and clearing broker for the transaction. The transaction settled at the DTC in New York, NY on March 12, 2015.

372.    On February 27, 2015, in its capacity as an investment manager for Ohio PERS, Capital Guardian, LLC ("Capital") purchased $730,000 of 4.375% notes due in 2023 (CUSIP:71647NAF6) (the "NAF6 Notes") for Ohio PERS's account in a total of two transactions: $490,000 at the trade price of $82.667, and $240,000 at the trade price of $82.574.  Capital is a United States entity and all of its offices and operations are in the United States.  Bank of America Securities LLC, through its San Francisco office, located at 600 Montgomery St., acted as both executing broker and clearing broker for the two transactions.

373.    On March 2, 2015, in its capacity as an investment manager for Ohio PERS, Capital purchased $270,000 of NAF6 Notes at a trade price of $82.769 for Ohio PERS's account.  HSBC Securities (USA) Inc., through its New York, NY office, located at 140 Broadway, acted as both executing broker and clearing broker for the transaction.

374.    On March 19, 2015, in its capacity as an investment manager for Ohio PERS, Stone Harbor, made the following purchases of Petrobras 2% notes due in 2016 (CUSIP:71647NAC3) (the "NAC3 Notes"), on behalf of Ohio PERS:

- $24,000 of the NAC3 Notes, denominated in U.S. dollars, at a trade price of $94.00 were purchased from selling counterparty Tradition Asiel Securities, Inc. ("Tradition Asiel"), a Delaware corporation located at 255 Greenwich Street, New York, New York 10007, which also acted as executing broker for the transaction.  Stone Harbor's purchase order for this transaction was placed from its offices in New York.  The securities for this transaction were sourced from the DTC participant account of Pershing, LLC, a subsidiary of the Bank of New York Mellon ("BNYM") located in Jersey City, New Jersey.  This transaction settled on the DTC in New York, New York on March 24, 2015 and delivery was made in New York, New York to DTC account number 8187, the DTC participant account of J.P. Morgan Chase Bank, National Association/Public Employee Retirement System of Ohio (OPERS), a custodian bank for Ohio PERS;

- $2,000 of the NAC3 Notes, denominated in U.S. dollars, at a trade price of $94.00 were purchased from selling counterparty Tradition Asiel, located at 255 Greenwich Street, New York, New York 10007, which also acted as executing broker for the transaction.  Stone Harbor's purchase order for this transaction was placed from its offices in New York.  The securities for this transaction were sourced from the DTC participant account of Pershing, LLC, a subsidiary of BNYM located in Jersey City, New Jersey.  This transaction settled on the DTC in New York, New York on March 24, 2015 and delivery was made in New York, New York to DTC account number 8187, the DTC participant account of J.P. Morgan Chase Bank, National Association/Public Employee Retirement System of Ohio (OPERS), a custodian bank for Ohio PERS; (iii) $169,000 of the NAC3 Notes, denominated in U.S. dollars,

at a trade price of $93.8750, were purchased from Merrill Lynch Brokerage, which acted as both selling counterparty and executing broker for the transaction.  Stone Harbor's purchase order for this transaction was placed from its offices in New York.  The securities for this transaction were sourced from the DTC participant account of Merrill Lynch, Pierce, Fenner & Smith, Inc./Fixed Income.  This transaction settled on the DTC in New York, New York on March 24, 2015 and delivery was made in New York, New York to DTC account number 8187, the DTC participant account of J.P. Morgan Chase Bank, National Association/Public Employee Retirement System of Ohio (OPERS), a custodian bank for Ohio PERS;

- $6,000 of the NAC3 Notes, denominated in U.S. dollars, at a trade price of $93.8750 were purchased from Merrill Lynch Brokerage, located at 200 North College Street, Charlotte, North Carolina 28255.  Stone Harbor's purchase order for this transaction was placed from its offices in New York.  The securities for this transaction were sourced from the DTC participant account of Merrill Lynch, Pierce, Fenner & Smith, Inc./Fixed Income.  This transaction settled on the DTC in New York, New York on March 24, 2015 and delivery was made in New York, New York to DTC account number 8187, the DTC participant account of J.P. Morgan Chase Bank, National Association/Public Employee Retirement System of Ohio (OPERS), a custodian bank for Ohio PERS;

- $60,000 of the NAC3 Notes, denominated in U.S. dollars, at an offering price of $93.8750, were purchased from J.P. Morgan Securities plc, 25 Bank Street, Canary Wharf, London, E14 5JP, United Kingdom.  Stone Harbor's purchase order for this transaction was placed from its offices in New York.  The securities for this

transaction were sourced from the DTC participant account of J.P. Morgan Chase/J.P. Morgan Chase International.  This transaction settled on the DTC in New York, New York on March 24, 2015 and delivery was made in New York, New York to DTC account number 8187, the DTC participant account of J.P. Morgan Chase Bank, National Association/Public Employee Retirement System of Ohio (OPERS), a custodian bank for Ohio PERS; and

- $3,000 of the NAC3 Notes, denominated in U.S. dollars, at a trade price of $93.8750, were purchased from J.P. Morgan Securities plc, 25 Bank Street, Canary Wharf, London, E14 5JP, United Kingdom.  Stone Harbor's purchase order for this transaction was placed from its offices in New York.  The securities for this transaction were sourced from the DTC participant account of J.P. Morgan Chase/J.P. Morgan Chase International.  This transaction settled on the DTC in New York, New York on March 24, 2015 and delivery was made in New York, New York to DTC account number 8187, the DTC participant account of J.P. Morgan Chase Bank, National Association/Public Employee Retirement System of Ohio (OPERS), a custodian bank for Ohio PERS.

375.    In addition to the foregoing transactions, Ohio PERS asserts its Exchange Act causes of action for all of the debt transactions set forth in Section XIII, *infra*, on which it also asserts Securities Act claims.  As elaborated further *infra*, all of those transactions were domestic transactions.

376.    Additional transactions reflected on Exhibit A may be domestic transactions, which will be confirmed during the ongoing discovery in this litigation.  Furthermore, such discovery and testimony may also reveal additional detail about the transactions described herein.

## XIII.   EXCHANGE ACT CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF

**For Violation of Section 10(b) of the Exchange Act and Rule 10b-5**
**Against the Exchange Act Defendants**

377.    Plaintiff repeats, incorporates and re-alleges paragraphs 1 – 376 by reference.

378.    During the Relevant Time Period, the Exchange Act Defendants disseminated or approved the false statements specified above, which they knew or deliberately or recklessly disregarded were materially false and misleading in that they contained material misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

379.    The Exchange Act Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they:

- Employed devices, schemes and artifices to defraud;

- Made untrue statements of material facts or omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading; or

- Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiff in connection with its purchases of Petrobras securities during the Relevant Time Period.

380.    Plaintiff has suffered damages in that, in reliance on the integrity of the market, it paid artificially inflated prices for Petrobras securities.  Plaintiff would not have purchased Petrobras securities at the prices it paid, or at all, if it had been aware that the market prices had been artificially and falsely inflated by the Exchange Act Defendants' misleading statements.

381.    As a direct and proximate result of the Exchange Act Defendants' wrongful conduct, Plaintiff suffered damages in connection with its purchases of Petrobras securities during the Relevant Time Period.

## SECOND CLAIM FOR RELIEF

### For Violations of Section 18 of the Exchange Act
### Against the Exchange Act Defendants

382.    Plaintiff incorporates paragraphs 1-376 by reference.[4]

383.    As set forth herein, the Exchange Act Defendants made or caused to be made statements in its SEC filings which were, at the time and in light of the circumstances under which they were made, false or misleading with respect to material facts.

384.    Petrobras was required to file reports with the SEC pursuant to Sections 13(a) and 15(d) of the Exchange Act and the rules and regulations promulgated thereunder.

385.    In connection with its purchase of the Company's securities, Plaintiff specifically read and relied upon the financial statements set forth in the Company's SEC filings throughout the Relevant Time Period.

386.    Plaintiff relied upon Petrobras' financial statements and statements concerning its internal controls as being materially complete, and as not omitting material information.  Plaintiff relied upon Petrobras' SEC filings not knowing that they were false or misleading.

387.    In reliance upon the materially false and misleading statements included in Petrobras' SEC filings during the Relevant Time Period, Plaintiff purchased Petrobras securities at artificially inflated prices.

388.    Plaintiff's reliance on Petrobras' SEC filings was reasonable.

---

[4]        To the extent the applicable Statute of Repose bars claims on any of OPERS's transactions, OPERS does not make claims pursuant to those transactions.

389.    When the truth emerged regarding the materially false and misleading statements contained in Petrobras' SEC filings, including statements concerning the Company's financial condition, the price of Petrobras' securities declined, causing substantial harm to Plaintiff.

390.    As a direct and proximate result of Petrobras' wrongful conduct, Plaintiff suffered damages in connection with its transactions in the Company's securities during the Relevant Time Period.

### THIRD CLAIM FOR RELIEF

**For Violation of Section 20(a) of the Exchange Act
Against the Individual Exchange Act Defendants**

391.    Plaintiff repeats, incorporates and re-alleges paragraphs 1 – 376 by reference.

392.    The Individual Exchange Act Defendants acted as controlling persons of Petrobras within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, participation in and/or awareness of the Company's operations and/or intimate knowledge of the statements filed by the Company with the SEC and disseminated to the investing public, the Individual Exchange Act Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.  The Individual Exchange Act Defendants were provided with, or had unlimited access to copies of, the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

393.    In particular, the Individual Exchange Act Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have

had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

394.     As set forth above, Petrobras and the Individual Exchange Act Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions, each as a controlling person, the Individual Exchange Act Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Petrobras' and the Individual Exchange Act Defendants' wrongful conduct, Plaintiff suffered damages in connection with its purchases of the Company's common stock during the Relevant Time Period.

## XIV.   ALLEGATIONS FOR CLAIMS FOR RELIEF UNDER THE SECURITIES ACT

### A.     Introduction

395.     The allegations in this Section XIV are, in effect a separate complaint.  For the following claims, there are no allegations of fraud, scienter or recklessness.  These claims are brought under Sections 11, 12(a)(2) and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77(1)(2) and 77o, and are based solely on claims of strict liability or the absence of any affirmative defense based on the reasonableness of the relevant defendants' investigations into the true facts.

396.     Plaintiff's claims under the Securities Act do not allege any fraud or scienter, and do not incorporate any of the allegations contained in Section IX above, nor are Plaintiff's Securities Act claims based on any allegation that any defendant engaged in fraud or any other kind of deliberate or intentional misconduct, and Plaintiff disclaims any reference to, or reliance on, the fraud allegations supporting its Exchange Act claims.

397.     As set forth below, Plaintiff's Securities Act claims are based on its purchase in or traceable to the 2013 and 2014 Offerings of securities issued by PGF, a wholly-owned subsidiary of Petrobras.

398.     Each of the offerings was conducted pursuant to an August 29, 2012 registration statement on Form S-3 (previously defined above as the "2012 Registration Statement") for the offer and sale of an indeterminate amount of securities at indeterminate offering prices, including debt securities, and a prospectus supplement issued in connection with that Offering.  The date of each Offering – and not the prior date of the 2012 Registration Statement – was the "effective date" of the 2012 Registration Statement for purposes of Section 11 liability pursuant to 17 C.F.R. § 230.415 and 17 C.F.R. § 229.512(a)(2).  According to the 2012 Registration Statement, " . . . for the purpose of determining any liability under the Securities Act of 1933, each such post-effective amendment shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of such securities at the time shall be deemed to be the initial *bona fide* offering thereof."  The 2012 Registration Statement also provided that "each prospectus filed by the registrant pursuant to Rule 424(b)(3) shall be deemed to be part of the registration statement as of the date the filed prospectus was deemed part of and included in the registration statement." The 2012 Registration Statement also provided that "each of the undersigned registrants hereby undertakes that, for purposes of determining any liability under the Securities Act of 1933, each filing of [defendant Petrobras'] annual report pursuant to Section 13(a) or 15(d) of the Exchange Act that is incorporated by reference in the registration statement shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of such securities at that time shall be deemed to be the initial *bona fide* offering itself."

116

399.     Plaintiff's Securities Act claims arise from a series of materially misleading statements and omissions of material fact about the reported value of Petrobras' assets, periodic expenses, net income, whether Petrobras suffered from material weaknesses in its disclosure controls and procedures (including its internal controls over financial reporting), and the Company's continual statements and assurances that it was operating ethically and with "zero tolerance" for corruption.

### B.     Relevant Securities Offerings

#### 1.     May 15, 2013 Notes Offering

400.     On or about May 15, 2013, Petrobras and PGF conducted a public offering and filed a prospectus supplement dated May 13, 2013 on Form 424B2 for the offer and sale of an aggregate of $11 billion in debt securities pursuant to the 2012 Registration Statement (the "2013 Prospectus" and the "2013 Offering," together with the 2012 Registration Statement, referred to collectively as the "2013 Offering Documents").  The 2013 Offering Documents offered six series of notes (the "2013 Notes"): (1) $1.25 billion of notes paying 2.00%, due in 2016, to be sold at $995.84 per $1000 par value; (2) $2 billion of notes paying 3.00%, due in 2019, to be sold at $993.52 per $1000 par value; (3) $3.5 billion of notes paying 4.375%, due in 2023, to be sold at $988.28 per $1000 par value; (4) $1.75 billion of notes paying 5.625%, due in 2043, to be sold at $980.27 per $1000 par value; (5) $1 billion of floating-rate notes, due in 2016, to be sold at par; and (6) $1.5 billion of floating-rate notes, due in 2019, to be sold at par.  The underwriters for the 2013 Offering included defendants HSBC Securities, J.P. Morgan, and Morgan Stanley, all of which are United States entities.

401.     Ohio PERS asserts the Securities Act Claims in connection with its purchase of the following debt securities in or traceable to the 2013 Prospectus:

a)      the NAF6 Notes (defined *supra*);

b)      the 5.625% notes due in 2043 (CUSIP:71647NAA7) (the "NAA7 Notes"); and

c)      the NAC3 Notes (defined *supra*).

402.    Ohio PERS's purchases of the debt securities in or traceable to the 2013 Offering were domestic transactions.  Ohio PERS made purchases of debt securities in the 2013 Offering in the United States, directly from the Chicago locations of each of the Underwriter Defendants Morgan Stanley, HSBC Securities and J.P. Morgan.   In addition, Ohio PERS's investment managers, acting on behalf of Ohio PERS, made purchases of the same debt securities, traceable to the 2013 Offering, on the secondary market in the United States.

403.    Ohio PERS's domestic transactions in Petrobras debt securities in, or traceable to, the 2013 Offering include, but are not limited to:

(a)    On the May 13, 2013 offering date and at the offering price of $98.8280, Ohio PERS purchased a total of $3 million[5] of NAF6 Notes directly from Underwriter Defendant Morgan Stanley & Co., LLC, a U.S.-based broker-dealer and joint bookrunner and underwriter for the 2013 Offering.  Ohio PERS securities traders located in Columbus, Ohio placed the purchase orders for these NAF6 Notes to the Chicago, Illinois office of Morgan Stanley.  The securities for this transaction were sourced from Morgan Stanley in the United States pursuant to its role as joint bookrunner and underwriter for the 2013 Offering.  This transaction settled in the DTC in New York, New York on May 20, 2013 and the securities were delivered to the DTC participant account of Ohio PERS' custodian bank, J.P. Morgan Chase Bank.

---

[5]      All total dollar amounts for note purchases described in this section refer to principal amounts.  All transactions were denominated in U.S. dollars.

(b) On the May 13, 2013 offering date and at the offering price of $98.0270, Ohio PERS purchased a total of $4 million of NAA7 Notes directly from Underwriter Defendant HSBC Securities, a U.S.-based broker-dealer and joint bookrunner and underwriter for the 2013 Offering. Ohio PERS securities traders located in Columbus, Ohio placed the purchase orders for these NAA7 Notes to the Chicago, Illinois office of HSBC Securities. The securities for this transaction were sourced from HSBC Securities in the United States pursuant to its role as joint bookrunner and underwriter for the 2013 Offering. This transaction settled on the DTC in New York, New York on May 20, 2013 and the securities were delivered to the DTC participant account of Ohio PERS' custodian bank, J.P. Morgan Chase Bank.

(c) On the May 13, 2013 offering date and at the offering price of $99.5840, Ohio PERS purchased a total of $1 million of NAC3 Notes directly from Underwriter Defendant J.P. Morgan, a U.S.-based broker-dealer and joint bookrunner and underwriter for the 2013 Offering, in two transactions of $500,000 each. Ohio PERS securities traders located in Columbus, Ohio placed the purchase orders for these NAC3 Notes to the Chicago, Illinois office of J.P. Morgan. The securities for these transactions were sourced from J.P. Morgan in the United States pursuant to its role as joint bookrunner and underwriter for the 2013 Offering. This transaction settled on the DTC in New York, New York on May 20, 2013 and the securities were delivered to the DTC participant account of Ohio PERS' custodian bank, J.P. Morgan Chase Bank.

(d) On the May 13, 2013 offering date and at the $98.82 offering price, Logan Circle Partners, LP ("Logan Circle"), in its capacity as an investment manager for Ohio

PERS, purchased, for Ohio PERS's account, $1,600,000 of NAF6 Notes in the 2013 Offering.  Logan Circle is a United States entity with headquarters at 1717 Arch St., Philadelphia, PA, and all of Logan Circle's offices and operations are in the United States.  The purchase was made directly from Underwriter Defendant Morgan Stanley and settled on May 20, 2013 at the DTC in New York, New York through Morgan Stanley's DTC participant account.

(e)   On February 27, 2014, in its capacity as an investment manager for Ohio PERS, BlueBay Asset Management LLP ("BlueBay"), an entity located in the United Kingdom, purchased, on Ohio PERS's behalf, $5,000,000 of NAF6 Notes traceable to the 2013 Offering and denominated in U.S. dollars, at a trade price of $90.3040.  The executing broker for this transaction was Jefferies & Company, Inc. (referred to here as "Jefferies – New York," but now known as Jefferies LLC), located at 520 Madison Avenue, New York, New York 10022.  Upon information and belief, this transaction settled in New York, New York on March 4, 2014 in the DTC participant account of one of Ohio PERS' custodian banks, either J.P. Morgan Chase Bank, National Association/Public Employee Retirement System of Ohio (OPERS) or BNYM.

404.   Additional transactions reflected on Exhibit A may be domestic transactions traceable to the 2013 Offering, which will be confirmed during the ongoing discovery in this litigation.  Furthermore, such discovery may also reveal additional detail about the transactions described herein.

## 2.    March 11, 2014 Notes Offering

405.    On or about March 11, 2014, Petrobras and PGF filed a prospectus supplement dated March 10, 2014 on Form 424B2 for the offer and sale of an aggregate of $8.5 billion in debt securities pursuant to the 2012 Registration Statement (the "2014 Prospectus" and the "2014 Offering," together with the 2012 Registration Statement, referred to collectively as the "2014 Offering Documents").   The 2014 Offering Documents offered six series of notes (the "2014 Notes"): (1) $1.6 billion of notes paying 3.250%, due in 2017, to be sold at $999.57 per $1000 par value; (2) $1.5 billion of notes paying 4.875%, due in 2020, to be sold at $999.43 per $1000 par value; (3) $2.5 billion of notes paying 6.25%, due in 2024, to be sold at $997.72 per $1000 par value; (4) $1 billion of notes paying 7.250%, due in 2044, to be sold at $991.66 per $1000 par value; (5) $1 billion of floating-rate notes, due in 2017, to be sold at par; and (6) $500 million of floating-rate notes, due in 2020, to be sold at par.   The underwriters for the 2014 Offering included Underwriter Defendant Citigroup, a United States entity.

406.    Ohio PERS asserts the Securities Act Claims in connection with its purchase of the following debt securities in or traceable to the 2014 Prospectus:

a)      the 6.25% notes due in 2024 (CUSIP:71647NAM1) (the "NAM1 Notes"); and

b)      the 4.875% notes due in 2020 (CUSIP:71647NAH2) (the "NAH2 Notes").

407.    Ohio PERS's purchases of the debt securities in or traceable to the 2014 Offering were domestic transactions.   Ohio PERS itself, as well as investment managers acting on behalf of Ohio PERS, made purchases of debt securities in the 2014 Offering in the United States, directly from the Chicago and New York offices of Underwriter Defendant Citigroup pursuant to Citigroup's role as a bookrunner and underwriter of the 2014 Offering.   In addition, Ohio PERS's

investment managers, acting on behalf of Ohio PERS, made purchases of the same debt securities, traceable to the 2014 Offering, on the secondary market in the United States.

408.    Ohio PERS's domestic transactions in Petrobras debt securities in, or traceable to, the 2014 Offering include, but are not limited to:

(a)   On the March 10, 2014 offering date and at the offering price of $99.720, Ohio PERS purchased a total of $5,000,000 of NAM1 Notes directly from Underwriter Defendant Citigroup, a U.S.-based broker-dealer and joint bookrunner and underwriter for the 2014 Offering.   Ohio PERS securities traders located in Columbus, Ohio placed the purchase orders for these NAM1 Notes to the Chicago, Illinois office of Citigroup.   The securities for these transactions were sourced from Citigroup in the United States pursuant to its role as joint bookrunner and underwriter for the 2014 Offering.   This transaction settled on the DTC in New York, New York on March 17, 2014 and the securities were delivered to the DTC participant account of Ohio PERS' custodian bank, J.P. Morgan Chase Bank.

(b)   On the March 10, 2014 offering date and at the offering price of $99.720, BlueBay, in its capacity as investment manager for Ohio PERS, purchased $2,280,000 of NAM1 Notes, denominated in U.S. dollars, on behalf of Ohio PERS.   The purchase order for this transaction was placed by BlueBay directly with the New York office of Underwriter Defendant Citigroup, located at 388 Greenwich Street, New York, New York, 10013.   The securities for this transaction were sourced from Citigroup in the United States pursuant to its role as joint bookrunner and underwriter for the 2014 Offering.   Upon information and belief, this transaction

settled on March 17, 2014 in the DTC participant account of Ohio PERS's custodian bank, BNYM.

(c)   On June 5, 2014, in its capacity as an investment manager for Ohio PERS, Lazard Asset Management LLC ("Lazard"), a Delaware limited-liability corporation located at 30 Rockefeller Plaza, New York, New York 10112, purchased, on behalf of Ohio PERS, $2,175,000 of NAM1 Notes, traceable to the 2014 Offering and denominated in U.S. dollars, at a trade price of $106.2760.  The purchase order for this transaction was placed from Lazard's offices in New York.  The selling counterparty and executing broker for this transaction was the New York office of Goldman Sachs & Co., located at 200 West Street, New York, New York 10282. Upon information and belief, this transaction settled on June 10, 2014 in the DTC participant account of Ohio PERS's custodian bank, BNYM.

(d)   On November 17, 2014, in their capacities as investment managers for Ohio PERS, Aberdeen LLC, in conjunction with Aberdeen Inc., purchased, on behalf of Ohio PERS, $3,910,000 of NAM1 Notes, traceable to the 2014 Offering and denominated in U.S. dollars, at a trade price of $98.5480.  The purchase order for this transaction was placed by Aberdeen LLC traders in the United Kingdom, using the Omgeo CTM electronic trading platform, which is also used by Aberdeen Inc. in the United States.  The selling counterparty for this transaction was Citibank, N.A., located at 399 Park Avenue, New York, New York 10043, and the Omgeo CTM platform designated the "Place of Trade" for this transaction as the United States.  Upon information and belief, this transaction settled on the DTC in New York, New York on November 20, 2014, and was delivered to the

DTC participant account of Ohio PERS's custodian bank, J.P. Morgan Chase Bank.

(e) On November 19, 2014, in their capacities as investment managers for Ohio PERS, Aberdeen LLC, in conjunction with Aberdeen Inc., purchased, on behalf of Ohio PERS, $977,000 of NAM1 Notes, traceable to the 2014 Offering and denominated in U.S. dollars, at a trade price of $100.3550.  The purchase order for this transaction was placed by Aberdeen LLC traders in the United Kingdom, using the Omgeo CTM platform.  The selling counterparty for this transaction was Citibank, N.A., located at 399 Park Avenue, New York, New York 10043, and the Omgeo CTM platform designated the "Place of Trade" for this transaction as the United States.  Upon information and belief, this transaction settled on the DTC in New York, New York on November 24, 2014, and was delivered to the DTC participant account of Ohio PERS's custodian bank, J.P. Morgan Chase Bank.

(f) On November 20, 2014, in their capacities as investment managers for Ohio PERS, Aberdeen LLC, in conjunction with Aberdeen Inc., purchased, on behalf of Ohio PERS, $977,000 of NAM1 Notes, traceable to the 2014 Offering and denominated in U.S. dollars, at a trade price of $101.5800.  The purchase order for this transaction was placed by Aberdeen LLC traders in the United Kingdom, using the Omgeo CTM platform.  The selling counterparty for this transaction was Citibank, N.A., located at 399 Park Avenue, New York, New York 10043, and the Omgeo CTM platform designated the "Place of Trade" for this transaction as the United States.  Upon information and belief, this transaction settled on the DTC in

New York, New York on November 25, 2014, and was delivered to the DTC participant account of Ohio PERS's custodian bank, J.P. Morgan Chase Bank.

(g) On November 20, 2014, in their capacities as investment managers for Ohio PERS, Aberdeen LLC, in conjunction with Aberdeen Inc., purchased, on behalf of Ohio PERS, $2,986,000 of NAM1 Notes, traceable to the 2014 Offering and denominated in U.S. dollars, at a trade price of $102.0710. The purchase order for this transaction was placed by Aberdeen LLC traders in the United Kingdom, using the Omgeo CTM platform. The selling counterparty for this transaction was Citibank, N.A., located at 399 Park Avenue, New York, New York 10043, and the Omgeo CTM platform designated the "Place of Trade" for this transaction as the United States. Upon information and belief, this transaction settled on the DTC in New York, New York on November 25, 2014, and was delivered to the DTC participant account of Ohio PERS's custodian bank, J.P. Morgan Chase Bank.

(h) On September 8, 2014, BlueBay, in its capacity as investment manager for Ohio PERS, purchased, on behalf of Ohio PERS, $1,326,000 of NAH2 Notes, traceable to the 2014 Offering and denominated in U.S. dollars, at a trade price of $104.0200. The executing broker for this transaction was Jefferies – New York, located at 520 Madison Avenue, New York, New York 10022. Upon information and belief, this transaction settled in New York, New York on September 11, 2014 in the DTC participant account of one of Ohio PERS' custodian banks, either J.P. Morgan Chase Bank, National Association/Public Employee Retirement System of Ohio (OPERS) or BNYM.

(i)   On September 9, 2014, BlueBay, in its capacity as investment manager for Ohio
PERS, purchased, on behalf of Ohio PERS, $1,472,000 of NAH2 Notes, traceable
to the 2014 Offering and denominated in U.S. dollars, at a trade price of $103.6050.
The executing broker for this transaction was Jefferies – New York, located at 520
Madison Avenue, New York, New York 10022.  Upon information and belief, this
transaction settled in New York, New York on September 11, 2014 in the DTC
participant account of one of Ohio PERS' custodian banks, either J.P. Morgan
Chase Bank, National Association/Public Employee Retirement System of Ohio
(OPERS) or BNYM.

(j)   On November 20, 2014, BlueBay, in its capacity as investment manager for Ohio
PERS, purchased, on behalf of Ohio PERS, $605,000 of NAH2 Notes, traceable to
the 2014 Offering and denominated in U.S. dollars, at a trade price of $98.3500.
The executing broker for this transaction was Jefferies – New York, located at 520
Madison Avenue, New York, New York 10022.  Upon information and belief, this
transaction settled in New York, New York on November 25, 2014 in the DTC
participant account of one of Ohio PERS' custodian banks, either J.P. Morgan
Chase Bank, National Association/Public Employee Retirement System of Ohio
(OPERS) or BNYM.

(k)  On February 25, 2015, Capital, in its capacity as investment manager for Ohio
PERS, purchased $800,000 of NAM1 Notes traceable to the 2014 Offering at a
trade price of $91.312 for Ohio PERS's account.  Pershing Securities New Jersey
(DLJ) ("Pershing Securities"), through its office in New York, NY, acted as both
executing broker and clearing broker for the transaction.

(l)   On February 26, 2015, Capital, in its capacity as investment manager for Ohio PERS, purchased $1,155,000 of NAM1 Notes traceable to the 2014 Offering for Ohio PERS's account in a total of three transactions: $290,000 at a trade price of 90.659, $440,000 at a trade price of $90.804, and $425,000 at a trade price of $91.065.  Pershing Securities, through its office in New York, NY, acted as both executing broker and clearing broker for these three transactions.

(m)   On February 26, 2015, MacKay Shields, in its capacity as an investment manager for Ohio PERS, purchased $1,150,000 of NAM1 Notes traceable to the 2014 Offering, at the trade price of $90.768, for Ohio PERS'account.  MacKay Shields placed the order by phone from its New York, NY office to the New York, NY office of Merrill Lynch Brokerage, which acted as both execution broker and clearing broker for the transaction. The selling counterparty for this transaction was Bank of America Securities LLC, which is a United States entity.  The transaction settled at the DTC in New York, NY on March 3, 2015.

(n)   On February 27, 2015, Capital, in its capacity as investment manager for Ohio PERS, purchased $240,000 of NAM1 Notes traceable to the 2014 Offering at a trade price of $92.255.  Pershing Securities, through its office in New York, NY, acted as both executing broker and clearing broker for these transactions.

(o)   On March 6, 2015, MacKay Shields, in its capacity as an investment manager for Ohio PERS, purchased a total of $785,000 of NAM1 Notes traceable to the 2014 Offering for Ohio PERS's account in two transactions: $525,000 at a trade price of $95.11, and $260,000 at a trade price of $95.148.  MacKay Shields placed the order by phone from its own New York, NY office to the New York, NY office of J.P.

Morgan Securities, LLC, which acted as both execution broker and clearing broker for the transactions.  The transactions settled at the DTC in New York, NY on March 11, 2015.

(p) On March 9, 2015, MacKay Shields, in its capacity as investment manager for Ohio PERS, purchased $260,000 of NAM1 Notes traceable to the 2014 Offering for Ohio PERS's account at a trade price of $94.69.  MacKay Shields placed the order by phone from its own New York, NY office to the New York, NY office of Barclays Capital, Inc., which acted as both execution broker and clearing broker for the transaction.  The transaction settled at the DTC on March 12, 2015.

(q) On March 18, 2015, Capital, in its capacity as investment manager for Ohio PERS, purchased $490,000 of NAM1 Notes traceable to the 2014 Offering at a trade price of $90.87.  Bank of America Securities LLC, through its San Francisco office, acted as both executing broker and clearing broker for the transaction.

(r) On March 19, 2015, Capital, in its capacity as investment manager for Ohio PERS, purchased $1,715,000 of NAM1 Notes traceable to the 2014 Offering for Ohio PERS's account in two transactions: $605,000 at a trade price of $90.169, and $1,110,000 at a trade price of $90.409.  Pershing Securities, through its New York, NY office, acted as both executing broker and clearing broker for the transactions.

409.    Additional transactions reflected on Exhibit A may be domestic transactions traceable to the 2014 Offering, which will be confirmed during the ongoing discovery in this litigation.   Furthermore, such discovery may also reveal additional detail about the transactions described herein.

410.     The only claims are that there were material misrepresentations and/or omissions of material fact in the 2012 Registration Statement filed with the SEC on August 29, 2012, the 2013 Prospectus, and the 2014 Prospectus (collectively referred to as the "Offering Documents"), in connection with two public offerings of securities registered in the United States.

411.     Under Section 11 of the Securities Act, Petrobras, PGF and the Officer and Director Defendants (as defined below) that signed the Registration Statement are liable for the misrepresentations and/or omissions of material fact in the Offering Documents.

## C.     The Securities Act Parties

### 1.     Plaintiff

412.     Ohio PERS is a public pension fund organized for the benefit of public employees throughout the State of Ohio who are not covered by another state or local retirement system.  As of December 31, 2013, Ohio PERS managed approximately $88.6 billion.  Ohio PERS serves over one million members.  Ohio PERS purchased Petrobras securities as detailed below.

### 2.     Issuer Defendants

413.     Defendant Petrobras is a corporation organized under the laws of Brazil, and maintains its principal executive offices at Avenida Republica do Chile, No. 65, 23rd Floor, 20031-912, Rio de Janeiro, Brazil. Petrobras also maintains an office at 570 Lexington Avenue, 43rd Floor, New York New York 10022.

414.     Defendant PGF is a wholly-owned, finance-related subsidiary of Petrobras incorporated in the Netherlands.  PGF maintains its principal executive offices at Weenapoint Toren A, Weena 722, 3014 DA Rotterdam, The Netherlands.  On February 12, 2014, PGF acquired all of the outstanding shares of PifCo, a wholly-owned subsidiary of Petrobras.  Between the beginning of the Relevant Time Period and August 9, 2013, PifCo was organized under the laws

of the Cayman Islands with its principal executive offices at 4th Floor, Harbrou Place, 103 South Church Street, P.O. Box 1034G-BWI, George Town, Grand Cayman, Cayman Islands.  On August 9, 2013, PifCo completed a transfer of domicile, registering in Luxembourg with principal executive offices at 40, Avenue Moneterey, 2163 Luxembourg.  On December 16, 2013, certain assets and liabilities of PifCo were spun off and subsequently merged into Petrobras.  The publicly issued debt of PGF is unconditionally guaranteed by Petrobras, and certain issues of this debt are registered with the NYSE.

### 3.     The Officer and Director Defendants

415.    Defendant Almir Guilherme Barbassa ("Barbassa") served as Chief Financial Officer ("CFO") of Petrobras from 2005 until February 6, 2015.  Barbassa signed the 2012 Registration Statement pursuant to which the Company offered and sold the 2013 Notes and the 2014 Notes.

416.    Defendant Maria das Graças Silver Foster served as Chief Executive Offer of Petrobras from February 13, 2012 through February 2015.  Previously, CEO Foster served as the Company's Director of Gas and Energy.  CEO Foster signed the 2012 Registration Statement pursuant to which the Company offered and sold the 2013 Notes and the 2014 Notes.

417.    Defendant Josué Christiano Gomes da Silva ("Josué da Silva") served as a Director of Petrobras from October 28, 2011 to March 2013.  Josué da Silva signed the 2012 Registration Statement pursuant to which the Company offered and sold the 2013 Notes and the 2014 Notes.

418.    Defendant Sílvio Sinedino Pinheiro ("Pinheiro") served as a Director of Petrobras since March 6, 2012.  Pinheiro signed the 2012 Registration Statement pursuant to which the Company offered and sold the 2013 Notes and the 2014 Notes.

419.     Defendant Daniel Lima de Oliveira ("Oliveira") served as CEO and Chairman of the Board of PifCo since September 1, 2005.  Oliveira signed the 2012 Registration Statement pursuant to which the Company offered and sold the 2013 Notes and the 2014 Notes.

420.     Defendant José Raimundo Brandão Pereira ("Pereira") served as a Director of PifCo since 2003.  Pereira signed the 2012 Registration Statement pursuant to which the Company offered and sold the 2013 Notes and the 2014 Notes.

421.     Defendant Sérvio Túlio da Rosa Tinoco ("Tinoco") served as CFO of PifCo since September 1, 2005.  Tinoco signed the 2012 Registration Statement pursuant to which the Company signed and sold the 2013 Notes and the 2014 Notes.

422.     Defendant Paulo José Alves ("Alves") served as the Chief Accounting Officer of PifCo since May 2011.  Alves signed the 2012 Registration Statement pursuant to which the Company offered and sold the 2013 Notes and the 2014 Notes.

423.     Defendant Gustavo Tardin Barbosa ("Barbosa") served as CEO and Managing Director "A" of PGF and previously held the title of Executive Manager Corporate Finance. Barbosa signed the 2012 Registration Statement pursuant to which the Company offered and sold the 2013 Notes and the 2014 Notes.

424.     Defendant Alexandre Quintão Fernandes ("Fernandes") served as CFO and Managing Director "B" of PGF, and signed the 2012 Registration Statement pursuant to which the Company offered and sold the 2013 Notes and the 2014 Notes.

425.     Defendant Marcos Antonio Zacarias ("Zacarias") served as Managing Director "A" of PGF, and signed the 2012 Registration Statement pursuant to which the Company offered and sold the 2013 Notes and the 2014 Notes.

426.    Defendant Cornelis Franciscus Jozef Looman ("Looman") served as Managing Director "B" of PGF and signed the 2012 Registration Statement pursuant to which the Company offered and sold the 2013 Notes and the 2014 Notes.

427.    Defendant Theodore Marshall Helms ("Helms") has served as the authorized U.S. representative for Petrobras, PGF and PifCo, and Helms signed the 2012 Registration Statement pursuant to which the Company offered and sold the 2013 Notes and 2014 Notes.

### 4.    The Underwriter Defendants

428.    Defendant Citigroup acted as an underwriter and joint bookrunner of the Notes Offerings.  Citigroup maintains its principal place of business at 388 Greenwich Street, New York, New York 10013.

429.    Defendant J.P. Morgan acted as an underwriter and joint bookrunner of the Notes Offerings.  J.P. Morgan maintains its principal place of business at 277 Park Avenue, New York, New York 10172.

430.    Defendant Morgan Stanley acted as an underwriter and joint bookrunner of the 2013 Offering.  Morgan Stanley maintains its principal place of business at 1585 Broadway, New York, New York 10036.

431.    Defendant HSBC Securities acted as an underwriter and joint bookrunner of the Notes Offerings.  HSBC Securities maintains its principal place of business at 354 Sixth Avenue, New York, New York 10011.

### 5.    Auditor Defendant

432.    Defendant PwC served as Petrobras' independent auditor from January 2012 onwards and was contracted to provide specialized technical accounting audit services for the years 2012, 2013 and 2014.  PwC is a member firm of PricewaterhouseCoopers International Limited.

PwC is based in Sao Paulo, Brazil.  By virtue of their position as independent accountants and auditors of Petrobras, PwC had access to the Company's key personnel, accounting books and records, and transactional documents, at all relevant times.  As a result of their provision of auditing and other services, PwC's personnel were frequently present at Petrobras' offices and had continual access to, and knowledge of, Petrobras' confidential internal corporate, financial and business information, and had the opportunity to observe and review the Company's business and accounting practices, and to test the Company's internal and publicly reported financial statements as well as the Company's internal controls. PwC examined and opined on the Company's financial statements for the fiscal years 2012 and 2013, and falsely represented that their audits of Petrobras' 2012 and 2013 financial statements had been conducted in accordance with generally-accepted auditing standards and/or Public Company  Accounting Oversight Board ("PCOAB") standards, and wrongfully issued "clean" or unqualified audit reports in which they falsely represented that those financial statements fairly presented the Company's financial condition and results of operations in conformity with IFRS.

433.    The Issuer Defendants, the Officer and Director Defendants, the Underwriter Defendants and the Auditor Defendant are referred to collectively here as the "Securities Act Defendants."

### 6.      Relevant Non-Defendant Individuals

434.    Guido Mantega currently serves as the Minister of Finance of Brazil and as the Chair of the Petrobras Board of Directors.  Mantega signed the 2012 Registration Statement.

435.    Marcos Antonia Silva Menezes served as a member of the Fiscal Council of Fundação Petrobras de Seguridade Social-PETROS, as Petrobras' Chief Accounting Officer, and as a director of PifCo.  He signed the 2012 Registration Statement.

436.    Fransciso Roberto de Albuquerque is a commander in the Brazilian army and, as a director of Petrobras, signed the 2012 Registration Statement.

437.    Jorge Gerdau Johanpeter served as director of Petrobras and signed the 2012 Registration Statement.

438.    Luciano Galvão Coutinho served as the Executive Secretary of the Brazilian Science and Technology Ministry, as President of the Brazilian Development Bank, and as a director of Petrobras, signed the 2012 Registration Statement.

439.    Sergio Franklin Quintella served as the President of the Federal Tribunal Court and, as a director of Petrobras, signed the 2012 Registration Statement.

440.    Marcio Perriera Zimmerman is currently the Deputy Minister of Energy in Brazil, and as a director of Petrobras, signed the prospectus included in the 2012 Registration Statement.

441.    Miriam Aparcedia Belchior is the Brazilian Minister of Planning, and as a director of Petrobras, signed the 2012 Registration Statement.

**D.    <u>Jurisdiction and Venue for Plaintiff's Securities Act Claims</u>**

442.    The claims asserted here arise under Sections 11, 12(a)(2) and 15 (15 U.S.C. §§ 77k, 77l and 77o) of the Securities Act.

443.    This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C § 1331 and §22 of the Securities Act (15 U.S.C. § 77v).

444.    Venue is proper in the Southern District of New York pursuant to Section 22(a) of the Securities Act (15 U.S.C. § 77v) and 28 U.S.C § 1391(b).  Substantial acts in furtherance of the wrongs alleged here, or the effects of those wrongs, have occurred within this District. Petrobras and all of the Underwriter Defendants maintain their principal U.S. offices in New York, New York, and various Petrobras securities trade in this District on the NYSE.

445.    In connection with the acts alleged here in Plaintiff's claims for relief under the Securities Act, the defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the mails, interstate telephone communications and the facilities of the national securities markets.

**E.      Material Misstatements and/or Omissions in the Offering Documents**

446.    Both the 2013 Offering and the 2014 Offering incorporated by reference the following documents, among others:

a)       The 2011 Form 20-F filed with the SEC on April 2, 2012;

b)       The 2011 Form 20-F/A filed with the SEC on July 9, 2012; and

c)       The 2012 Form 20-F filed with the SEC on April 29, 2013;

d)       The August 10, 2012 Form 6-K; and

e)       The April 30, 2013 Form 6-K.

447.    The 2014 Offering incorporated by reference the following additional documents, among others:

a)       The February 26, 2014 Form 6-K;

b)       The March 7, 2014 Form 6-K; and

c)       The March 11, 2014 Form 6-K.

448.    The Offering Documents, through the 2012 Registration Statement, also incorporated by reference "[a]ny future filings of Petrobras on Form 20-F made with the SEC after the date of this prospectus and prior to the termination of the offering of the securities offered by this prospectus."

1.      **2011 20-F**

449.    On April 2, 2012, Petrobras filed the 2011 20-F, which was incorporated by reference into the 2013 and 2014 Offering Documents, reporting total assets of $319 billion, including net PP&E of $182 billion, depreciation, depletion and amortization of $10.5 billion, and net income of $20.0 billion.

450.    The Company's 2011 20-F stated that Petrobras' "management assessed the effectiveness of each Company's internal control over financial reporting as of December 31, 2011 . . . [and] has concluded that as of December 31, 2011, each Company's internal control over financial reporting is effective." Petrobras further stated that the "management of [the] Company identified no further change in its internal control over financial reporting during the fiscal year ended December 31, 2011, that has materially affected or is reasonably likely to materially affect its internal control over financial reporting."

451.    Statements in the 2011 20-F about the Company's reported total assets, including net PP&E, total costs and expenses, including depreciation, depletion and amortization, and the net income reported in the 2011 20-F, were false and misleading because: (a) the reported value of Petrobras' assets was materially false and misleading as to the costs associated with illegal payments made by the Company's contractors, which had been incorporated into certain asset values at the time or their acquisition, and then capitalized as part of those assets' values when recorded on the Company's balance sheet, artificially inflating their values; and (b) had the illegal or improper payments been properly accounted for, Petrobras would have recognized materially greater expenses, and less net income. In addition, the statements in the 2011 20-F were materially false and misleading because Petrobras failed to disclose that the value of the Company's PP&E was adversely impacted by illegal or improper payments that inflated the value of myriad

construction contracts related to numerous parts of Petrobras' operations, including refineries, oil

exploration and development vessels and transportation infrastructure and vehicles.

452.    The 2011 20-F also incorporated the Company's Ethics Code and made statements

representing that the Company adhered to the Ethics Code and Code of Good Practices.

453.    The Ethics Code is explicitly described as below:

> We have always guided our business and our relations with third parties by strong
> ethical principles. In 1998, our board of executive officers approved the Petrobras
> Code of Ethics, which was extended to all Petrobras companies in 2002. In 2008,
> our board of executive officers further developed our ethics management through
> the creation of the Petrobras Ethics Commission. The Code of Ethics is applicable
> to all employees, the board of executive officers and the board of directors. The
> document      is      available      on      our      website      at
> http://www.petrobras.com.br/en/investors/. It is the responsibility of the Ethics
> Commission to promote compliance with ethical principles and act as a forum for
> discussion of subjects related to ethics. Currently, the Commission's focus is to
> develop and strengthen the Petrobras Ethics Management System, which is aimed
> at assuring the highest ethics standards by defining the roles of managers,
> employees, the Ethics Commission and their relationships.

454.    The preamble to the Code of Best Practices, in effect during the Relevant Time

Period, states that "it is necessary that both management and also employees of Petrobras conduct

themselves according to the highest ethical standards."  Chapter III of the Code of Best Practices,

titled "Policy for Conduct of Management and Employees Who Comprise the Senior Management

of Petrobras," states in Article 17 that "[m]anagement and employees comprising the Senior

Management of Petrobras have the same duty of loyalty and consequently must conduct

themselves in such a way as to avoid any occurrence of situations which may be construed as a

conflict of interest and affect the Company's businesses and operations."

455.    Article 18 of Chapter III of the Code of Best Practices states that:

> The management and employees comprising the Senior Management of Petrobras,
> principally those employees in positions of authority or, as a result of their
> functions, having contact with clients, suppliers and competitors, must, in
> compliance with this Policy, abstain from: receiving from any supplier, client or

137

competitor, a reward or payment for services rendered as an employee or consultant; receiving for himself or any member of his familiy [*sic*] or person residing in his place of abode, gifts or entertainment which, irrespective of value, may give grounds for conflicts of interest; [or] practicing [*sic*] any acts that place him/her in a position of subordination or under the influence of a supplier, client or competitor.

456.    Items I-III of the "Complementary Provisions" section of the Ethics Code, in effect

during the Relevant Time Period, states:

The Ethics Code covers the members of the Boards of Directors, Fiscal Councils, Executive Boards, the occupants of managerial functions, employees, trainees and service providers of Petrobras system, as individual and collective commitment of each and all of them to comply with it and promote its compliance in all actions of the productive chain of Petrobras System and in its relations with all interested parties. . . The employees of Petrobras System will formally acknowledge this Code, which will be widely disseminated through printed and electronic means. . . The violation of the principles and commitments expressed in this Code may result in the adoption of disciplinary measures, in accordance with the standards of the companies comprising Petrobras System.

457.    Section 1.1 of the Ethics Code pledges the following:

Pursuit [*sic*] a balance of power between the High Management (Board of Directors and Executive Boards) and shareholders interest, including minority, with a view to aligning the System's strategic objectives with the interests and rights of all interested parties.

458.    Section 1.2 further pledges that Petrobras would undertake to:

conduct its business with transparency and integrity, creating credibility with its shareholders, investors, employees, suppliers, customers, consumers, government, media, communities where it operates and society in general, pursuing to achieve growth and profitability with social and environmental responsibility.

459.    Section 8.8 of the Ethics Code explicitly states that the Company would undertake

to "refuse any corrupt and bribery practices, keeping formal procedures for control and

consequences of any transgressions."  Section 8.10 further states the Company would undertake

to "refuse support and contributions to political parties or political campaigns of candidates for

elective offices."

138

460.     Statements in the 2011 20-F about compliance with internal controls and financial reporting, and statements regarding adherence to the Petrobras Ethics Code and Code of Best Practices, were materially false and misleading and omitted material information by virtue of the illegal or improper payments made by contractors and contributions or other payments made to political parties, candidates or campaigns.

### 2.     August 10, 2012 6-K

461.     On August 10, 2012 Petrobras filed a Form 6-K which set out the Company's financial statements for the period ending June 30, 2012, which were incorporated by reference into the 2013 and 2014 Offering Documents.  The August 10, 2012 6-K reported total assets of $311 billion, including net PP&E of $185 billion, depreciation, depletion, and amortization of $2.7 billion, and a net loss of $953 million.

462.     Statements in the August 10, 2012 6-K about the Company's reported total assets, including net PP&E, total costs and expenses, including depreciation, depletion and amortization, and the net income reported in the August 10, 2012 6-K, were false and misleading because: (a) the reported value of Petrobras' assets was materially false and misleading as to the costs associated with illegal payments made by the Company's contractors, which had been incorporated into certain asset values at the time or their acquisition, and then capitalized as part of those assets' values when recorded on the Company's balance sheet, artificially inflating their values; and (b) had the illegal or improper payments been properly accounted for, Petrobras would have recognized materially greater expenses, and less net income.  In addition, the statements in the August 10, 2012 6-K were materially false and misleading because Petrobras failed to disclose that the value of the Company's PP&E was adversely impacted by illegal or improper payments that inflated the value of myriad construction contracts related to numerous parts of Petrobras'

operations, including refineries, oil exploration and development vessels and transportation infrastructure and vehicles.

### 3.    2012 20-F

463.    On April 29, 2013, Petrobras filed the 2012 20-F, which was incorporated by reference into the 2013 and 2014 Offering Documents, reporting total assets of $332 billion, including net PP&E of $205 billion, depreciation, depletion and amortization of $11.1 billion, and net income of $10.9 billion.  The 2012 20-F also incorporated the Company's Ethics Code and made statements substantially similar to the ones alleged in paragraph 453 above.

464.    The Company's 2012 20-F stated that Petrobras' "management assessed the effectiveness of each Company's internal control over financial reporting as of December 31, 2012 . . . [and] has concluded that as of December 31, 2012, each Company's internal control over financial reporting is effective."  Petrobras further stated that the "management of [the] Company identified no further change in its internal control over financial reporting during the fiscal year ended December 31, 2012, that has materially affected or is reasonably likely to materially affect its internal control over financial reporting."

465.    Statements in the 2012 20-F about the Company's reported total assets, including net PP&E, total costs and expenses, including depreciation, depletion and amortization, and the net income reported in the 2012 20-F, were false and misleading because: (a) the reported value of Petrobras' assets were materially false and misleading as to the costs associated with illegal payments made by the Company's contractors, which had been incorporated into certain asset values at the time or their acquisition, and then capitalized as part of those assets' values when recorded on the Company's balance sheet, artificially inflating their values; and (b) had the illegal or improper payments been properly accounted for, Petrobras would have recognized materially

greater expenses, and less net income.  In addition, the statements in the 20-F were materially false and misleading because Petrobras failed to disclose that the value of the Company's PP&E was adversely impacted by illegal or improper payments that inflated the value of myriad construction contracts related to numerous parts of Petrobras' operations, including refineries, oil exploration and development vessels and transportation infrastructure and vehicles.

466.    Statements regarding Petrobras' adoption and implementation of the Code of Good Practices and Ethics Code as set forth in paragraphs 452 - 453 above were repeated in the 2012 20-F.

467.    Statements in the 2012 20-F about compliance with internal controls and financial reporting, and statements regarding adherence to the Petrobras Ethics Code were materially false and misleading and omitted material information by virtue of the illegal or improper payments made by contractors and contributions or other payments made to political parties, candidates or campaigns.

### 4.    April 30, 2013 6-K

468.    On April 30, 2013 Petrobras filed a Form 6-K which set out the Company's financial statements for the period ending March 31, 2013, which were incorporated by reference into the 2013 and 2014 Offering Documents.  The April 30, 2013 6-K reported total assets of $345 billion, including net PP&E of $214 billion, depreciation, depletion, and amortization of $3.2 billion, and net income of $3.9 billion.

469.    Statements in the April 30, 2013 6-K about the Company's reported total assets, including net PP&E, total costs and expenses, including depreciation, depletion and amortization, and the net income reported in the April 30, 2013 6-K, were false and misleading because: (a) the reported value of Petrobras' assets were materially false and misleading as to the costs associated

with illegal payments made by the Company's contractors, which had been incorporated into certain asset values at the time or their acquisition, and then capitalized as part of those assets' values when recorded on the Company's balance sheet, artificially inflating their values; and (b) had the illegal or improper payments been properly accounted for, Petrobras would have recognized materially greater expenses, and less net income.  In addition, the statements in the April 30, 2013 6-K were materially false and misleading because Petrobras failed to disclose that the value of the Company's PP&E was adversely impacted by illegal or improper payments that inflated the value of myriad construction contracts related to numerous parts of Petrobras' operations, including refineries, oil exploration and development vessels and transportation infrastructure and vehicles.

### 5.      February 26, 2014 6-K

470.    On February 26, 2014 Petrobras filed a Form 6-K which set out the Company's financial statements for the 2013 year-end period, which were incorporated by reference into the 2014 Offering Documents.  The February 26, 2014 6-K reported total assets of $321 billion, including net PP&E of $228 billion, depreciation, depletion, and amortization of $13.2 billion, and net income of $2.6 billion.

471.    Statements in the February 26, 2014 6-K about the Company's reported total assets, including net PP&E, total costs and expenses, including depreciation, depletion and amortization, and the net income reported in the February 26, 2014 6-K, were false and misleading because: (a) the reported value of Petrobras' assets were materially false and misleading as to the costs associated with illegal payments made by the Company's contractors, which had been incorporated into certain asset values at the time or their acquisition, and then capitalized as part of those assets' values when recorded on the Company's balance sheet, artificially inflating their values; and (b)

had the illegal or improper payments been properly accounted for, Petrobras would have recognized materially greater expenses, and less net income.  In addition, the statements in the February 26, 2014 6-K were materially false and misleading because Petrobras failed to disclose that the value of the Company's PP&E was adversely impacted by illegal or improper payments that inflated the value of myriad construction contracts related to numerous parts of Petrobras' operations, including refineries, oil exploration and development vessels and transportation infrastructure and vehicles.

### 6.    March 7, 2014 6-K

472.    On March 7, 2014 Petrobras filed a Form 6-K which made the following statement: "our management has assessed the effectiveness of our internal control over financial reporting as of December 31, 2013, based on the criteria established in Internal Control – Integrated Framework (1992) issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).  Based on such assessment and criteria, the Company's management has concluded that the Company's internal control over financial reporting was effective as of December 31, 2013."

473.    This statement regarding the Company's assessment of its internal controls and financial reporting was materially false and misleading and omitted material information by virtue of the illegal or improper payments made by contractors and contributions or other payments made to political parties, candidates or campaigns.

### 7.    March 11, 2014 6-K

474.    On March 11, 2014, Petrobras filed a Form 6-K, which attached a copy of the March 2014 Underwriting Agreement between Petrobras, PGF and the Underwriter Defendants who underwrote the 2014 Notes Offerings, stating that neither Petrobras nor any of its officers had engaged in any corruption, including making "any direct or indirect unlawful payment to any

foreign or domestic government official or employee from corporate funds," or otherwise violating "any provision of the [FCPA], the U.K. Bribery Act 2010 or the Law No. 12,846 of 2013 [the new Brazilian anti-corruption law]." The March 2014 Underwriting Agreement further stated that neither Petrobras nor any of its officers had "made any bribe, rebate, payoff, influence payment, kickback or other unlawful payment."

475.    Statements in the March 11, 2014 6-K were materially false and misleading because Petrobras and its executives, including Costa and Barusco, have admitted that for at least a decade, if not longer, they had participated in a scheme to award inflated contracts to Brazilian and foreign construction and engineering firms, and that included in the cost of those inflated contracts were improper payments paid to Petrobras executives, made to influence or attempt to influence, Brazilian politicians.

 8. **Petrobras' Financial Statements Failed to Comply with Public Company Accounting Oversight Board Standards and SEC Regulations**

476.    PwC audited Petrobras' financial statements and its system of internal controls over financial reporting for the years ended December 31, 2012 and 2013. PwC also issued and signed audit opinions in which it certified that Petrobras' internal controls were adequate and that the Company's financial statements were free of material misstatements and fairly presented Petrobras' financial position.

477.    PwC subsequently consented to the incorporation by reference of those unqualified audit opinions in the Offering Materials for the Company's 2013 Notes Offerings and 2014 Notes Offerings.

478.    PwC's unqualified opinions on Petrobras' financial statements, incorporated by reference into the 2013 Notes Offerings and 2014 Notes Offerings, were materially false and

misleading.  Contrary to their representations, PwC's audits of those financial statements were not

conducted in accordance with PCAOB standards, including the adoption of the AICPA's Auditing

Standards Board's Auditing Standards to the extent not superseded or amended by the PSAOB

(hereinafter referred to as "GAAS") and Petrobras' financial condition and results of operations

were not presented in conformity with IFRS, as they purported to be.  In issuing unqualified audit

opinions and consenting to their incorporation in Petrobras' SEC filings, PwC made false and

misleading statements in violation of Section 11 of the Securities Act.

479.    On February 4, 2013, PwC signed a "Report of Independent Registered Public

Accounting Firm" reporting on Petrobras' financial statements and internal controls for the year

ended December 31, 2012.  Specifically, PwC reported:

> In our opinion, the accompanying consolidated statement of financial position and
> the related consolidated statements of income, of comprehensive income, of cash
> flows and of changes in stockholders' equity present fairly, in all material respects,
> the financial position of Petróleo Brasileiro S.A. - Petrobras and its subsidiaries (the
> "Company") at December 31, 2012, and the results of their operations and their
> cash flows for the year ended December 31, 2012 in conformity with
> International Financial Reporting Standards (IFRS) as issued by the International
> Accounting Standards Board (IASB). Also in our opinion, the Company
> maintained, in all material respects, effective internal control over financial
> reporting as of December 31, 2012, based on criteria established in Internal Control
> - Integrated Framework issued by the Committee of Sponsoring Organizations of
> the Treadway Commission (COSO). The Company's management is responsible
> for these financial statements, for maintaining effective internal control over
> financial reporting and for its assessment of the effectiveness of internal control
> over financial reporting, included in the accompanying Management's Report on
> Internal Control over Financial Reporting. Our responsibility is to express opinions
> on these financial statements and on the Company's internal control over financial
> reporting based on our integrated audits. We conducted our audits in accordance
> with the standards of the Public Company Accounting Oversight Board (United
> States). Those standards require that we plan and perform the audits to obtain
> reasonable assurance about whether the financial statements are free of material
> misstatement and whether effective internal control over financial reporting was
> maintained in all material respects. Our audits of the financial statements included
> examining, on a test basis, evidence supporting the amounts and disclosures in the
> financial statements, assessing the accounting principles used and significant
> estimates made by management, and evaluating the overall financial statement

presentation. Our audit of internal control over financial reporting included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audits also included performing such other procedures as we considered necessary in the circumstances. We believe that our audits provide a reasonable basis for our opinions.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements. Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

Rio de Janeiro, February 4, 2013
PricewaterhouseCoopers Auditores Independentes CRC 2SP000160/O-5 "F" RJ
/s/ Marcos Donizete Panassol
Contador CRC 1SP155975/O-8 "S" RJ

480.    On February 6, 2013, Petrobras filed an interim report with the SEC on Form 6-K

in which PwC consented to the incorporation by reference of its report in Petrobras' 2012

Registration Statement.  Specifically:

We hereby consent to the incorporation by reference in the Registration Statement on Form F-3 (No. 333-163665) of Petróleo Brasileiro S.A. - Petrobras, of our report dated February 04, 2013 relating to the financial statements of Petrobras and the effectiveness of internal control over financial reporting, which is included in Petrobras` Form 6-K dated February 05, 2013.

/s/ PricewaterhouseCoopers

146

PricewaterhouseCoopers
Auditores Independentes

Rio de Janeiro - Brazil
February 5, 2013

481.     On April 29, 2013, PwC reissued its signed report of February 5, 2013, with

Petrobras' filing of the 2012 20-F with the SEC.  In an exhibit to the 2012 20-F, PwC again

consented to the incorporation by reference of its report in Petrobras' 2012 Registration Statement.

Specifically,

> We hereby consent to the incorporation by reference in the Registration Statement
> on Form F-3 (No. 333-183618) of Petróleo Brasileiro S.A. - Petrobras of our report
> dated February 4, 2013 relating to the financial statements and the effectiveness of
> internal control over financial reporting, which appears in this Annual Report on
> Form 20-F.
>
> /s/ Marcos Donizete Panassol
> Marcos Donizete Panassol Engagement Leader
>
> PricewaterhouseCoopers
> Rio de Janeiro - Brazil April 26, 2013

482.     On February 25, 2014, PwC signed a "Report of Independent Registered Public

Accounting Firm," reporting on Petrobras' financial statements and internal controls for the year

ended December 31, 2013.  The report was issued in a Form 6-K filed by Petrobras with the SEC

on February 26, 2014.  It read as follows:

> In our opinion, the accompanying consolidated statement of financial position and
> the related consolidated statements of income and comprehensive income,
> changes in equity and cash flows present fairly, in all material respects, the financial
> position of Petróleo Brasileiro S.A. - Petrobras and its subsidiaries (the
> "Company") at December 31, 2013, and December 31, 2012, and the results of their
> operations and their cash flows for the years ended December 31, 2013, and
> December 31, 2012, in conformity with International Financial Reporting
> Standards as issued by the International Accounting Standards Board. Also in our
> opinion, the Company maintained, in all material respects, effective internal control
> over financial reporting as of December 31, 2013 based on criteria established in
> Internal Control - Integrated Framework  (1992) issued by the Committee of
> Sponsoring Organizations of the Treadway Commission (COSO). The Company's

management is responsible for these financial statements, for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting, included in the accompanying Management's Report on Internal Control over Financial Reporting. Our responsibility is to express opinions on these financial statements and on the Company's internal control over financial reporting based on our integrated audits. We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the financial statements are free of material misstatement and whether effective internal control over financial reporting was maintained in all material respects. Our audits of the financial statements included examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. Our audit of internal control over financial reporting included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audits also included performing such other procedures as we considered necessary in the circumstances. We believe that our audits provide a reasonable basis for our opinions.

We also have audited the adjustments to the 2011 financial statements to retrospectively apply the change in accounting for employee benefit plans for the revisions to IAS 19 Employee Benefits as described in Note 2.3. In our opinion, such adjustments are appropriate and have been properly applied. We were not engaged to audit, review, or apply any procedures to the 2011 consolidated financial statements of the Company other than with respect to the adjustments and, accordingly, we do not express an opinion or any other form of assurance on the 2011 consolidated financial statements taken as a whole.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

Rio de Janeiro, February 25, 2013[6]

/s/ PricewaterhouseCoopers Auditores Independentes
CRC 2SP000160/O-5 "F" RJ
/s/ Marcos Donizete Panassol
Contador CRC 1SP155975

483.    On March 10, 2014, PwC reissued its signed report of February 25, 2014, with Petrobras' filing of Form 6-K/A with the SEC.   In an exhibit to the Form 6-K/A, PwC again consented to the incorporation by reference of its report in Petrobras' Registration Statement filed on Form F-3:

We hereby consent to the incorporation by reference in the Registration Statement on Form F-3 (No. 333-183618) of Petróleo Brasileiro S.A. - Petrobras of our report dated February 25, 2014 relating to the financial statements and the effectiveness of internal control over financial reporting, which appears in the Petróleo Brasileiro S.A. - Petrobras Form 6-K dated February 26, 2014 and the related amendment on Form 6-K/A dated March 10, 2014. We also consent to the reference to us as experts under the heading "Independent Registered Public Accounting Firm" in such Registration Statement.  We also consent to the reference to us under the heading "Selected Financial Data" in such Registration Statement.

/s/PricewaterhouseCoopers Auditores Independentes
Rio de Janeiro, Brazil
March 10, 2014

484.    Finally, on April 30, 2014, PwC reissued its signed report of February 25, 2014, with Petrobras' filing of the 2013 20-F with the SEC.  In an exhibit to the 2013 20-F, PwC again

---

[6] The February 25, 2013 date of PwC's report incorporated into Petrobras' February 26, 2014 6-K appears to be a typographical error.  In the March 10, 2014 6-K referenced in paragraph 483, PwC refers to "**our report dated February 25, 2014** relating to the financial statements and the effectiveness of internal control over financial reporting, **which appears in the Petróleo Brasileiro S.A. - Petrobras Form 6-K dated February 26, 2014** and the related amendment on Form 6-K/A dated March 10, 2014."  (emphasis added).

consented to the incorporation by reference of its report in Petrobras' Registration Statement filed

on Form F-3:

> We hereby consent to the incorporation by reference in the Registration Statement on Form F-3 (No. 333-183618) of Petróleo Brasileiro S.A. - Petrobras of our report dated February 25, 2014 relating to the financial statements and the effectiveness of internal control over financial reporting, which appears in this Annual Report on Form 20-F.

> /s/ Marcos Donizete Panassol
> Marcos Donizete Panassol Engagement Leader

> PricewaterhouseCoopers Rio de Janeiro - Brazil April 30, 2014

485.    As Petrobras' external auditor, PwC was required to audit the Company's financial

statements and the effectiveness of the Company's internal controls over financial reporting in

accordance with the standards of the PCAOB and GAAS.  The PCAOB, which was established by

the Sarbanes-Oxley Act of 2002, adopted GAAS in April 2003.  The standards adopted by PCAOB

that also have been approved by the SEC are designated with the prefix "AS." Preexisting interim

standards that have been adopted by the PCAOB are designated by the prefix "AU."

486.    GAAS is comprised of ten standards that fall into three basic categories: General

Standards, Fieldwork Standards, and Reporting Standards.  These standards are set forth in AU

§150.01-.02.  Specifically, the General Standards require an auditor to exercise due professional

care in the performance of the audit.  The Standards of Fieldwork provide guidance on audit

planning, proper evaluation of internal controls, and the collection of appropriate evidential matter.

Finally, the Standards of Reporting provide guidance to the auditor on the content of an audit

report.

487.    An audit is a risk-based process during which the auditor should exercise due care.

An auditor should be always aware of the risk of misstatements due to fraud or error, and to the

possibility of illegal acts.  As those risks increase or materialize, auditors are obligated by GAAS

and PCAOB standards to alter their audit procedures accordingly. PwC failed to recognize glaring risks and evidence of illegal acts, and consequently, failed to adjust its audit procedures, leading to an unqualified audit report that was materially false and misleading.

488.    For example, PwC failed to exercise professional care in its audits of Petrobras' financial statements, and thus violated GAAS General Standard No. 3, which requires due professional care to be exercised in the performance of the audit and the preparation of the report, and AU § 230, Due Professional Care in the Performance of Work, which states that "[d]ue professional care imposes a responsibility upon each professional within an independent auditor's organization to observe the standards of field work and reporting."  AU § 230.02.  The duty to exercise due care required PwC to obtain reasonable assurances that the financial statements were free from material misstatement, whether caused by error or fraud.   AU §230.10.  PwC failed to do this.

489.    PwC also failed to exercise sufficient professional skepticism in violation of AU §316.  Specifically, AU § 316 requires the following:

> Due professional care requires the auditor to exercise professional skepticism. Because of the characteristics of fraud, the auditor's exercise of professional skepticism is important when considering the fraud risks.  Professional skepticism is an attitude that includes a questioning mind and a critical assessment of audit evidence. The auditor should conduct the engagement with a mindset that recognizes the possibility that a material misstatement due to fraud could be present, regardless of any past experience with the entity and regardless of the auditor's belief about management's honesty and integrity.  Furthermore, professional skepticism requires an ongoing questioning of whether the information and evidence obtained suggests that a material misstatement due to fraud has occurred. In exercising professional skepticism in gathering and evaluating evidence, the auditor should not be satisfied with less-than-persuasive evidence because of a belief that management is honest.

> AU § 316.13 (internal citations omitted).

490.    AU § 316 therefore required PwC to be continually alert for indications of misstatements of Petrobras' financial statements due to either error or fraud.   The PCAOB

standards require the auditor to approach the audit "with a mindset that recognizes the possibility that a material misstatement due to fraud could be present." AU § 316.13. Due to the presence of multiple red flags about the presence of widespread corruption and bribery at Petrobras, PwC knew or should have known that there was a strong possibility of material misstatements in connection with Petrobras' financial statements for the 2012 and 2013 fiscal years. For example, PwC should have recognized the importance of PP&E to the balance sheet and that the most significant cash outflow was capital expenditures, which in 2012 and 2013 were about four times greater than Petrobras' net income.

491. In failing to perform procedure sufficient to provide a reasonable basis for identifying and assessing the risks of material misstatements, PwC violated AS No. 12.

492. Furthermore, PwC should have been aware that there was a heightened risk in connection with the inflation of construction contracts. As to that point, it was required to perform increased audit procedures compared to those it otherwise performed. For example paragraphs 6 and 9 of AS No. 13, The Auditor's Responses to the Risk of Material Misstatements, state the following:

> The auditor also should determine whether it is necessary to make pervasive changes to the nature, timing, or extent of audit procedures to adequately address the assessed risks of material misstatement. Examples of such pervasive changes include modifying the audit strategy to: (a) increase the substantive testing of the valuation of numerous significant accounts at year end because of significantly deteriorating market conditions, and (b) obtain more persuasive audit evidence from substantive procedures due to the identification of pervasive weaknesses in the company's control environment.

> * * *

> In designing the audit procedures to be performed, the auditor should . . . obtain more persuasive audit evidence the higher the auditor's assessment of risk.

493. AS No. 13.14 provides specific examples of precisely how PwC should have modified its audit procedures to address its assessed risks. In that regard, PwC should have

changed: (a) the nature of audit procedures to obtain evidence that is more reliable or to obtain additional corroborative information; (b) the timing of audit procedures to be closer to the end of the period or to the points during the period in which fraudulent transactions are more likely to occur; and (c) the extent of the procedures applied to obtain more evidence, e.g., by increasing sample sizes or applying computer-assisted audit techniques to all of the items in an account.

494.    In failing to modify its audit procedures, PwC failed to comply with AS No. 13. Had PwC appropriately modified or designed its audit procedures to be responsive to the risk of material misstatement of the Company's financial statements due to misstatements in its PP&E accounts and carried out those procedures with the appropriate degree of professional skepticism, it would have discovered that the Company's capital expenditures, PP&E, and net income all were materially overstated.

495.    PwC's failure to obtain sufficient appropriate evidential matter regarding its audits of capital expenditures, construction in progress accounts, and equipment and other assets accounts also did not comply with PCAOB auditing standards.  For example, PwC violated GAAS Standard of Fieldwork No. 3, which requires sufficient appropriate evidential matter to afford a reasonable basis for: (1) the opinion regarding the financial statements and (2) the opinion regarding internal control over financial reporting.  PwC also violated AS No. 15:  Audit Evidence, which states that "as the risk increases, the amount of evidence that the auditor should obtain also increases. . . . [O]rdinarily more evidence is needed to respond to significant risks." Notwithstanding ample indicators of increased risk of fraud and illegal acts in parts of Petrobras' financial statements, PwC failed to obtain more evidence than it typically would in the absence of increased risk.  For example, the Company made significant capital expenditures, including excessive amounts paid to acquire certain refineries and experiencing significant budget overruns

on large projects.  There were also various news articles reporting the Company's practice of engaging in bribes and kickbacks.  Also, PP&E was by far the largest asset on Petrobras' balance sheets.  At December 31, 2013 and 2012, PP&E represented 70.9% and 62.5% of total assets, respectively.  Furthermore, it is recognized that bribery by international companies is common when there is close interaction between public and private actors.  PwC should have been aware of all of these facts.  And yet, in violation of As No. 12, AS No. 13, AS No. 15 and Standard of Fieldwork No. 3, PwC refused to obtain additional evidence or modify its audit procedures.

496.    The audit procedures that PwC was required to perform include the following: (a) Physically inspecting major additions and verifying claims of ownership; (b) For constructed property and construction in progress, examining appropriate documentation supporting the amount recorded on the Company's balance sheet, such as review of construction contracts, work orders, and job status reports; (c) Verifying that all payment for capital expenditures were properly authorized and including appropriate supporting documentation; (d) Verifying that change orders went through the proper approval process and that the resulting payments were appropriately authorized; (e) Obtaining support for authorization of fixed assets additions by reference to minutes of meetings of the board of directors, capital asset budgets, or other evidence of approval by appropriate personnel; (f) In connection with the assets under construction, examining all of the supporting documentation for large expenditures, and understanding why certain projects were exceeding their original budgeted amounts and why there were large add-on contracts that increased the original plans.  Key items should have been selected that were large, suspicious, unusual, or risk-prone (AS No. 15.25); (g) Examining journal entries and other adjustments for evidence of possible material misstatement due to fraud (AU § 316.58); and (h) Inquiring of

individuals involved in the financial reporting process about inappropriate or unusual activity relating to the processing of journal entries and other adjustments.

497.    PwC also failed to detect illegal acts engaged in by Petrobras employees, including the acceptance of bribes and kickbacks and subsequent overpayment to contractors in violation of the Foreign Corrupt Practices Act ("FCPA").  Thus, PwC violated AU § 317, Illegal Acts by Clients.  In accordance with AU § 317, PwC was required to perform certain additional procedures when it became aware of information concerning a possible illegal act.   In that regard, PwC was required to gain an understanding of the nature of the act, the circumstances in which it occurred, and other information to evaluate that act's effect on the financial statements. If management failed to provide necessary information, PwC was required to consult with Petrobras' legal counsel or other specialists. See AU § 317.10.

498.    In addition, AU § 317 specifies the need for following additional audit procedures, all of which PwC failed to conduct: (a) Examining supporting documents . . . [;] (b) Confirm[ing] significant information concerning the matter . . . [;] (c) Determin[ing] whether the transaction has been properly authorized . . . [; and] (d) Consider[ing] whether other similar transactions or events have occurred, and apply procedures to identify them.  *See* AU 317.11.

499.    PwC also violated GAAS Standards of Reporting Nos. 1 and 4 by falsely representing that Petrobras' financial statements were presented in conformity with IFRS when they were not – as evidenced by the pending write-down of approximately $30 billion of PP&E – and by improperly providing unqualified opinions on Petrobras' financial statements for the years ended December 31, 2012 and 2013, even though its audits were not conducted in accordance with PCAOB auditing standards and the financial statements were not prepared in accordance with IFRS.

500.     Under AS No. 5, PwC was required to complete a careful examination regarding Petrobras' effective controls over financial reporting.  PCOAB's rulemaking in connection with AS No. 5 makes clear that PwC could not simply rely on the assessment of internal controls reached and communicated to it by Petrobras management or third parties, but was instead required to conduct its own independent assessment of internal controls before it could issue a "clean" opinion.   According to AS No. 5: "The auditor is required to provide an independent opinion on the effectiveness of the company's internal control over financial reporting. . . .  The auditor cannot obtain sufficient evidence to support an opinion on the effectiveness of internal controls based solely on observation of or interaction with the company's controls.  Rather, the auditor needs to perform procedures such as inquiry, observation, and inspection of documents, or walkthroughs, which consist of a combination of these procedures, in order to fully understand and identify the likely sources of potential misstatements[.]"   After performing an independent analysis, an independent auditor is not permitted to issue a clean opinion if any "material weaknesses" exist.

501.     Because PwC did not identify, let alone independently test the effectiveness of, any internal control that would have prevented the overstatement of PP&E, discussed above, as required by AS No. 5, PwC's unqualified opinions regarding the effectiveness of Petrobras' system of internal controls were materially false and misleading.

## FOURTH CLAIM FOR RELIEF

### For Violations of Section 11 of the Securities Act Against the Securities Act Defendants

502.     Plaintiff repeats and re-alleges paragraphs 395 – 501, as if fully set forth herein, except that Plaintiff expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as this claim is based solely on claims of strict liability and/or negligence under the Securities Act.

503.    This claim is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. §77k, against the Issuer Defendants, the Underwriter Defendants, the Officer and Director Defendants and the Auditor Defendant.

504.    The 2013 Offering Documents and the 2014 Offering Documents were inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated herein.

505.    Petrobras and PGF are the issuers.  As the issuers of the Notes, Petrobras and PGF are strictly liable to Plaintiff, who purchased pursuant and/or traceable to the 2012 Registration Statement, for the materially untrue statements and omissions alleged herein.

506.    The Officer and Director Defendants were officers and/or directors of Petrobras and signed the 2012 Registration Statement or authorized it to be signed on their behalf and were responsible for the contents and dissemination of the Registration Statement.

507.    The Underwriter Defendants were underwriters of certain of the 2013 Notes Offering and certain of the 2014 Notes Offerings purchased by Plaintiff.  The Underwriter Defendants acted negligently, and are liable to Plaintiff, who purchased certain of the 2013 Notes and certain of the 2014 Notes pursuant to or traceable to the Offering Documents in which each Underwriter Defendant participated.  The Underwriter Defendants owed Plaintiff a duty to make a reasonable and diligent investigation of the statements in the 2012 Registration Statement, as well as any documents referenced or incorporated by reference therein.

508.    PwC, the Auditor Defendant, issued unqualified opinions on Petrobras' financial statements, which were incorporated by reference into the 2013 Notes Offerings and 2014 Notes Offerings.  Contrary to its representations, PwC's audits of those financial statements were not

conducted in accordance with PCAOB standards, and Petrobras' financial condition and results of operations were not presented in conformity with IFRS, as they purported to be.  In issuing unqualified audit opinions and consenting to their incorporation in Petrobras' SEC filings, PwC made false and misleading statements in violation of Section 11 of the Securities Act.

509.    By reasons of the conduct herein alleged, each defendant violated, and/or controlled a person who violated, Section 11 of the Securities Act.

510.    Plaintiff purchased Petrobras securities (*see* paragraphs 15-18 and 400-408) pursuant and/or traceable to the 2013 Offering Documents and the 2014 Offering Documents and sustained damages thereby. The value of Petrobras securities has declined substantially subsequent to and due to defendants' violations.

511.    At the time of its purchases in Petrobras' 2013 and 2014 Offerings, Plaintiff was without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered each of those facts.

512.    This claim was brought within the applicable statute of limitations.

<u>**FIFTH CLAIM FOR RELIEF**</u>

**For Violations of Section 12(a) (2) of the Securities Act**
**Against the Underwriter Defendants**

513.    Plaintiff repeats and re-alleges paragraphs 395 – 501, as if fully set forth herein, except that Plaintiff expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as this claim is based solely on claims of strict liability and/or negligence under the Securities Act.  This claim is brought against the Underwriter Defendants.

514.    The Underwriter Defendants were sellers, offerors, and/or solicitors of purchasers of the 2013 and/or 2014 Notes pursuant to the Offering Documents.  The Offering Documents

contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and failed to disclose material facts. The Underwriter Defendants' actions of solicitation included participating in the preparation and dissemination of the false and misleading Offering Documents.

515.  The Underwriter Defendants owed a duty to Plaintiff, as a purchaser of certain of the 2013 and 2014 Notes, to make a reasonable and diligent investigation of the statements contained in the Offering Documents to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading. The Underwriter Defendants knew of, or in the exercise of reasonable care should have known of, the misstatements and omissions contained in the Offering Documents, as set forth above.

516.  Plaintiff purchased certain of the 2013 and 2014 Notes from the Underwriter Defendants pursuant to the defective Offering Documents. Specifically, Plaintiff purchased (i) Petrobras 5.625% notes due in 2043 (CUSIP 71647NAA7) in the offering from Defendant HSBC Securities as set forth in below; (ii) Petrobras 2.00% notes due in 2016 (CUSIP 71647NAC3) in the offering from Defendant J.P. Morgan as set forth below; (iii) Petrobras 4.375% notes due in 2023 (CUSIP 71647NAF6) in the offering from Defendant Morgan Stanley as set forth below; and (iv) Petrobras 6.25% notes due in 2024 (CUSIP 71647NAM1) from Defendant Citigroup as set forth below. Plaintiff did not know nor in the exercise of reasonable diligence could have known, of the false nature of the statements and omissions contained in the Offering Documents.

517.  By reason of the conduct alleged herein, the Underwriter Defendants violated and/or controlled persons who violated Section 12(a)(2) of the Securities Act. Accordingly,

Plaintiff, who holds certain of the 2013 and 2014 Notes purchased in the Offerings, has the right to rescind its purchases of and recover the consideration paid for these Notes.

518.    Plaintiff hereby offers to tender to the Underwriter Defendants Notes purchased in the Offerings that Plaintiff continues to own, in return for the consideration paid for these Notes, together with interest thereon.  Plaintiff is entitled to and hereby claims rescission damages.

519.    Less than one year has elapsed between the time the facts upon which this claim is based were or could reasonably have been discovered and the time this claim was brought. Less than three years have elapsed between the time that the securities upon which this claim is brought were *bona fide* offered to the public and the time this action was commenced.

## SIXTH CLAIM FOR RELIEF

### For Violations of Section 15 of the Securities Act
### Against the Officer and Director Defendants (Except Helms)

520.    Plaintiff repeats and re-alleges paragraphs 395 – 501 above, as if fully set forth herein, except that Plaintiff expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as this claim is based solely on claims of strict liability and/or negligence under the Securities Act.

521.    This claim is brought by Plaintiff, as a purchaser of certain of the 2013 and 2014 Notes, against the Officer and Director Defendants (except Helms) pursuant to Section 15 of the Securities Act.

522.    As set forth in Plaintiff's Fourth Claim for Relief, Petrobras and PGF are liable pursuant to Section 11 of the Securities Act.  Each of the Officer and Director Defendants named for this Claim was a control person of Petrobras, PifCo, and/or PGF with respect to the Offerings by virtue of such individual's position as a senior executive officer and/or director of Petrobras, PifCo, and/or PGF and had direct and/or indirect business and/or personal relationships with other

directors, officers, and/or major shareholders of Petrobras, PifCo, and/or PGF. By reason of their positions within Petrobras, PifCo, and/or PGF, and/or positions on the Board of Directors of Petrobras, PifCo, and/or PGF, the Officer and Director Defendants named for this Claim had the requisite power to directly or indirectly control or influence the specific corporate policies that resulted in the unlawful acts and conduct alleged in Plaintiff's Fourth Claim for Relief.

523.    Each of the Officer and Director Defendants named for this Claim was a culpable participant in the violations of Section 11 of the Securities Act alleged in Plaintiff's Fourth Claim for Relief above, based on their having signed one or more of the Offering Documents and having otherwise participated in the process that allowed the Offerings to be executed. The Officer and Director Defendants named for this Claim, by virtue of their managerial and/or board positions with Petrobras, PifCo, and/or PGF, controlled Petrobras, PifCo, and/or PGF, as well as the contents of the Offering Documents, at the time of the Offerings. Each of the Officer and Director Defendants named for this Claim was provided with or had unlimited access to copies of the Offering Documents, and had the ability to either prevent their issuance or cause them to be corrected.

524.    As a result, the Officer and Director Defendants named for this Claim are liable pursuant to Section 15 of the Securities Act for the primary violations of Section 11 of the Securities Act by Petrobras and PGF.

525.    By virtue of the foregoing, Plaintiff having purchased or otherwise acquired certain of the 2013 and 2014 Notes pursuant or traceable to the Offering Documents, is entitled to damages against the Officer and Director Defendants named for this Claim.

526.    Less than one year has elapsed between the time Plaintiff discovered or reasonably could have discovered the facts upon which this claim is based and the time this claim was brought.

Less than three years have elapsed between the time that the securities upon which this claim is brought were bona fide offered to the public and the time this action was commenced.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows: awarding rescission and/or damages, including interest; awarding reasonable costs, including attorneys' fees; and such equitable/injunctive relief as the Court may deem proper.

### JURY DEMAND

Plaintiff demands a trial by jury.

DATED: January 29, 2016

**KAPLAN FOX & KILSHEIMER LLP**

By: */s/ Frederic S. Fox* _____

Frederic S. Fox
Donald R. Hall
Hae Sung Nam
Melinda D. Campbell
Matthew P. McCahill
Pamela A. Mayer
Joshua H. Saltzman
850 Third Avenue, 14th Floor
New York, New York 10022
Tel: (212) 687-1980
Fax: (212) 687-7714
Email:  ffox@kaplanfox.com
        dhall@kaplanfox.com
        hnam@kaplanfox.com
        mcampbell@kaplanfox.com
        mmccahill@kaplanfox.com
        pmayer@kaplanfox.com
        jsaltzman@kaplanfox.com

*Counsel for Plaintiff Ohio Public Employees Retirement System*
